IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

Plaintiff,

vs. CRIMINAL ACTION NO. 1:07CR93

MICHAEL L. GORE,

Defendant.

- - -

Testimony had in the Trial of the above styled action on November 28, 2007, at 1:55 p.m., before Honorable Irene M. Keeley, Chief Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE GOVERNMENT: DAVID E. GODWIN, ESQUIRE
Assistant United States Attorney
320 West Pike Street, Suite 300
Clarksburg, West Virginia 26302
304-623-7030

FOR THE DEFENDANT: TRAVIS R. FITZWATER, ESQUIRE
P.O. Box 875
Morgantown, West Virginia 26507
304-296-8510

The Defendant was present in person.

Proceedings recorded by stenomask, transcript produced by official court reporter.

---

# INDEX


| WITNESS (For the Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Rachelle Furby | | | | |
| Jimmy Wegman | | | | |
| William Longwell | | | | |
| Kevin Jensen | | | | |

| EXHIBITS | ADMITTED |
|---|---|
| Government Exhibit 1 | |
| Government Exhibit 2 | |

P R O C E E D I N G S

(11-28-2007, 1:55 o'clock p.m., defendant present)

THE COURT: Alright. Ladies and Gentlemen, that concludes the opening statements in the case. The Government will now present its case in chief. Mr. Godwin, you may call your first witness.

MR. GODWIN: Your Honor, I call Rachelle--

THE COURT: Okay. Ladies and Gentlemen, we want to check to make sure your monitors are on because the Government's going to be using the technology. Let us see if they're turned on.

MR. GODWIN: Rachelle Furby is the witness' name.

THE COURT: Rachelle Furby. Do you have someone who's going to bring her in?

MR. GODWIN: Yeah.

THE COURT: Agent Fox. Okay, thank you. Ladies and Gentlemen, whatever is shown will be on your screens and also on the large screen in the courtroom, okay. Ms. Furby, good afternoon. Would you please approach the Clerk in the black suit standing at the front of the courtroom? She will administer the oath to you before you take the witness stand.

RACHELLE FURBY, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you. You may take the witness stand. The witness is Rachelle Furby, F-u-r-b-y.

THE COURT: Alright, Ms. Furby, good afternoon. Would you please speak in a loud clear voice into the microphone to answer your questions? You may proceed, Mr. Godwin.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Ms. Furby, where do you live?

A. I live in Rosedale, West Virginia.

Q. And how are you employed?

A. I work for the Federal Bureau of Prisons at FCI in Gilmer.

Q. What is your position with the Bureau of Prisons?

A. I'm a correctional officer.

Q. How long have you been a correctional officer?

A. I've been there for two years.

Q. Always at FCI Gilmer?

A. Yes.

Q. What training did you receive as a correctional officer?

A. I was sent to FLETC in Georgia for training for three weeks.

THE COURT: You need to speak into that microphone. It's a little to your left there. You need to move it more directly in front of your mouth. Thank you.

BY MR. GODWIN:

Q. FLETC is the Federal Law Enforcement Training--

A. Training--
Q. --Center?
A. --Center. Yes, sir.
Q. And that’s where various agencies, law enforcement agencies train their officers and their agents?
A. Yes, sir.
Q. So you went through the standard training for a correctional officer for the Bureau of Prisons?
A. Yes, sir.
Q. How long is that training?
A. I was there for three weeks.
Q. What kind of things did they train you on?
A. We do self-defense training.

THE COURT: I’m going to have to stop you again. I’m afraid that the jurors who are at the far end of the courtroom can’t hear you. Move the microphone closer to you. Speak in a loud clear voice. Thank you.

THE WITNESS: We do self-defense training. We have classes on communication skills. We have firearms training. We have just different classes to help us.

BY MR. GODWIN:
Q. Now, are you trained in the procedures of the prison?
A. Yes, sir.
Q. Does that training continue after you--when you actually get to the prison and work?

A. Yes, sir.
Q. Now, were you on duty on July the 8th, 2007?
A. Yes, sir.
Q. And what shift did you work that day?
A. I was working evening shift.
Q. Which begins at what time?
A. At 4 o'clock.
Q. Four to 12?
A. Yes, sir.
Q. And what responsibilities were you assigned on that day?
A. I was the phone monitor.
Q. Phone monitor?
A. Yes, sir.
Q. Tell the jury what a phone monitor does.
A. A phone monitor, we monitor the inmate telephone calls by a computer base program. And our--I was in the control center. We have a computer set up in there that we listen to the phone calls.
Q. Now, you mentioned the control center. What--what is the control center? What part of the prison is that?
A. The control center is the heart of the institution. It's where the doors and stuff are open, and where the radio traffic comes through, and where things are announced.
Q. Now the system has a surveillance camera system, does it not?

A. Yes, sir.
Q. And is--is that--is that system also--can it be monitored from the control room?
A. Yes, sir.
Q. So through the cameras you can also see what’s going on in various parts of the--of the--of the prison?
A. Yes, sir.
Q. Was there an occasion when--when you heard a radio call that caused you to pay attention to the cameras?
A. Yes, sir.
Q. Okay. What--what was just the general nature of the call?
A. Well, I was the phone monitor, and I had taken a brief break, and I was walking around the control center. And there was radio traffic that they were sending an inmate to the operations lieutenant. And at that time, I proceeded to the cameras to put--put the situation on camera.
Q. Why would that report that an inmate was being sent to the operations lieutenant--why would that peak your interest?
A. Because when they--when they radioed across, they--when they said it, they said that there were--there was some kind of issue.
Q. So you went to the cameras and what did you do?
A. I put the camera on the unit that made the call, and I

located--located the inmate and followed him over to where the lieutenant was.
Q. On the camera?
A. Yes, sir.
Q. Now this camera that you're referring to, you had the ability to manipulate it or--
A. Yes. It--
Q. --to zoom in this direction--
A. --it was a mobile camera. Yes, sir.
Q. And you say you located the inmate that you thought it was. How--by what means did you locate an inmate that you took interest in?
A. Well, it was during our mainline, which is our evening--when they go to eat and there was a flow of inmates going back into the housing unit and when the call came, it came from a housing unit, so I located that housing unit and located the inmate walking towards, you know, the operations lieutenant.
Q. Okay. So most of the traffic was in the other direction?
A. Yes, sir.
Q. Now did you know the inmate that you--that you noticed walking towards the operations?
A. Once we got the camera on and I did locate an inmate walking in the--towards the operations lieutenant's office,

I did recognize.
Q. Who did you recognize it to be?
A. Inmate Gore.
Q. Now you nodded with your head. Are you referring to the person who's here as the defendant today?
A. Yes, sir.
Q. How did you know him?
A. I'd worked in his housing unit for several months.
Q. So you knew him personally I mean as him being an inmate in the unit that you supervised prior to this?
A. Yes, sir.
Q. Okay. And what did you continue to do after that point?
A. Well, I just kept the camera on the situation the whole--the whole time, I just kept the--
Q. That was your role?
A. Yes, sir.
Q. You stayed in the control center and didn't go out on the yard, is that right?
A. No, I did not.
Q. Now, the--we're talking about the yard. This occurred outside?
A. Yes.
Q. Okay. Now I want to--I'm going to go ahead and hand to you--
MR. GODWIN: Your Honor, may I--

THE COURT: You may approach.
MR. GODWIN: --approach?
MR. GODWIN:
Q. I hand to you what's been marked as Government Exhibit Number 2 and ask you if you recognize that?
A. Yes, sir.
Q. And what is that?
A. This is our facility.
Q. Pardon?
A. This is our facility.
Q. That's FCI Gilmer?
A. Yes, sir.
Q. It's a schematic or drawing apparently done by an engineer at some point?
A. Yes, sir.
Q. Okay, now it has indications on it like H1, H2. Those aren't the actual ones that are used by the facility, is that right?
A. No, they're not.
Q. Okay. So those are some kind of engineering--
A. Yes.
Q. But the drawing itself shows the buildings and the yard and the location of the different parts of the prison, is that correct?
A. Yes, sir.

Q. And to your--in your opinion, does that accurately reflect what FCI Gilmer would look like if you were looking down upon it?
A. Yes.
MR. GODWIN: Your Honor, I move the admission of Government Exhibit 2.
THE COURT: Any objection to the admission of Government Exhibit 2?
MR. FITZWATER: No objection, Your Honor.
THE COURT: Government Exhibit 2 is admitted and may be published to the jury whenever appropriate.
(Government Exhibit Number 2 admitted)
BY MR. GODWIN:
Q. I think while I'm here, I'll go ahead and ask you about Government Exhibit 1. Now did I meet with you about two weeks ago?
A. Yes, you did, sir.
Q. And did I bring a disk to you to review?
A. Yes, sir.
Q. And is that the very same disk that I brought to you?
A. Yes, it is.
Q. And how do you know it's the same disk?
A. Because I initialed and dated the disk that day.
Q. As RF--
A. 1/15 of '07.

Q. 1 or 11?
A. Eleven, I'm sorry.
Q. 11/15 of '07?
A. Yes, sir.
Q. So on the 15th, you reviewed that file?
A. Yes.
Q. What is on that disk?
A. It is the recording of the incident that occurred.
Q. Now there are--there was recordings made and preserved from two different camera angles. Did you watch both of those camera angles?
A. That day, I did, yes.
Q. And--and did--does what's on that disk, the video recording, does it accurately depict what you saw occurring in that yard that day--
A. Yes, sir.
Q. --from the two different camera angles?
A. Yes.
MR. GODWIN: Your Honor, I move the admission of Government's Exhibit 1.
THE COURT: Any objection?
MR. FITZWATER: No objection, Your Honor.
THE COURT: Government Exhibit 1 is admitted.
(Government Exhibit Number 1 admitted.)
MR. GODWIN: With the Court's permission, I'd like

to put--to publish these by means of projection. The--the schematic has been scanned in and the live files, they both have been loaded onto the hard disk of this laptop and I'd like to project them like that.

THE COURT: You may. Let's take down the lights. We're going to go through all of it now?

MR. GODWIN: Yes. We're going to--

BY MR. GODWIN:

Q. First--first of all, let's look at Government Exhibit Number 2. Can you see my arrow up here?

A. Yes, I can.

Q. Okay. I'd like for you to--so that you could help orient us to what this--what the different parts of the facility are. Where you were. Where the cameras were. Where this action took place. Okay?

A. Okay.

Q. Now, this--this part up here--actually the engineer said it was A0. What--what part of the prison is this?

A. That's a front lobby. Our front entrance where human resources and the business office and--

Q. So if you come in from the public area, up the road, then is this right here where the front door would be to the prison?

A. Yes, sir.

Q. Okay. Now, what--what exists between this area of the

prison and this area of the prison?
A. Where again?
Q. Right here.
A. That's the control center.
Q. Okay. Now, is that where they have what they call the sally-port?
A. Yes, sir.
Q. You have to be admitted into it and you have to be permitted out?
A. Yes, sir.
Q. It's a means by which you can control who--who goes into the secured part of the prison and who doesn't?
A. Yes.
Q. Okay. So where were you located?
A. I was in the control center that day.
Q. Here?
A. Yes.
Q. Where the arrow is?
A. Yes.
Q. Okay. Now, along here is kind of a long wall, then here's a building, and another building, and out here's these odd shape buildings, and this building. Now, this kind of looks like a window or what is this part?
A. That's our compound. That's where they--that's where they--they walk to get to the different buildings.

Q. Now these arrows, some of them are grass and then some--are these walkways concreted?
A. Yes, sir.
Q. What--what is this big main part of the building here?
A. On the right hand side is our lieutenant's office.
Q. Is that what I'm pointing--
A. Yes.
Q. --to here?
A. Yes.
Q. Okay.
A. And then we have medical, our inmate services, and--
Q. So that includes all of this--
A. All of that right side and our special housing unit is also on that side.
Q. Is that this part that kind of looks like an airport terminal?
A. Yes, sir.
Q. And what is the purpose of the special--special housing unit?
A. Our special unit is where we house inmates that have--have broken the policies and rules in the handbook.
Q. So it's--it's a--it's a place where they are more restrictive--
A. Yes.
Q. --incarceration rules and facilities?

A. Yes, sir.
Q. Is there a nickname for it?
A. The SHU.
Q. The SHU?
A. The special--uh-huh.
Q. Do the inmates also call it the hole?
A. The hole, yes.
Q. What is this facility?
A. That’s our rec department. That’s our gym.
Q. And is there a recreation section here?
A. Yes.
Q. Now this says ball field. There’s no actual ball field showing, but are there actually facilities here for playing various kinds of ballgames?
A. Yes.
Q. Now let’s go back across, you took us here, starting with this section and kind of through here. What--what’s on this side of--
A. The other side is our associate warden complex, our education department, and our religious services, our VT, which is vocational training.
Q. This says Unicor, I believe.
A. Unicor is down there.
Q. That’s a--Unicor is like a prison’s industries?
A. Yes.

Q. Where inmates actually work and something is produced?
A. Yes.
Q. It's in front of--it's kind of a double entry room. Is this--and this is actually a facility there?
A. Yes. There's actually a building and in the back of the facility they have--they have a place where they store--because they build trucks so they actually have a place that they store parts in stock. It's just a wire gated--
Q. They build trucks?
A. Yes, sir.
Q. For the Government?
A. Yes.
Q. Is this part you're talking about that's behind it?
A. No. No, that's actually--that's actually our barber shop, our commissary, it's actually--
Q. Where's that warehouse part?
A. It's back--it's behind the Unicor facility.
Q. This way?
A. Yeah, like right in there.
Q. All right, so this is the barbershop, etcetera. What is this part of the facility right here?
A. That's our food service.
Q. So these little markings are actually indications of tables where they eat?
A. Yes, sir.

Q. Now what are these odd shaped structures back here?
A. Those are housing units. That's where the--mostly inmate housing.
Q. How are they designated in terms of names or what are they called?
A. The first one is Alpha unit.
Q. This is it?
A. Yes, sir.
Q. Alpha being a word that means A?
A. Yes, sir.
Q. Is there more than one unit in the Alpha unit?
A. There's four--four units.
Q. Okay. How are they organized?
A. Alpha 1 is the lower left hand unit.
Q. On the side I have the arrow by?
A. Yes, sir. And it--
Q. The bottom is one. Okay.
A. The top left side is 3.
Q. Three. Over here?
A. Two and four.
Q. Two and four. And what are these indications here? What is actually there?
A. The inner--these are our inner stairwells of going from the top to bottom and the outer ones are emergency stairs.
Q. Okay. So what is this called?

A. That's Bravo unit or B unit.
Q. Okay. So is it designated the same way, bottom is 1, 2, top is 3 and 4--
A. Yes, sir.
Q. --going left to right? And this--this would be Charlie Unit?
A. Yes, sir.
Q. C?
A. Yes, sir.
Q. The same as four units--
A. Yes.
Q. Four--C 1, 2, 3, 4?
A. Yes, sir.
Q. So are these--there's actually 12 units contained in these different buildings, buildings and constructions. Is that the normal housing for inmates?
A. Yes, sir.
Q. So the inmates would normally live over here, if they were just out in the population of the prison, is that right? I'm sorry. I'm not paying--
A. That--that is the housing.
Q. Yeah. And then this would be the--is this the only other housing unit in the prison?
A. That is our only other housing unit, yes.
Q. And the special housing unit. Okay, now, you've seen

the two video close ups, which we're going to show here in a minute, while we're on this I'd like you to point us to where the cameras were. Now, the first one looks out over the yard from a distance and you see the lieutenant and the shack and all that from a distance. Do you recall that?
A. Yes, sir.
Q. Where was that at?
A. That camera was located on C Unit right there in the corner.
Q. Right here where I'm pointing?
A. Yes, sir.
Q. And it's looking out across this yard, is that right?
A. Yes, sir.
Q. Now where is this shack that we were talking about?
A. Okay, that square right there? It's right in front there. Right there in that area.
Q. Right here where the arrow is?
A. Yes, sir.
Q. Okay. Now when we see this video from this angle--this--the way we have the C Unit, there's also another little building that's apparent. I believe you can see that it's right here on the sidewalk. Are you familiar with that?
A. Yes. It's our--the recreation shakedown room where they go through the medical detectors before they go on to the rec yard.

Q. So they're out here in this--this open yard compound, going over here to this fenced in rec part, they go through that to make sure they don't have any metal on them?
A. Yes, sir.
Q. Okay. Now the other video, the second one we're going to look at, is the other--the other one is the one that you actually manipulated, is that right?
A. Yes, sir.
Q. Now where was that camera?
A. That camera was on top of the AW Complex.
Q. AW, and that's associate warden?
A. Yes, sir.
Q. And that's here in this area?
A. Right. Right on that--on the corner of that building.
Q. This corner?
A. Yes, sir.
Q. So right here by the lieutenant--the lieutenant's office is here, right?
A. Right.
Q. And this smoke shack is right here?
A. Yes, sir.
Q. And this camera is looking over the yard, is that right?
A. Yes, sir.
Q. Now when we first look at it, it's looking over this way, so what is it depicting? Well, I'll tell you what.

We'll get into it and I'll ask you when you can actually see it. For the purpose of this one that you identified was from Building C. Now this area here, indicated with the cursor, what area is that?
A. That's our outside rec.
Q. So this is recreation for games and whatever? These tables?
A. Yes, sir.
Q. And is this the shake down shack we mentioned you'd have to go through a metal detector before you go from one section to the other?
A. Yes, sir.
Q. Now what is this right here?
A. That is the shake down shack outside of the lieutenant's office.
Q. So is that called smoke shack?
A. Smoke shack, shake down shack.
Q. Now is--this is the building where the associate warden is there, the lieutenant's here, and the SHU is down here where my arrow would be off the screen, is that right?
A. Yes, sir.
Q. So the lieutenant's office is right here where the arrow is?
A. Yes.
Q. And then the dining hall would be over here where the

arrow is off the screen?
A. Yes, sir.
Q. The housing units would be back around this side and then that leads back to where we are because the camera itself is on the other housing unit, is that right?
A. Yes, sir.
Q. Okay, now, this person right here that just walked up from that, do you know who that was?
A. Yes, that was the operation lieutenant, Jensen.
Q. And do you know who this was?
A. Yes, that's Inmate Gore.
Q. Now there's a line here. Do you see that?
A. Yes, sir.
Q. Is there a significance to that line?
A. It's red line. There shouldn't be any inmate traffic unless they were told to go into that area.
Q. So while inmates can walk along this path, this sidewalk where I'm indicating with the arrow, you cannot cross that line without being instructed to do it?
A. Yes, sir.
Q. Now again this is not the camera you manipulated, is that right?
A. No, it is not.
Q. It remained in this distant setting throughout the time of these events?

A. Yes, sir.
Q. Now, did you have any ability to hear what these people were saying?
A. No, I did not.
Q. The system doesn't allow you do that, right?
A. No.
Q. Do you know who that is where I'm indicating that person's crossed the red line?
A. That is Officer Feathers.
Q. Now we have Officer Feathers, the defendant Mr. Gore, and Lieutenant Jensen?
A. Yes, sir.
Q. Now these men who are walking, do you know who they are?
A. I don't know who they are.
Q. You don't know their names?
A. By--by looking at this, I can't tell you who they are.
Q. Are they officers?
A. Yes, sir.
Q. And this is the point which there was distress and the officers are returning--
A. Responding.
Q. Are responding to this call to see if they need help?
A. Yes, sir.
Q. Now you watched this video in its entirety, does it continue and end with the--with the depiction of what was

occurring on--on the yard at that time?

A. Yes, sir.

Q. Let’s watch that in real time for 31 seconds and then we’ll continue with the last four minutes. Was there inmates leaving the yard?

A. Yes, sir.

Q. Okay. Now it appears as though these men that are over here keep moving in this direction.

MR. GODWIN: Your Honor, in the interest of time, I’m going to accelerate part of it. She’s testified about the entire picture and the jury will have the ability to watch this part if it chooses as part of the evidence. Now I’m advancing here for another two minutes and the men are gone from the scene. These are the men here?

A. Yes, sir.

Q. Heading toward--back to the area of the SHU, is that right?

A. Yes.

Q. 5 minutes and 45 seconds. That shows the interested inmates, a secure yard and the men are out of the scene and right at the end--there’s a little bit at the end, is that correct?

A. Yes, sir.

Q. This is the one we just looked at which is from a distance. Instead of the other one, this is the video from

the camera that you said that was on the associate warden's part of the building and that you were able to manipulate, is that right?
A. Yes, sir.
Q. Now this is where I'll get back to the question I was asking before. What is this part of the facility right here we're looking at?
A. That's our food service department.
Q. Okay. So this camera is looking from the associate warden's--it's sort of looking off to the left side of this compound here?
A. Yes, sir.
Q. And what is this right here?
A. That Alpha Unit 1 and 2.
Q. The back facilities here and the housing units are across here, is that right?
A. Yes, sir.
Q. Okay, now this is where you've taken control of the camera?
A. Yes, sir.
Q. Now what are you showing here? Which is this--what structure is this?
A. That's Bravo Unit.
Q. And is this the rear--this is the little shack we call the smoke shack?

A. Yes, sir.
Q. And now what do you--what are you homing in on here? Who is this?
A. That's Inmate Gore.
Q. Do you know--do you know who is over here or what's going on?
A. Officer Wegman and Officer Longwell.
Q. That's the area from where you understood the call came?
A. Yes, sir.
Q. Where I have the arrow here?
A. Yes.
Q. And is this about where you were recognizing Mr. Gore?
A. Yes.
Q. This area right here, is that one of the stairwells that we saw on the drawing that's along the housing units?
A. Yes, sir.
Q. It's one of the exterior stairwells?
A. Yes.
Q. Who uses--who uses those?
A. The officers and the inmates.
Q. Anybody can use them if they're authorized to be there?
A. Yes, sir.
Q. Now the call that drew your attention was the call from Longwell that the inmate was going to the lieutenant?
A. Yes, sir.

Q. That would've occurred at the time you first went in by the cameras--
A. Yes, sir.
Q. --or right about that? So this is after the call?
A. Yes.
Q. Now you're manipulating the camera again. Now who is this man?
A. That's Lieutenant Jensen.
Q. And this is the defendant?
A. Yes, sir.
Q. This is the conversation you could see from a far distance where they stood there for over a minute talking to each other?
A. Yes, sir.
Q. Now who is this person?
A. That's Officer Feathers.
Q. Now did you hear that call where the Lieutenant just put in another call?
A. Yes.
Q. So these are the officers we saw running across the yard in the other video, in that period in the close up here, is that right?
A. Yes, sir.
Q. Is this that red line we were talking about?
A. Yes, sir.

Q. It's shine--that shiny area there. Now this is the--they're escorting him down here toward the area of the SHU, is that right?

A. Yes, sir.

Q. See the tail end of that, is that right?

A. Yes, sir.

Q. This is a close up down closer to the SHU?

A. Yes, sir.

Q. Now we're at 7 minutes and 15 seconds of this particular video. The events are pretty much over at this point, is that right?

A. Yes, sir.

Q. And it continues. I think we got about another 20 seconds or so. Right after 8 minutes, it shows them leaving the area.

MR. GODWIN: Thank you. That's all the questions I have.

THE COURT: All right. Mr. Fitzwater.

MR. FITZWATER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. FITZWATER:

Q. Good afternoon, Ms. Furby. My name is Travis Fitzwater and I represent Mr. Gore in this case. I'm going to ask you some questions to follow up on the things that you just testified to here in response to the questions Mr. Godwin

was asking you. The first question that I have for you, you pointed out a red line on the video and I believe you testified that inmates were not supposed to cross that red line, is that correct?

A. Yes, sir.

Q. Now are inmates ever directed to cross that red line?

A. Yes, sir.

Q. When you first knew to pay attention to the video, could you tell me again what it was that brought your attention to the video?

A. There was a call from Officer Longwell that stated they were sending an inmate to the operations lieutenant.

Q. In order for Mr. Gore to make it over to where the operations lieutenant's office is, he has to cross that red line, is that correct?

A. Yes, sir.

Q. Okay. You also testified a bit ago that you underwent some training at the Federal Law Enforcement Training Center, is that correct?

A. Yes, sir.

Q. And also that you had been at FCI Gilmer for approximately two years at about the time this incident occurred?

A. No, I--I was there about a year and seven, eight months. I've just hit my two year mark.

Q. Oh, just recently.

A. Yes.

Q. Okay, I'm sorry. I think--

A. Sorry.

Q. I think I just misunderstood. But you had been there for quite awhile--long enough to know about the procedures and so on that govern what happens in the facility, correct?

A. Yes, sir.

Q. Okay. When you saw Officer Feathers take a step towards Mr. Gore to grab him from behind, did you recognize--at that time were you able to determine what was going on?

A. No, sir. At the time when I was running the camera, I was having to move it from one point to the other so that initial--I wasn't really focused on that initial point of the video because I was trying to manipulate it to keep it with the movement.

Q. Okay. Having just seen the video today, were you able, as you watched it today, to make a determination in your mind as to why Mr. Feathers grabbed Mr. Gore from behind?

MR. GODWIN: I object.

THE COURT: Sustained.

MR. FITZWATER: May I lay a foundation, Your Honor, or--

THE COURT: It's speculation.

BY MR. FITZWATER:

Q. I don't have very many questions for you, Ms. Furby. If you'd just bear with me for a moment, I'm going to check my notes.

(Pause)

BY MR. FITZWATER:

Q. Did you review this video with anyone other than--you testified you reviewed it with Mr. Godwin, the United States Attorney, but other than that have you reviewed this video with anyone prior to reviewing it today?

A. Only--only with him, sir. I didn't review it prior to his visit.

Q. Have you taped any other incidents such as this while you've been in the operations center at the facility at Gilmer?

A. I mean I haven't taped any incidences such as this but I mean I--when I'm in control I make sure I keep an eye on the mainline and things like that, but.

Q. Have you witnessed other incidences where inmates have had to be restrained?

A. Not by video, no, sir.

Q. How about in person?

A. Yes, sir.

Q. Approximately how many times have you witnessed an inmate who had to be restrained?

A. Only a couple.

Q. Based upon your training, is there a set procedure that is supposed to be followed by a corrections officer when they deem that they have to restrain an inmate?
A. Yes, sir.
Q. Are you able to tell me briefly what that procedure entails?
A. Well, I mean you just--you have to secure the surroundings of course for the inmate and I mean you restrain them. I'm not sure what you're asking me to explain.
Q. Let me ask you specifically, were you trained--were you yourself trained in the methods that should be used to restrain an officer when you went through your training?
A. Yes, sir, we were--
Q. I misspoke. I'm sorry. I said--I said restrain an officer and I should've said restrain an inmate. I apologize for that.
A. We were taught to place--to put hand restraints and as far as handcuffs and shackles on.
Q. Was there any instruction--when you underwent your training, was there any training which required or suggested that you issue some sort of verbal announcement before you initiated a physical contact with an inmate who needs to be restrained?
A. I mean situation--I mean the situations where we were

taught, I mean of course you're supposed to give a verbal warning but it depends on what the level of aggression or the level of what the situation is as to--

Q. And that would be a judgment call that the officer would have to make--

A. Yes, sir.

Q. --in whatever the situation is?

A. Yes, sir.

Q. That's correct? Okay.

MR. FITZWATER: I have no further questions, Your Honor.

THE COURT: Is there any redirect?

MR. GODWIN: No, Your Honor.

THE COURT: All right, thank you, Ms. Furby. You may step down. You're excused as a witness.

(Witness excused)

THE COURT: The Government may call its next witness.

MR. GODWIN: Call Jimmy Wegman.

THE COURT: All right, Jimmy Wegman. Mr. Wegman, please approach the Clerk here in the front of the courtroom. She will administer the oath to you before you take the witness stand.

JIMMY WEGMAN, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you. You may take the witness

stand. The witness is Jimmy Wegman, W-e-g-m-a-n.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Mr. Wegman, where do you live?

A. I live in Randolph County.

Q. Okay. And how are you employed?

A. I work with BOP.

THE COURT: All right, Mr. Wegman, I'm going to ask you to speak in a loud, clear voice directly into the microphone and you can move it closer to you, sir. We need to make sure that all of the jurors can hear you.

THE WITNESS: Yes, ma'am.

BY MR. GODWIN:

Q. You said you were employed how?

A. Through the Gilmer County Federal Prison.

Q. FCI Gilmer?

A. Yes, sir.

Q. You work for the Bureau of Prisons?

A. Yes, sir.

Q. What is your position with the Bureau of Prisons?

A. Correctional officer, sir.

Q. And how long have you been a correctional officer?

A. Through BOP or entirely?

Q. Let's start with BOP.

A. Around nine months.

Q. Okay. You received their training?
A. Yes, sir.
Q. Okay. And that was the training at FLETC?
A. Yes, sir.
Q. Now you have prior experience in either corrections or law enforcement?
A. Yes, sir.
Q. What was that experience?
A. I worked for the State of West Virginia as a correctional officer also.
Q. Where was that?
A. Huttonsville Correctional Center.
Q. And how long did you work there?
A. Approximately three years.
Q. And you received the state's training to be a correctional officer?
A. Yes, sir.
Q. And do you have any other law enforcement experience?
A. No, sir.
Q. Now were you working at FCI Gilmer on July 8th, 2007?
A. Yes, sir.
Q. And what--what shift were you working that day?
A. Evening watch.
Q. That's four to twelve shift?
A. Yes, sir.

Q. And what duties were you assigned that day?
A. I was working in the housing unit, Bravo 3.
Q. Okay. Let me draw your attention to around--right around the dinner hour. Did you have an occasion to meet up with the defendant here, Mr. Gore?
A. Yes, sir.
Q. Did you know Mr. Gore when you first saw him on that evening?
A. No, sir.
Q. You didn't know who he was or what his name was or where he lived?
A. No, sir, I didn't.
Q. Okay. Well, what were you doing when you first--first came into contact with the defendant?
A. Random pat down searches.
Q. Okay. Tell us--tell us what the random pat down searches are? Why are they being done and why did you do them? How did you do them?
A. Okay. A random pat down search is you stand outside your housing unit and you--you pat down inmates as they come to you and make sure they don't have contraband on them, you know, weapons or food and things of that sort.
Q. Is it particularly done at the dinner time?
A. Yes.
Q. Why is that?

A. Well they bring it back at chow times. We do it at pretty much every meal.
Q. Sometimes inmates will attempt to take food out of the chow hall that they're not allowed to?
A. Yes, sir.
Q. Okay. And you called it random. What did you mean by that?
A. Well, you just--just pick--you don't specify on one person. You pick a person. You pat them down and then so forth and so on. You pick another person that's coming through and pat them down.
Q. So whoever's next around there, you call them over and do it?
A. Yes, sir.
Q. Now why--why do you do these pat downs? Was it your idea?
A. No, sir. It's actually the rule at the prison.
Q. The rule at the prison?
A. Yes, sir.
Q. You're directed to do it?
A. Yes, sir.
Q. So you're--you're responsible for this? It's your obligation to do it?
A. Yes, sir, we are.
Q. Now tell us--was there anything in particular going on

at the time that you were aware of at the time that Mr. Gore approached you?

A. No, sir.

Q. It was a--it appeared to be a quiet and peaceful setting with people coming and going?

A. Pretty much as normal, yes, sir.

Q. Okay. Well tell us what--what occurred as he approached you. What--what you said and what he said?

A. Well, as he approached me, first of all, I asked him to step over. I wanted--I needed to perform a pat down search on you. And I started--he turned around. He had his shirt in his hand and I started to perform my pat down search on him. And he seemed to be real tense, shaking, just real flexed up. And I asked--I asked him if he was okay, if everything was all right, and he didn't answer me.

And so after I patted him down, I asked him to see his shirt. I looked at his shirt and I advised him--I said are you okay? And he didn't answer me again. And I said what's your name? And he didn't--didn't tell me his name. I asked him a couple times and then I told him I said are you okay and I need you respond to me so I'll know you're okay and everything's fine. And he said I don't need to respond to anything you ask me. I said what's your name? And he told me his name. And I said you need to calm down. I said because you're going to go to the lieutenant's office. And

he started cursing at me.
Q. Did he have identification on him?
A. I can't recall. I asked him for ID and he didn't give it to me.
Q. He's required to have identification on him, isn't he?
A. Yes, sir, at all times.
Q. Okay. And you say you had to ask him several times before he would even tell you his name?
A. Yes, sir.
Q. Now when it generated into him cursing at you--first of all, let me ask you, did you use any abusive language toward him?
A. No, sir.
Q. Was there a point where he accused you of it?
A. Yes, sir, he did. He accused me--he didn't say--he said, what did you call me? I said I didn't call you anything. And--and I said I apologize if you feel I did but you're going to have to calm down or you're going to go to the lieutenant's office. Well, then that's--he started getting mad then and started saying stuff to me.
Q. What was your purpose in all of this--in this encounter with him? What were you trying to accomplish?
A. Just to do a pat down search. That was pretty much it because we usually do them every shift or every, you know.
Q. Is it your responsibility if you think that there's

some--some problem with the inmate to inquire into that?

A. Yes, sir. Yes, if he--if he doesn't respond, there's a lot of things that could be wrong with him. It could be--I'm just, you know, speculating, but he could be mental or he could have--have some kind of problem that we don't know of.

Q. Okay. So do you recall anything that you said that--that--excuse me--that he said at the point where you said he began using profane language? What kind of things was he saying to you? Did he call you names or was he saying what he was going to do, just what was the nature of it?

A. Do you want me to say the words or?

Q. Yeah, I think you need to tell--

A. Okay, he said--

Q. --what you recall.

A. Yes, sir.

Q. If you recall the words he used.

A. Fuck you. You're fucking nothing. And he just, you know, pretty much cussed like that.

Q. Did he ever call you any other names?

A. No, sir.

Q. How did this end, this--this which started out with a pat down and asking him how he was and what his name was, now he's yelling at you. What--how did that end?

A. I advised him to go to the lieutenant's office.

Q. Okay. And how long did--did this take from where you start the pat down to where he's being told to go to the lieutenant's office?

A. I'm not exactly sure how long. It just seemed like it didn't take but just a couple minutes actually.

Q. Now why would you send him to the lieutenant's office? Was that your idea?

A. Well, you know, he was just getting out of control. I mean whenever he starts being verbal towards you and calling me names and things like that, I thought it would be better if he went to talk to the lieutenant to see if everything was okay and what was wrong with him.

Q. Was that what you felt you were supposed to do at that point?

A. Yes, sir.

Q. Now who is the lieutenant? I mean--and I don't mean Lieutenant Jensen, but I mean the position of lieutenant on that shift. What--what position is that?

A. Well, he has control of the shift and of his officers. He would determine what was, you know, what was the matter and determine if he deserved the SHU or not.

Q. Is it his--would it be his responsibility to assist you in handling potential disciplinary problems?

A. Yes, sir.

Q. Now what did Mr. Gore do after you told him to go see

the lieutenant?
A. Well he stood there for a second and he eyeballed me, you know, it looked like he was going to jump on me actually and then he just--he just turned and went to--toward the lieutenant’s office.
Q. Could you--how would you describe his demeanor? Can you describe it any other than the way you just did?
A. He was mad. He appeared to be mad.
Q. Okay. Now where was Officer Longwell when this was occurring?
A. He was beside of me.
Q. So was he within--within distance to hear what was being said?
A. Yes, sir.
Q. Okay. Now was a call made to the lieutenant to forewarn the lieutenant of this problem?
A. Yes, sir. Officer Longwell called the lieutenant.
Q. Mr. Longwell made that call?
A. Yes, advising that we were sending an inmate over.
Q. Now after you sent Mr. Gore--
THE COURT: Mr. Godwin, excuse me, I know one of our jurors is having a problem right now. I think what we ought to do is take our mid afternoon recess and that will help her and then we can come back and resume. Okay. Ladies and Gentlemen, it’s ten till three. I’d ask that you

be prepared to return, assuming Juror Number 2 is able to, at 3 o'clock. All right. Thank you very much. Would you please follow my admonition. You can't discuss the case among yourselves during the recess.

(Jury out at 2:50 p.m.)

THE COURT: Officer Wegman, you remain on direct examination and you'll be returning to the stand. Please step down and you can resume the stand when we return.

THE WITNESS: Yes, ma'am.

THE COURT: Any problems with the technology?

MR. GODWIN: No, Your Honor.

THE COURT: Okay, very good. Then this Court stands in recess for ten minutes. Thank you.

(Recess from 2:51 p.m., until 3:05 p.m., 11-28-2007)

THE COURT: Okay, thank you. Please be seated. I understand that the juror's fine and that we can resume. Would Mr. Wegman please return to the stand?

(Jury in at 3:07 p.m.)

THE COURT: Welcome back, Ladies and Gentlemen. You'll recall that Mr. Wegman is on the stand on direct examination. Mr. Godwin may now resume his direct examination.

BY MR. GODWIN:

Q. After--after you instructed Mr. Gore to go see the lieutenant, Mr. Longwell made the call by radio to the

lieutenant's office, what did you do at that point?
A. Well, I went to the--I started up my stairs toward my housing unit. I was going to call the lieutenant and let him know that the individual was mad or appeared to be mad. But before I got up the steps, I looked over and you can see across the compound to the lieutenant's office, the lieutenant had already come out of his office.
Q. Why would you be concerned that the lieutenant know that he's mad?
A. To give him a heads up kind of because the individual seemed pretty irate, you know, and I was concerned for his safety actually.
Q. Concerned for whose safety?
A. The lieutenant's.
Q. What--corrections officers here in the prison setting, are--do you have any weapons upon you?
A. No, sir.
Q. None at all?
A. No, sir.
Q. So none of the correctional officers, including the lieutenant, would have any weapons on the prison grounds?
A. What kind of weapons, sir?
Q. I mean you don't--none of the officers, including the lieutenant, would walk around with a weapon on them, is that right?

A. No, sir.
Q. And that's the standard procedure for officer and inmate safety, is that correct?
A. Yes, sir.
Q. Okay, when you saw that the lieutenant was already out and you came back down, what did you do next?
A. Well, at that point the housing unit below Bravo 3 was Bravo 1, he was coming out of his unit and we walked to the curb and that was about it.
Q. Was there any time when you went over to where the lieutenant was?
A. Yes, sir.
Q. What caused you to go over there?
A. There was a scuffle. They were scuffling with the inmate and it appeared that they were having a time getting him down and at that point we took off running.
Q. And when you got there what did you do at the scene?
A. I secured the area. There was enough people on him. I didn't--I figured that he didn't need anybody else on him. They had him subdued. I secured the area and made sure that the rest of the inmates moved away and moved back to their housing units.
Q. I want to show you a portion of what's been admitted as Government's Exhibit 2--1, excuse me, a video. Now do you recognize this scene? Well, let me--let me help you out

there. Okay. Do you recognize that scene?
A. Yes, sir.
Q. What is that?
A. It's Mr. Gore coming across the compound right there.
Q. This person?
A. Yes, sir.
Q. Where are you?
A. I'm back to the curb and I'm walking toward my unit.
Q. Is this you?
A. Yes, sir.
Q. Who is this?
A. That's Officer Longwell.
Q. Okay, now what are you doing at this point?
A. I'm going--I'm headed up toward my steps so I could call the lieutenant.
Q. So this is you going up the steps?
A. Yes, sir.
Q. Is that you coming back down?
A. Yes, sir.
Q. So at this point you've looked out across this scene and saw that the lieutenant's already outside?
A. Yes, sir.
Q. Now you mentioned another officer. Is that this person here?
A. Yes, sir.

Q. And this is you?
A. Yes, sir.
Q. And is this still--this is Officer Longwell?
A. Yes, sir.
Q. Let's advance it about a minute. Okay. This is what you referred to as a scuffle.
A. Yes, sir. It's a little farther into it there.
Q. Do you recognize yourself here?
A. Yes, sir. I believe I'm the--right there. The guy right there, yes, sir.
Q. This person?
A. Yes, sir.
Q. Okay. These are the men you said that got him subdued?
A. Yes, sir. At that point, I was trying to find cuffs. They--they told me they had them.
Q. Now why are you shaking your arm like that?
A. I'm telling the inmates to go, go back to the housing units because they appeared to be right there by the out of bounds sign.
Q. And did you--you left the area for the purpose of securing the compound then?
A. Yes, sir.
Q. And was that pretty much your involvement in this incident?
A. Yes, sir.

MR. GODWIN: I have no other questions, Your Honor.
THE COURT: All right. Is there cross-examination?
MR. FITZWATER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. FITZWATER:
Q. Officer Wegman, my name is Travis Fitzwater and I represent Mr. Gore in this case. And I'm going to ask you a few questions to follow up on the testimony that you just gave.
A. Yes, sir.
Q. I believe you testified that during the pat down you noticed that Mr. Gore's muscles were flexed, is that correct?
A. Yeah, they appeared to be flexed.
Q. And what is the--we don't have the benefit on this video of seeing the part of this afternoon which involved you doing the pat down of Mr. Gore, so I'm going to ask you just to describe it a little bit, how you conduct the pat down and what is an inmate required to do during that process if you could please?
A. Okay. I had advised him I was going to give him a pat down. He turns his back toward me, puts his hands out. I don't advise them to do it. That's just what--that's how you do a pat down search. You start patting them down at the top. You start patting the top part and their chest and

their arms. And then you start down their--their--towards their trunk and then you pat down the legs, and looking at the ankles and pants legs.

Q. When you said that you noticed that it appeared that Mr. Gore's muscles were flexed which--are they specific muscles that you had in mind or can you recall now?

A. Well, from what I can recall, he had his hands out to the sides. They appeared to be clinched. And he just, from my--to the best of my recollection, he was kind of a shaking, flexing practically his whole body. I had his legs spread and his legs were actually shaking.

Q. Now at the--at the moment that you perceived that he was flexing his body, was this before or after the point at which you--you felt the need to call Mr. Jensen and tell--and send Mr. Gore to Mr. Jensen? I need a sequence of events.

A. I'm sorry. Could--

Q. I'm trying to get the sequence of events as to what happened.

A. Okay.

Q. About how much time did you spend with Mr. Gore?

A. It's approximate, approximately a couple minutes, a minute.

Q. And at which point--how long had you been with Mr. Gore--approximately how much time had you been with Mr. Gore when

you noticed that the muscles were flexed?
A. From initial--from patting him down. From--
Q. Would that have been early on in that two minute period?
A. Yes, sir.
Q. To your recollection, had anything occurred before you noticed the muscles were flexed which in your estimation could create a hostile situation?
A. No, sir.
Q. What made you decide to go to the point--what made you decide to go over to where Mr. Jensen and Mr. Gore were? What exactly made you decide to do that? Because you ran over at one point.
A. Yes, because they appeared to be having a time getting him down, that's why I initially took--took off running and the other officers had started running also. Pretty much it.
Q. Okay. Did you see personally what caused--did you observe anything that you felt started this--this scuffle as you've described it between Mr. Gore and Mr. Jensen and Mr. Feathers from your vantage point?
A. I'm sorry. Can I have that question again please?
Q. When you noticed the scuffle--
A. Yeah.
Q. --about how far away were you from the scuffle when you first saw what was happening?

A. Just an estimate, approximately 75 yards.
Q. From that distance, were you able to determine, if you were able to, who was the--which of the three men took the first action which began this scuffle as you have described it?
A. I'm not sure, sir.
Q. Did you or Officer Longwell, out of the two of you do you know who first saw the scuffle?
A. I believe it was Officer Longwell saw it first.
Q. And did he say something to you upon seeing it to--to get your attention to it?
A. I can't remember if he said something or--I know he took off running, and then I just looked and I saw it.
Q. Were you able to see what Mr. Jensen was doing just prior to the scuffle?
A. No, sir.
Q. Do you recall preparing a memorandum for--well, it's--a memorandum which would've been titled Memorandum for Jay Bell back on July 8th?
A. Yes, sir.
Q. Do you recall stating, you know, what you wrote in that memorandum?
A. Pretty much, I believe.
Q. And at the time that you wrote that memorandum, did you understand what it was--what it was for?

A. For the incident?
Q. That's what I'm asking you. Is it?
A. Yeah, for the incident.
Q. And who--who is Jay Bell to your knowledge?
A. He is the Lieutenant.
Q. Okay. And Lieutenant Bell is an employee at Gilmer--a lieutenant at Gilmer?
A. Yes, sir.
Q. Okay. And is it a standard procedure, after there's been an incident, for people who have information about that incident to issue memorandums?
A. Yes, sir.
Q. And it is the purpose for issuing those memorandums to record whatever evidence exists with regard to the incident?
A. Yes, sir.
Q. Do you record making--do you recall making a statement in your memorandum that Mr. Jensen was trying to apply hand restraints to Mr. Gore before the incident occurred, the scuffle?
A. Yes, I believe so.
Q. Now is that statement in your memorandum based upon your firsthand knowledge or were you basing it on having heard it from someone else?
A. Well, I mean I could see across the way it appeared. It appeared that they were trying to put hand restraints on him

and then he started resisting from that--from that distance, it's a little ways.

Q. So earlier you testified that you couldn't--you couldn't see, but now as you think over it, you think maybe you could've seen what--what Mr. Jensen was doing?

A. Well, at that distance, you know, I just, you know, I didn't want to say something I wouldn't--at that distance, it appeared that he was still trying to do hand restraints on him.

Q. When you say that it appeared they were trying to put hand restraints on him, what does a hand restraint--what does that look like? Handcuff or--

A. Yeah, they were advising that--it appeared that they were trying to cuff him from behind.

Q. And when you were describing at a moment of this video on your direct examination when Mr. Godwin was asking you questions, you were walking around the scuffle.

A. Yes, sir.

Q. And I can't recall exactly what you said, but you said you were either looking for hand restraints or leg restraints. Could you tell which one of those two you said?

A. Actually I said I was looking for cuffs. I actually asked for cuffs because I didn't know if they had them yet.

Q. Okay. So before you got to the scene, you just testified that you thought--it appeared to you that

Lieutenant Jensen was attempting to apply the hand restraints and were you referring to cuffs when you said that?
A. The leg shackles. Because leg cuffs are--they're different than the handcuffs and I didn't know which one they had. It just happened all of a sudden and I wanted to make sure they had what they needed to cuff him.
Q. Okay. So--so then your--to clarify your testimony, what you observed when you were somewhere in the neighborhood of 70, 75 yards away was what you thought was Lieutenant Jensen--Lieutenant Jensen applying some kind of restraint and you're--you're now, as you think about it, aren't sure whether it was hand--or excuse me--cuffs for the hands or cuffs for the legs?
A. No, sir. It appeared that they were trying to cuff him up and whenever I got there, I wasn't sure if they'd, you know, had him cuffed or if he--if they had the cuffs, they had the leg shackles and I was trying to find out what they had.
Q. Okay. So when you testified that it appeared they were trying to cuff him up, that wasn't because you had seen actual restraints, either leg or hand, it was just based upon what you could see from the--
A. Yes, sir.
Q. --that distance? Okay. I don't recall if you testified

on direct about any allegation that you had made an inappropriate statement to Mr. Gore but I'm going to ask you now. At any point were you accused by anyone of making an inappropriate statement to Mr. Gore?

A. Mr. Gore said I said a cuss word to him or something to that effect.

Q. And when did he make that statement?

A. It was right after the pat down and--it was right after the pat down. I was looking at his shirt and it was about that time, right after that.

Q. And did you respond to Mr. Gore's allegation in any way?

A. Yeah, I told Mr. Gore, you know, I apologize if you feel that I did but if you're going to have this attitude you're going to go see the lieutenant's office--to the lieutenant's office.

Q. And what--what exactly, and if you could just number them off for me if there's more than one, are the--are the things, the items that Mr. Gore did from your perception which justified your decision that he--that you needed to send him to Lieutenant Jensen?

A. I'm not sure of your question.

Q. Well, you--you've testified to a number of different behaviors and actions that Mr. Gore displayed and took during your interaction at the beginning and shortly after the pat down. And I'm wondering among those different

things that he did, the actions that he took and things that he did, which of those, and maybe it was all of them, I'm not sure, or maybe it was some of them, but which of those caused you to make the determination that the appropriate way to respond would be to require that he go see the lieutenant--Lieutenant Jensen?

A. Mainly the cursing at me and saying things to me.

Q. Okay. And which was--I'm assuming it wasn't everything that he said to you. Which things in particular that he said caused, you know, were among your reasons for determining that he needed to go--to be sent to Lieutenant Jensen?

A. Mainly whenever he said fuck you, you're fucking nothing, being pretty belligerent.

Q. Now when you say being belligerent, and I'm not trying to be flippant here but it's important, how--how do you--when you say belligerent, how do you define the meaning of belligerent?

A. Well basically just cursing at me.

Q. Well belligerence to you, does that imply--I'll represent to you that the definition of belligerence usually implies an inciting to some sort of altercation. And I'm wondering if that's the way you define belligerence in your mind?

A. An inciting to what?

Q. An incitement to an altercation, sort of an indication that the person who is--that is being belligerent is intending for there to be an altercation.
A. Yes, sir.
Q. So you felt Mr. Gore, and correct me if I'm wrong, Mr. Gore was heading towards an altercation by what you observed out of him?
A. Yes, sir.
Q. Did you instruct Mr. Gore to allow you--before you sent him to Lieutenant Jensen, did you instruct Mr. Gore to allow you to place him in restraints?
A. No, sir.
Q. When you make a determination--and you testified that you had actually been through state training and federal training for corrections officers?
A. Yes, sir.
Q. Do they train you--have you ever been trained in your training that when you determine that an inmate is heading--an inmate's behavior indicates that they're heading toward an altercation, have you ever been trained that you should make an effort in that moment to restrain the inmate?
A. Yes.
Q. Is there a reason why on this occasion you did not try to restrain Mr. Gore and instead you sent him on his own to cross the compound?

A. We didn’t have cuffs. I didn’t have cuffs.
Q. In your training--does your training cover a situation where you have an inmate that you believe is, and correct me if my characterization is somehow wrong, you know, an imminent--imminently going to cause an altercation? When you’re in a situation where you have that with an inmate and you do not have restraints, does the--does the training cover that? Does it--or is it silent to recollection on that scenario?
A. I’m not sure--I’m not sure of your question.
Q. What I mean by that is have you ever been trained for example that if you have an inmate that you believe is going to--is going to be a problem, you know, let’s say kind of like a volcano ready to blow or something like that, and you yourself don’t have the restraints, either whether it’s leg restraints or handcuffs or both, does the training cover what to do in that situation?
A. Yes, but at that point he didn’t--he settled down when I told him to go to the lieutenant’s office and he went to the lieutenant’s office.
Q. Okay, so he--at one moment, you ascertained that he was being belligerent which means he might--only way I can think to describe it is a volcano ready to pop or blow.
A. Right.
Q. A balloon filled too much, it’s going to burst if you--

anymore so you've got to be careful with it. But at some--at some point before you sent him to Lieutenant Jensen you felt that he--he calmed down or he backed off. Something like letting steam out of the boiler. Something let--something happened which caused, in your estimation, Mr. Gore to calm a little bit.
A. Well, he stopped cursing and I told him to go to the lieutenant's office. Then he stopped cursing and he went to the lieutenant's office.
Q. Ordinarily is it a standard procedure that some member of the corrections staff from any particular unit escort an inmate when that inmate has been sent to the lieutenant's office?
A. I'm not real sure.
Q. Do you know Officer Feathers?
A. Yes, sir.
Q. You are aware, of course, that Officer Feathers was the first person other than Lieutenant Jensen to be present with Mr. Gore just prior to the altercation, correct?
A. Yes, sir.
Q. Do you have personal knowledge why Mr. Feathers went to join Mr. Jensen and Mr. Gore?
A. I'm not real sure.
Q. So to your knowledge there is no requirement that--that a particular member of a housing unit, and I mean a

correctional officer who's assigned to a housing unit, to your knowledge there's not one person who's designated to escort or accompany an inmate who--who is being sent to the lieutenant?

A. I don't know.

MR. FITZWATER: I have no further questions. Thank you, Mr. Wegman.

THE COURT: All right. Is there any redirect?

MR. GODWIN: No. No redirect.

THE COURT: All right. Does this conclude this witness' testimony in the case--

MR. GODWIN: Under--

THE COURT: --for both sides?

MR. GODWIN: Under the Government's subpoena, yes.

MR. FITZWATER: Your Honor, I would like to be given the opportunity to make my decision as to whether I would call Mr. Wegman under the subpoena that I have--

THE COURT: All right.

MR. FITZWATER: --just until the end of the day and I'll let you know.

THE COURT: All right. Mr. Wegman, you need to remain pursuant to the subpoena of the defendant. You may step down at this time however. You'll have to leave the courtroom.

(Witness Excused)

THE COURT: All right. Mr. Godwin, your next witness.

MR. GODWIN: I call William Longwell.

THE COURT: Thank you. William Longwell. All right, Mr. Longwell, please approach the front of the courtroom to the Clerk who will administer the oath to you before you take witness stand.

WILLIAM LONGWELL. GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you. You may take the witness stand. The witness is William Longwell, L-o-n-g-w-e-l-l.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Sir, would you please tell us where you live?

A. I live in Burnsville, sir.

Q. All right, down in Braxton County?

A. Yes, sir.

Q. And where do you work?

A. I live at or work at FCI Gilmer.

Q. And are you employed by the Bureau of Prisons?

A. Yes, sir.

Q. And what's your position with the Bureau?

A. I'm a correctional officer.

Q. How long have you been a corrections officer?

A. For--with the BOP for a year and a half, total about three years.

Q. So you have a year and a half experience with the Federal Bureau of Prisons and you received the benefit of their training?
A. Yes, sir.
Q. And you had prior corrections experience?
A. Yes, sir.
Q. And what was that?
A. As a correctional officer for the regional jail, West Virginia Regional Jail Authority.
Q. Is that the one at Flatwoods?
A. Charleston. Charleston.
Q. Charleston. Okay. So you received the state's training for that position?
A. Yes, sir.
Q. Did you have any other law enforcement or corrections experience?
A. Yes, sir.
Q. What is that?
A. Military, also a civilian police officer.
Q. A police officer in both the military and civilian force?
A. Yes, sir.
Q. Which police force in civilian life?
A. I was with Paden City Police Department in Wetzel County for approximately eight months.

Q. Now is that getting out of the army and being in the military police?
A. Correct. I was a police officer before I went to Iraq.
Q. Were you working at FCI Gilmer on July 8th, 2007?
A. Yes, sir.
Q. Were you working the evening shift from four to twelve?
A. Yes, sir.
Q. What were your assignments on that day? What was you-- what were you assigned to do on that day?
A. I was a housing unit officer. I believe it was right after chow, we was outside doing pat searches during an open move during--
Q. So you were assigned as one of the housing unit officers. Which housing unit?
A. I believe it was Bravo 4 or Bravo 2 that I was working.
Q. It was in the B or the Bravo building?
A. Yes, sir.
Q. Okay. Do you know Officer Wegman?
A. Yes, sir.
Q. The gentleman who just left the courtroom?
A. Yes, sir.
Q. Was he there that day?
A. Yes, sir.
Q. Do you know the defendant over here, Mr. Gore?
A. I didn't know him up until that day, no.

Q. You saw him on that day?
A. Yes, sir.
Q. You had indicated you were outside the Bravo housing unit and that pat downs were being done. Were you doing that?
A. Yes, sir.
Q. And was Officer Wegman doing that close by?
A. Yes, sir.
Q. These are--this is a procedure that you're instructed to do?
A. Yes, sir. It's part of our--our normal duties.
Q. And at what point did you become aware of the defendant, Mr. Gore's presence there in that area that evening?
A. We was both, me and Officer Wegman, were doing pat searches. I was conducting mine on one side of the sidewalk where he was doing his on the other side. I just heard--overheard a conversation or a statement that--I heard Wegman had made, asked--asked him what was wrong, something of that nature. Something didn't sound right. It brought my attention to it.
Q. So you heard Mr. Wegman saying something about what's wrong or--
A. Something of that--well, what's wrong, you know, asking him how he was doing, you know, why is--the conversation wasn't a normal conversation being made so I observed what

was going on.
Q. And that caught your attention?
A. Yes, sir.
Q. And then did you observe and listen--and hear this conversation and this encounter between the two men from that point on?
A. Yes. I walked around to the back of Officer Wegman, off to the backside of him to where I could pay attention to what was going on.
Q. All right. And what--what occurred there that you saw and heard?
A. I remember Officer Wegman was asking him--was asking him what was wrong. Had asked him--I know he asked him if everything was okay. He was just asking him normal questions and the inmate refused to answer the questions at that time. And he said he didn’t have to answer his questions and that was the beginning of the whole argument.
Q. Did you hear--
A. I--
Q. I’m sorry.
A. Go ahead.
Q. Did you hear Officer Wegman ask any question of the defendant that as an inmate he didn’t have a duty to answer?
A. I heard the inmate--or Inmate Gore told Officer Wegman he didn’t have to answer him.

Q. But as an officer in your training, did you hear Mr. Wegman say or do anything, ask anything that Mr. Gore didn't have to answer?
A. No, he didn't ask him anything that wouldn't reply an answer, no.
Q. So is it fair to say that Mr. Gore then was not being cooperative with Mr. Wegman?
A. Correct, he was not.
Q. And you referred to it as an argument that went on from there. At what point was this that you were calling it an argument? What was occurring?
A. The--basically the way that Inmate Gore was presenting himself to the officer, his argumentative tone he didn't have to do this, he didn't have to answer his questions. Things that--it just wasn't a normal conversation. He was just being argumentative. It was--
Q. Did you--oh, I'm sorry. I didn't mean to cut you off if you had any--
A. No, sir.
Q. Did you ever hear either one of the men use any kind of profane or unpleasant language?
A. When I was standing there, my attention was on Inmate Gore. I was paying attention to only what he was saying. I never heard the officers curse at him. What I do remember is when Inmate Gore said, hey, you're not supposed to curse

at me. I remember the officer apologized for anything he may have said. But I never heard him say anything of a curse word to him.

Q. Did you hear any cursing after that apology?

A. I heard a lot of cursing coming from Inmate Gore.

Q. Do you recall any of it specifically?

A. I remember Inmate Gore saying who the fuck are you? You can't tell me what to do.

Q. Is that--in your training as a correctional officer, is that appropriate behavior of an inmate toward a correctional officer?

A. No, sir.

Q. As a correctional officer in your training are you--do you--are you obliged to do something about that kind of behavior?

A. Yes. We send the inmates to the lieutenant or have the inmate to see the lieutenant to find out exactly what's wrong or have the inmate placed in separate housing.

Q. Now was there a point at which one of you told Mr. Gore to go see the lieutenant?

A. Yes, sir. Through the conversation with Inmate Gore and Officer Wegman, I had talked to Officer Wegman and we said, you know, something--something's wrong, you know, something's not right here, let's send him over to see the lieutenant. And Officer Wegman asked him if he wanted to go

see a lieutenant, he said yes.

Q. And what did you do at that point?

A. Inmate Gore starting walking towards, you know, more or less turned to go towards the lieutenant's office, then turned and came back to Officer Wegman. I stepped back for a second and called the lieutenant's office and said we had one in route to the lieutenant's office.

Q. Do you recall specifically what you said?

A. Yes, sir. I said we have one in route--I said--I identified myself on the radio and called the lieutenant and said we have one in route to your--your office with a bad--major or a bad attitude problem.

Q. And why did you call this an attitude problem?

A. Due to his actions, his verbal--his language he was using towards us, his physical gestures he was giving to us as he was--he more or less had a bad attitude towards us, more or less to give them a heads up, we may want to get someone else--more officers over there to take care of the situation.

Q. From Mr. Gore's demeanor as you observed it did he seem to be angry?

A. Very.

Q. And did you have any idea what he was angry about?

A. No, sir.

Q. So you made the radio call. That's done with a--go

ahead and tell us about the radio system you all have. Where was this radio?

A. I use the clip on mic that went to my shirt, that you carry the radio on your belt and it has a radio flex mic and you just either hook it onto your shirt or somewhere on your shirt or your--

Q. So you just key the mic and speak and it goes out across the radio?

A. Yes.

Q. And who--who are you in radio contact with when you do that?

A. Basically all of the housing unit officers will hear you, control will hear you. Anybody that's on Channel 1 will hear you.

Q. The control center?

A. Control center, the lieutenant's--

Q. The lieutenant's office?

A. All of the officers in the housing units and compound.

Q. The officer--an officer out there--for example, we've seen photos of there was some officers over in the rec area, would they be able to hear it if they were outside there in the rec area?

A. Yes, sir, if they had a--if they had a radio they would hear it also.

Q. But you speak into the radio, do they hear it from their

portable radio as well?
A. They hear it from their radio also.
Q. So anybody wearing that radio, any officer is going--or anybody around the officer is going to hear what you're saying?
A. And they'd also be watching. When I said that, everybody--everybody's eyes would be on him.
Q. So all the officers, both in offices inside the prison buildings as well as those out about, would know what you said so long as they had an operating radio that's turned onto Channel 1 like it's supposed to be?
A. Right.
Q. What did you do after you made the radio call?
A. After I made the radio call, we just went back to normal--doing the pat searches. We really didn't pay too much attention to--I didn't really pay too much attention to that situation because it was over with. We went back doing our--our pat searches.
Q. Was there a point at which you observed something that made you think well maybe it's not over?
A. Yes. After Officer Wegman went back inside the housing unit, then apparently he came back out, another officer came out. And I was doing my pat searches and Officer--I forget the officer's name, he made the statement of--made the statement of, oh, no, or something happened, you know, made

a remark that something was happening. And I looked over and saw a big pile--or a pile of officers with an inmate on the ground and we took off running.
Q. I want to show you a couple of brief portions of the video that's been introduced as Government's Exhibit 1 in this case. Do you--you reviewed this with me in your pre-trial interview, didn't you?
A. Yes, sir.
Q. And do you recognize this scene then?
A. I'm the officer standing right there in the--right there where your--
Q. This is--
A. --cursor's at, right there.
Q. This is you?
A. Yes, sir.
Q. I'm going to make this move and I want you to see if you can tell who the other officers are and where they are. Do you know who this is?
A. That's either Officer Harold or Officer Wegman. I believe that's Officer Harold on the right side and right there's Officer Wegman I believe.
Q. So now you have Officer Harold, yourself, and Officer Wegman here as these three officers?
A. Correct.
Q. You know for sure that you're the one with your back

turned?
A. Yes, that is me.
Q. Okay.
A. And we're just going about--we're--
Q. Okay.
A. --we're just back talking to inmates.
Q. Now you've just gone back to normal activity and you're off the screen, so let me ask you another--can you identify yourself and what you saw.
A. I'm running across the compound right here. We're telling inmates to get into, you know--
Q. Who's this? Is this you?
A. I don't--no, that's me from right behind right there.
Q. This is you?
A. I'm one of the two. I'm the on the left. I'm to the left.
Q. This is--
A. Left.
Q. This is you?
A. Yes. As I come up behind, I take the handcuffs from one of the officers--
Q. And that's you taking handcuffs?
A. Correct. I placed it on the inmate's left hand.
Q. Now at this point, what is Mr. Gore doing?
A. He is--right there, I have a direct--I'm looking at him

directly in the eyes. He has a blank stare on his face just--his eyes are just fixed. His teeth are clinched. He’s not saying anything. He’s--just a blank stare.
Q. Is he moving?
A. He’s not--no, he’s not moving. He’s--he’s struggling. He’s--
Q. Well, that’s what I’m asking, was he attempting to move? Let me ask it that way.
A. Yes. He was trying--he was wrestling with us.
Q. Describe his motion as best as you are able to and recall.
A. You mean his eyes?
Q. Well you told us about his eyes and his stare, but I mean in terms of his body. What was he doing with his body?
A. He was basically being held around the chest area and the arm that he was--had free was pulled out behind him in this area. His left hand was underneath his chest.
Q. So there were--all these men were holding onto him and pulling on him?
A. Yes, holding him, yes.
Q. Was he still struggling against that?
A. Yes.
Q. So even at this point, when he was down with all these men on him, he’s struggling with them?
A. Yes.

Q. Now was this you?
A. No, sir. I'm--
Q. You're down here, right?
A. My head's right there, like the third head from--
Q. One of these heads here?
A. Yes, in the middle of those three right there. I'm just placing the handcuffs on him. Leg restraints were being--were placed on--
Q. That's what's being done right here?
A. Yes.
Q. Now who's this, this short man?
A. That's Lieutenant--Lieutenant Jensen.
Q. And who's that behind him?
A. I don't recall.
Q. Okay.
A. I don't recall who that is.
Q. Did you remain here during this--this time period?
A. Yes. Right there, my hat had fallen off, right there. I'm placing the handcuffs on him and getting the leg restraints on him, and then I get ready to stand him up here. Then right there to the left, I put my hat on, picked up an ID tag that I found on the ground.
Q. This is you right here?
A. Yes, sir.
Q. Now during this time period since you came over here,

did you ever see anybody strike, hit, or kick Mr. Gore?
A. No, sir.
Q. Do anything other than to grab a hold of him to get him under control?
A. No, sir.
Q. I mean is that the only thing you saw?
A. Yes, sir.
Q. And what's occurring now?
A. He's just being escorted--he'd be escorted over to medical and then over to SHU or to SHU where medical will come out and they'll talk to him to see if he's--
Q. Did he have--did he have any apparent issue--injuries?
A. Not that I--I've never--I was never told of any. I never--
Q. I just mean from what you saw.
A. Nothing that I saw.
Q. Did you see any blood or scrapes on him?
A. No, sir.
Q. And then you're one of these officers here at the shack?
A. Yes, sir.
Q. And what did you do after this--this appears to be pretty much over, what did you do after that at that point?
A. At that point, I went back to my housing unit and went back to work.
MR. GODWIN: I have no other questions, Your Honor.

THE COURT: All right. Cross examination.

CROSS EXAMINATION

BY MR. FITZWATER:

Q. Mr. Longwell, my name is Travis Fitzwater and I represent Michael Gore in this case, and I'm going to ask you a few questions mostly following up on what you just testified to in response to Mr. Godwin's questions.

A. Yes, sir.

Q. First let me ask you about something that you just testified to hearing Mr. Gore say. You said you heard--heard a lot of cursing coming from Mr. Gore.

A. Yes, sir.

Q. Was that something that you remember clearly?

A. I remember there was a lot of yelling and a lot of cursing. I don't remember exactly some of it because I wasn't--we're used to hearing a lot of cursing and a lot of yelling from inmates. I remember him saying who--who the fuck are you, something to that nature, you know, you can't tell me, you know, can't ask me anything. I don't have to answer you.

Q. Do you know about how many inmates at any given time on average there are at Gilmer?

A. Fifteen to 1600.

Q. Now when you say that you're used to hearing a lot of cursing from inmates, how frequently does that happen?

A. It's normal conversations that people have, sir.
Q. Do the correctional officers, to your knowledge, ever use cursing? Do they ever curse when they're--you said normal conversations? Are these normal conversations between inmates?
A. Yes, sir.
Q. Does the cursing ever take place in normal conversations between inmates and the correctional officers?
A. Yes, sir. Sometimes things like that do happen.
Q. And is it ever the case, to your knowledge, that the correctional officers would also use some of the curse language, cursing?
A. Sometimes that does happen, yes, sir.
Q. Is--to your knowledge--well, let me back up for a minute. In my notes from your testimony a little bit earlier, you--you were an MP in the army and then you were in the Paden City Police Department and I don't have in my notes what training, if any, you did before you became a correctional officer. Did you do any training specifically before you became a correctional officer?
A. I worked for the regional jail authority. I went through state training as a correctional officer.
Q. And when you go to the Bureau of Prisons facility in Gilmer, do they accept your state training as sufficient or did they require any additional--

A. I went down to--for more training down in Georgia for a--to become--

Q. And how long--

A. --certified.

Q. How long was the process of the training in Georgia?

A. It's four weeks.

Q. During any of your training, are you instructed that you're not allowed to use--that the correctional officers are not allowed to use swear words or those kinds of what we would call inappropriate language?

A. Yes, sir.

Q. Do correctional officers, to your knowledge, who have been found to use swear words and inappropriate language in the presence of inmates, are they reprimanded?

A. I haven't been in the BOP long enough really to know of that. I know you do--can get counseled if you use--you profoundly use a lot of cursing in front of inmates. That's all I can tell you about right now. I don't know anything else about it.

Q. So it is possible that you might--

A. Yes, sir.

Q. --get some--some reprimand of some sort?

A. Yes, sir.

Q. Okay. Have you ever heard Officer Wegman use swear words or inappropriate language when dealing with an inmate?

A. Ever?
Q. Yes, sir.
A. I can’t say no. I don’t really--I don’t work with him too much so I don’t really remember any. I can’t identify any certain times.
Q. How long--how long have you worked at the Gilmer facility?
A. For a year and a half.
Q. And to your knowledge how long has Mr. Wegman worked at that facility?
A. He’s been there for about nine to ten months.
Q. To your knowledge is there any kind of probationary period that a correctional officer has to undergo when they first start working at the facility for the Bureau of Prisons?
A. Yes. It’s for one year of probation. You have one year of probationary time.
Q. And if a correctional officer is found to have engaged in some infraction of the rules during that one year probation period, is the repercussion of that more severe than it would be after the one year period?
A. Sir, I don’t know. That’s a supervisor question in general. I’m not--I don’t know what they would do.
Q. Sure, that’s fair enough. I just thought maybe from your experience if you were aware of any heightened actions

that would be taken, so. You stated on your--your direct examination, which was when Mr. Godwin was asking you questions, that you couldn't hear what Officer Wegman was saying to Michael--to Mr. Gore, is that correct?

A. Can you say it again?

Q. Well you stated specifically, I think, that you were focused on Mr. Gore and because of that focus you did not hear what Mr. Wegman was saying to Mr. Gore.

A. Correct, I was paying attention to the inmate's actions and what he was saying.

Q. Do you recall that there was an investigation to the incident that happened with Mr. Gore?

A. Say that again.

Q. Do you recall that anybody took any steps to investigate the events surrounding this incident with Mr. Gore?

A. No, sir.

Q. Do you recall being asked to make a statement as to what you knew about the incident with Mr. Gore?

A. I wrote my--my incident report and turned it into the supervisors.

Q. So when you wrote the incident report, you didn't believe that that incident report was going to be made a part of an investigation of the event?

A. I didn't--I wasn't aware of the investigation that was going to go on and I wasn't in that process, sir. I didn't

know of anything until I got called in.
Q. Do you recall writing a memorandum to Operations Lieutenant Jay Bell?
A. Yes, sir. That was my incident report.
Q. And that--do you recall that that was--that would've been dated July 8th, the same day of the incident?
A. Yes, sir.
Q. When you prepared that memorandum for Lieutenant Bell, did you feel that it was important that you record the events to the best of your knowledge at that time?
A. Yes, sir.
Q. And did you have any concern that you record the events which you knew to your own personal knowledge and not maybe what could've been hearsay or what somebody else said happened?
A. Correct.
Q. Do you recall writing in your memorandum that you overheard Officer Wegman asking the inmate what housing unit he was out of and what the inmate's name was?
A. Yes. Yes, I do remember that now.
Q. So does that--would that cause you to change your testimony?
A. No, it don't change my testimony. It adds to it.
Q. Okay. Well, earlier you said you couldn't hear the statements that Officer Wegman was making, but some of those

statements you did hear, right?
A. I do remember the statements that were being made. I just couldn't remember them sitting right here, what the statements were. I didn't have my statement in front of me.
Q. Okay. So do you think--do you think there may have been any other things that Officer Wegman said that you may have heard that you may have written in your statement?
A. No. I just know he was just asking him what was wrong. I remember he was just--he was asking--we was basically trying to figure what was wrong. Something was going on, you know, he didn't have any--it wasn't a normal thing that he was upset over.
Q. Now you testified that at some point you came up behind Officer Wegman. You actually said behind and to the side. Is that accurate?
A. Correct.
Q. To your knowledge, did Officer Wegman know that you were--you were there at the moment that you came up behind him?
A. Yes, he did because I made eye contact with him.
Q. Okay.
A. That way he'd know I was there.
Q. And what caused you to walk over and stand behind Officer Wegman?
A. To back him up.

Q. Do you know who made the decision to send Mr. Gore to Lieutenant Jensen?
A. It was either--I know that Officer Wegman, me and him was talking occasionally. I asked him, I said, what do you want to do? And we came to the conclusion, you know, we asked him about going to see the lieutenant, and he said yes. He said he wanted to go see a lieutenant.
Q. Approximately how many inmates have you had to send to see the--to see the lieutenant in charge? I don't--I'm not going to say that--I'm not going to say specifically Lieutenant Jensen because I'm sure Lieutenant Jensen is not always there, but--
A. Correct.
Q. But when you have to send an inmate when there's been an escalated situation is it always to whoever the lieutenant on duty is?
A. Correct. Normally, yes it is or you call for a compound officer or someone more senior to you that could help you out.
Q. How often, approximately, have you been involved in a situation where an inmate has to be sent to see a more senior officer?
A. Fairly recently. We--we send them over, I wouldn't say frequently, but we do send inmates over once in awhile to see the lieutenant.

Q. So do you have--can you give me any kind of ballpark number on--
A. No, sir.
Q. Would it be more than a half dozen?
A. I couldn't tell you. I mean anytime we have a situation we can't handle ourselves, we send them to the lieutenant.
Q. Okay. Is there a set procedure that's--to your knowledge regarding what steps need to be taken when a determination is made to send an inmate to a more senior officer?
A. Can you say that again?
Q. To your knowledge is there a set procedure that you're supposed to follow after you make a determination that an inmate should be sent to a--a more senior officer such as a lieutenant?
A. We have our--I'm not exactly for sure of a set procedure that's written. I do know whenever I do have problems and I can't resolve it to send them to a lieutenant or someone more senior to take care of it.
Q. Let me ask a somewhat more specific question. To your knowledge is there any requirement that an inmate who is being sent to a lieutenant or to any more senior officer because of an escalated situation, is there a requirement that somebody accompany them or go with them when they're going to see--

A. I don't believe it's policy. It's--I've learned that yes it would've made a better environment for--or made a better--it would've been a better situation if I would've had another officer escort him over or something of that nature, you know, anything that could've helped.

Q. So to your--to your knowledge it's not a set policy?

A. No, sir.

Q. And would it be fair to say that it's up to the discretion of--

A. The officers.

Q. --the officers? Prior to the incident when you sent Mr. Gore to see the lieutenant, have you ever sent any other inmates anytime before this date, July 8th, had you ever sent any other inmates to go see a lieutenant or a more senior officer than yourself?

A. I believe yes. I've sent inmates over before to see the lieutenant prior to that, yes.

Q. And on any of those occasions, did you or anyone else escort the inmate, the ones that you just testified to that you said you believed you had sent to see a lieutenant prior to this July 8th incident, on any of those occasions--

A. Did I have an officer escort the person over to see a lieutenant? No.

Q. Or you?

A. No.

Q. After this incident is it your practice to always see that when an inmate is being sent to see the lieutenant that somebody accompany that inmate?
A. Like it depends on the person's attitude, the person's state, you know, how they're presenting themselves. I haven't sent anybody to see the lieutenant for--for a while to have them escorted, no.
Q. But it's safe to say that--it's fair to say that on July 8th you--neither you or Officer Wegman went with Mr. Gore?
A. Negative, we can't leave our--leave our post.
Q. Okay. Is there anyone--do you describe your post as by the unit designation?
A. Correct.
Q. And your post is Unit B?
A. Correct. I work within the housing unit and I work out to my perimeter of my post.
Q. And is there a correctional officer on a particular post who would hold the most senior authority or position?
A. Can you say that again?
Q. Within--you said that you worked at a particular post and you said you weren't allowed to leave it. And we described that post as Unit B in this instance. I'm asking you is there somebody designated at each post who has the most authority? Do you know which correctional officer in any given post has the most authority? Is there a chain of

command?
A. Within the housing unit itself?
Q. Yes.
A. No, sir, not that I--not that I'm aware of.
Q. Are you aware of a gentleman by the name of Feathers?
A. Yes. Yes. Officer Feathers.
Q. Sort of rhetorical. Officer Feathers in this instance, was he assigned to the Unit B post?
A. No, he was compound.
Q. And what's the difference between his assignment and the assignment that--that you had?
A. I work within a housing unit. Each unit has living areas, four living areas per building. I work in one of the living areas. During moves, we go out and we work the outer portion or the portion with--within our--our building controlling inmate movement, pat searches. The compound officer works out in the center area, dining facility, everything out--outside of the housing unit areas, he works.
Q. And you described Officer Feather's assignment as quote "compound," is that correct?
A. Correct, compound.
Q. Have you ever yourself been assigned to compound?
A. Yes, I've worked compound.
Q. So you know what the requirements are and obligations are for somebody in that assignment?

A. Yes, I just don't have the--I'm not a senior officer like he is.
Q. Okay, so Mr. Feathers is a senior, correct?
A. Correct.
Q. And with his assignment to the compound, is he required to stay in one place such as--
A. No.
Q. --the requirement that was imposed on you and Mr. Wegman?
A. No.
Q. Do you know if there's any procedure, rule or requirement which would impose upon Mr. Feathers the duty to escort or accompany any inmate that he knows is being sent to see a lieutenant?
A. If we were to call for him to come over, yes, he would've come over immediately.
Q. To your knowledge did anybody call Mr. Feathers on the occasion of July 8th involving Mr. Gore?
A. No.
Q. Did you see Mr. Feathers go towards Mr. Gore and Mr. Jensen?
A. No, I never--I didn't really--I didn't watch others walk up to the situation. I was back doing my normal duties. I was talking to other inmates and other officers there.
Q. Now after you saw the scuffle, you ran to where it was

occurring, correct?
A. Correct.
Q. Is there some authority--is there some procedure which gives you the right to leave your post when there's a scuffle?
A. Yes, sir, there is.
Q. Okay. You indicated that on other occasions you had to send inmates to go see a lieutenant. And you also indicated that in this instance Mr. Wegman asked Mr. Gore did he want to go see the lieutenant.
A. Correct.
Q. And you indicated that Mr. Gore said yes. On any of the other occasions where you had to send an inmate to see a lieutenant, did you or anyone else make the same offer or ask the same question of the particular inmate, specifically, do you want to go see the lieutenant?
A. Sometimes, yes, I will as a--if I'm not able to resolve any situation, do you want to go see the lieutenant? Is there something wrong? Do you want to go see the lieutenant? I will give them that option once in awhile.
Q. Now has there ever been an occasion where you felt the need to give an inmate that option and the inmate responded by saying, no, I do not want--I do not want to go see the lieutenant?
A. Has that ever happened to me you said?

Q. Yes.
A. Yes. Sometimes inmates don't want to go see the lieutenant. They'd rather take care of the situation.
Q. And have you--in any of those instances were you able to then resolve the situation without requiring the inmate to indeed go see the lieutenant?
A. Yes, sir. Yes.
Q. And a minute ago you said, when there's been occasions where you've asked inmates did they want to go see the lieutenant, do you mean by that to say that sometimes an inmate will take an exception to or have a disagreement with the way you're handling whatever the situation is? Want me to rephrase it?
A. Not that, but maybe something he may need to talk to the lieutenant about, something else that's going on with a--you're--you're saying any inmate? Are you saying--
Q. Sure.
A. --Inmate Gore or are you saying any inmate?
Q. Well, any inmate and then I would ask the same question with--with Inmate Gore. Did you feel that Inmate Gore was somehow calling into question the way either Officer Wegman or yourself was handling that situation?
A. There's always--always--anytime an inmate could have a problem, anyone, and want to go see the lieutenant about it.
Q. Is it a frequent occurrence that an inmate might accuse

you or have you ever seen an inmate accuse another officer of failing to properly conduct your duties?
A. Can you say that again?
Q. Is it a common occurrence that an inmate will say you're not doing your job properly?
A. Common occurrence, I wouldn't say yes, but yes it can happen. I mean yes inmates do try to tell us what we're doing, try to tell us our job.
Q. There was testimony today from Officer Wegman that he felt that Mr. Gore was tensing his muscles up. Did you see anything like that out of Mr. Gore?
A. I did not have my hands on Gore so I would not be able to tell--to say yes or no.
Q. Okay. And there was testimony today out of Mr. Wegman that he felt essentially that Mr. Gore was agitated and he thought maybe there was something wrong with him. Did you see anything before you came over to get Mr. Wegman's back as you--as you described it? Did you see anything before that point?
A. No, sir, because I was--I was patting down my own inmates, taking care of inmates and talking to them as they was going by. I wasn't next to them.
Q. If that's the case, why did you feel the need to go, and as you described it, get Mr. Wegman's back?
A. Anytime you have an inmate confronting an officer, you

don't--if you got two officer--you're standing there with two officers, you're not going to walk away from the situation.
Q. I understand that, but in response to my question whether you yourself observed anything which caused you to be concerned about Mr. Gore's behavior before you went over to get Mr. Wegman's back, you said no, because you were patting down other inmates?
A. Right.
Q. So then I asked if that's the case, why did you feel a need to get Officer Wegman's back?
A. Due to Inmate Gore's statements that he was making to Officer--the officer there.
Q. So does that mean that you--you did see something that caused you concern about Mr. Gore?
A. No, I heard something. Something caught my attention. As I was working on my side, I knew he was having some kind of a problem.
Q. What happened which caused you to determine that you would be justified in leaving your post, given the fact that ordinarily you're not permitted to leave your post?
A. At what time?
Q. Well, at some point you ran over to where the scuffle was taking place?
A. Yes, I did.

Q. And you testified that ordinarily you're not permitted to leave your post and that was your justification for not escorting Mr. Gore. So my question is what was it that you observed which caused you to determine that it would be proper for you to leave that post?
A. It was an emergency.
Q. And what about--what exactly did you see which caused you to determine that there was an emergency occurring?
A. Due to it was a pile of officers with an inmate on the ground which normally it indicates a fight, you know, something's going on. They're on the ground. That's an emergency. You got officers that need help.
Q. When you first noticed that something was happening, was that--at the moment you first noticed that there was a scuffle or that there was an emergency, was the pile of officers on the ground the first thing you saw?
A. I believe so, yes. Yes, it is.
Q. So you didn't--you--just to make clear, you didn't see what caused all of those people to end up on the ground?
A. No, I--
Q. You didn't see--
A. --never.
Q. --the--whatever--
A. No.
Q. --preceded that?

A. No, sir.
Q. You've testified that you heard Mr. Gore say something to the effect of who the fuck are you--
A. Something of that nature, yes.
Q. --to Mr. Wegman.
A. Yes, something--I know he said something of that nature, yes.
Q. After you heard--you said that you heard something which caused you to determine you needed to go get Mr. Wegman's back. After you heard that and you went over to get Mr. Wegman's back, at that point you were paying attention to Mr. Gore, correct?
A. Correct.
Q. And you really weren't paying much attention to what Mr. Wegman was doing or saying, correct?
A. I wouldn't say I wasn't paying attention to everything he was saying. You know, I can't really take key points out of his sentences to say what he was saying, no. I know he was--he was having a conversation with him.
Q. Did you observe Mr. Wegman's demeanor during this conversation?
A. His demeanor was about the same as mine, calm. Neither one of us was yelling, you know, we weren't--nobody was yelling out there.
Q. So you--did you notice any reaction in his demeanor

when, as you testified, Mr. Gore was using profanities directed at him?
A. I know cursing was being used but I don't exactly remember--I know I heard Inmate Gore say a couple of cursing words but I can't specify anything at this point.
Q. Well, I accept that you--you don't recall what if anything Mr. Wegman--I'm asking you if you noticed anything about his demeanor, anything about his facial expressions, his stance.
A. Inmate Gore or Officer--
Q. Officer Wegman.
A. He was not--he was not standing in any way--he wasn't proposing an aggressive posture to Inmate Gore.
Q. Did it appear at all that Mr. Gore's profanities that you've testified he used against Mr. Wegman, did it appear that that irritated or upset Mr. Wegman?
A. I don't believe I testified he did use it. I said I don't know if he did. I don't know if he did or not. I know that he apologized for anything he may have said, but I didn't hear Officer Wegman curse at Inmate Gore.
Q. Well, I'm asking--I was asking did you notice whether there was any specific reaction out of Officer Wegman to the profane statements that you testified Mr. Gore used which were directed at Mr. Wegman?
A. I'm sorry. I'm going to have to have you repeat the

question. I'm kind of getting lost.
Q. When you testified that Mr. Gore cursed at Mr. Wegman.
A. Right.
Q. And I'm asking in that moment, do you know whether Officer Wegman had any facial expressions or body expressions or movements which would indicate that he was displeased or irritated by whatever it was Mr. Gore was saying?
A. No, sir.
Q. Thank you for your patience, Officer Longwell.
MR. FITZWATER: I have no further questions of him.
THE COURT: Is there any redirect?
MR. GODWIN: No, Your Honor.
THE COURT: All right. Thank you very much, Officer Longwell. You may step down.
(Witness excused)
THE COURT: Mr. Godwin, does the Government have a witness that can be handled in the next half hour?
MR. GODWIN: I can put his direct on in the next half hour. I don't know if the cross can be done in that time.
THE COURT: All right, let's try and do that.
MR. GODWIN: I call Lieutenant Jensen.
THE COURT: Pardon me? I can't hear you.
MR. GODWIN: Oh, I'm sorry. Lieutenant Jensen.

THE COURT: All right. Lieutenant Jensen. Lieutenant Jensen, would you please approach the Clerk who will administer the oath to you before you take the witness stand.

KEVIN JENSEN, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you. You may take the witness stand. The witness is Kevin Jensen, J-e-n-s-e-n.

THE COURT: Lieutenant Jensen, would you please speak into the microphone in a loud clear voice? Thank you.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Sir, would you please tell us where you live and how--how you're employed?

A. Yes, sir. I'm a resident of Glenville, West Virginia. I am employed by the Department of Justice, Federal Bureau of Prisons.

Q. And how long have you been an employee of the Bureau of Prisons?

A. Eighteen years.

Q. Have you served in--where are you presently assigned?

A. I am assigned presently at the Federal Correctional Institution in Gilmer County, West Virginia.

Q. And how long have you been at FCI Gilmer?

A. Approximately two years.

Q. When you came to that position--to that facility, what

position were you hired in as?
A. As a lieutenant.
Q. Okay. Now, what had been your experience in the Bureau of Prisons prior to that?
A. I had spent two years as the supervising investigative supervisor in Yankton, South Dakota which is another Bureau facility. And prior to that, I served as a correctional officer in the Federal Correctional Institution in Englewood, Colorado. I joined the Bureau in--actually December 30, 1989.
Q. Okay, so--and--so you were--were you in Colorado for a number of years?
A. Yes, sir, I was.
Q. How long were you there?
A. About 13 years.
Q. Okay. In that--in those years of experience, you were a corrections officer?
A. Yes, for most of my time there with the exception of a couple of years when I worked as a warehouse supervisor. I was a single dad and changed up my--needed a job with better hours than the traditional shift work.
Q. The--the correctional officer--you--you had those years of experience as a correctional officer. Is that the same position that Officers Wegman, and Longwell, and Feathers were performing at Gilmer on--in July of '07?

A. Yes, sir, that'd be correct.
Q. So you have a number of experience--years of experience doing their--the job they were doing?
A. Yes, sir.
Q. Now, you're a Lieutenant, but actually there are different--there are different kinds of lieutenants at the prison, aren't there?
A. Yes, there is.
Q. Why don't you clarify that for us? What--first of all, what kind of lieutenant are you and what were your responsibilities?
A. At which time, sir?
Q. I want to focus on July of 2007 now.
A. Okay. Generally speaking, lieutenants are--have two different ranks. It has to do somewhat with pay scale but they're referred to as either activities or operations or GS9 lieutenants, GS11 lieutenants.
The activities lieutenants are for all practical purposes more of a training period. They go through generally about an 18 month period of learning that position and learning the job requirements and then if they make their probation and are satisfactorily performing their duties, then they compete to become an 11 lieutenant.
The primary responsibility of the GS 11 lieutenant is as--what is called an operations lieutenant, which means we

supervise our correctional staff and we are responsible for the overall operation of the institution and are in charge and responsible for every facet of the operation of the federal institution after business hours. For example, when the warden is gone for the day, then the operation lieutenant is in charge of the facility.

Q. So you're--after hours, the operations lieutenant is essentially the warden's representative and you're there to act for the warden in matters that arise in the absence of the--of the--for the hierarchy?

A. Exactly.

Q. Okay. Now there's been some mention by you of SIS or Special Investigative Service, and there has earlier been some mention of a--like an incident report and Lieutenant Bell. Lieutenant Bell was in the SIS at Gilmer, wasn't he?

A. Yes.

Q. Just briefly, so we're clear as to that, what is the SIS? What's their role in these kind of things?

A. The SIS is the investigative arm of an institution. If you think of it in terms of law enforcement, you would have your lieutenant shift supervisors that would be sergeants, the SIS, for all practical purposes are investigators. Hence, the special investigative supervisor is what SIS stands for. It is a collateral duty normally held for approximately 18 months at the pleasure of the captain.

Q. Just before we move on to the events of July 8th, you've explained that you have considerable experience. Have you received training over those--over these years in addition to the on the job training experience?
A. Yes, sir, I have.
Q. What kind of training has the Bureau provided you over those years?
A. I was trained initially in Artisian, New Mexico as a witness security case armed escort for a witness security case, if you will. The people that become witness--the witness--victim witness program. I'm sorry I can't think of the name right now. But at any rate, we were trained specifically for prisoner transports, high security moves with obviously the higher security inmates and those that required protection as a result of their cooperation with Government prosecutions.
Additionally, I was trained as a firearms instructor. I was trained as a commercial driver's license examiner and instructor for the operation of our bus program which is basically a transport vehicle utilized to move inmates from one point to another which is a routine function of the Bureau. And I have received specific training in the use of less lethal munitions. The investigations, as I mentioned, trained and worked in the capacity of the SIS lieutenant as well. And the yearly 40 hour block of annual refresher

training in which we go over current policies, changes in policies, procedures, and review how things have done--how things have changed and how we're to proceed in the upcoming year.

Q. So you stay current in the policies including say the policy on the use of force against inmates?

A. Yes.

Q. And now do you know about when an inmate comes to your facility there at Gilmer, is that inmate given any instruction as to what the expectations of that inmate are?

A. Yes, sir, they do. Shortly after arrival, they are mandated to attend an admission and orientation class, ANO class if you will. During these classes the department heads generally or their designees will all have a block of instruction for the inmates so that they go in and explain the different functions.

Food service may come in and say this is how we choose our meals. These are the mealtimes. This is what you're allowed to do in the dining hall. How you are to dress. Your meal selections, etcetera, etcetera, etcetera.

The different--all the different departments inside the community which if you think of a prison as just a small town, we have all the dynamics of a small town. So to answer the question, everybody in that community sends a representative and they are instructed on what's expected of

them, what they are to do and what they're not to do, and what the ramifications are. The disciplinary process is explained to them, their rights in terms of administrative remedy. If they're unhappy with a decision that management makes or that one of the correctional officer makes, they're instructed specifically on their right and their administrative remedy that they can follow to have their grievances heard and addressed at all levels all the way up to central office in Washington, D.C.

And they're also given a very comprehensive ANO handbook which outlines very specifically what is the rules and regulations and the expectations of that inmate for which they must sign a receipt, if you will, stating that yes, I did receive this manual.

Q. Do all inmates receive this training and this manual?

A. Yes, they do.

Q. You said a handbook. It sounded like you said ANO, A-N-O?

A. Yes, Admission and Orientation.

Q. Oh, okay.

A. The acronym is A-N-O. Everything in the Government's got an acronym to it. I'm sorry, I'll try to clarify.

Q. The Admission and Orientation handbook is designed specifically for Gilmer and for the inmate, is that right?

A. Yes. It is modeled after, as our policies are, a

program statement or a template and obviously because of the different security levels, the different physical make ups of the institutions, etcetera, then they're allowed some latitude as far as local concerns in addressing issues specifically to that institution.

Q. Are the--under these rules that are explained to the inmates, are they required to have identification on them at all times?

A. Yes.

Q. Are they required to answer questions of a corrections officer such as what's your name and what unit are you from?

A. Yes.

Q. Do inmates have the right to refuse to answer questions like that if they don't like the questions?

A. Only in an investigation after they've been informed of their right to remain silent and the consequences of their silence.

Q. But just in the normal course of everyday life when they're asked who are you and where are you from, they don't have a right to refuse to answer that, do they?

A. No, they do not. In fact if they refuse to give the information or provide incorrect or inaccurate information that in itself, there's a disciplinary action with consequences for those actions.

Q. But you were indicating that after the fact of some

problem, they do have some rights at that point that they're informed of?
A. Correct.
Q. Like other people would?
A. Exactly.
Q. Now the--what's the role of a corrections officer say in a housing unit or around a housing unit in dealing with inmates when they feel--when they have reason to think that there might be some kind of a problem with the inmate? What--what would you expect your--these corrections officers basically worked for you at that time, right?
A. Yes, they did.
Q. What would you expect of them?
A. Again the analogy is as a street cop walking his beat, that housing unit is his beat. That's his community and he is expected--he or she is expected to interact with the inmates, communicate with the inmates, attempt to take care of the problems, answer questions that the inmates may have, or to direct them to the proper personnel and authorities that they perhaps don't have the answer to the questions and they mediate between the inmates and at the first level of the operation as far as the Bureau's concerned to make sure that the unit runs smoothly, appropriately, that there is no--their primary function is obviously security, the safety of staff and inmates and to just maintain a supervisory role

as, as I said, similar to that of a beat cop in a small community.

Q. You indicated I think mediate. Would it be the role of the corrections officer and the lieutenant to mediate and try to diffuse problems before they get out of hand?

A. Absolutely.

Q. Would it be fair to say that's your--that's your main goal in a situation like that at least initially?

A. Absolutely.

Q. Okay. Now when an officer--corrections officer out on his post, his or her post, encounters a problem during the shift that they're having difficulty handling, do you expect them to involve you?

A. Yes. If they--if there's a situation in which they are unable to handle, characteristically they're--those things must come to our attention. And for those instances or inmates' issues that they are unable to resolve at their level then they normally notify us and they'll ask us if we will see this inmate and we will either have them sent to our office or tell them to resolve it in this manner, etcetera.

Q. Now would you consider a part of your normal official duties to deal with those problems when they're directed to you?

A. Yes.

Q. And I think you indicated earlier your initial--at least your initial approach would be to try to diffuse it and resolve the problem without--without additional or aggravated problems?
A. Absolutely. If it’s a matter of communication, finding out what the issues are, getting both sides of the story, and trying to come up with a viable solution that everybody, and you can’t please everybody, but as--the point is, is we try to--to compromise and get the situation resolved so that the inmate’s issue, he’s at least satisfied with the answer or he knows where to go next to get his problems resolved--his or her problem resolved.
Q. Do you have a lot of experience over these years, 18 years that you’ve indicated, in dealing with inmates who have become upset about something in diffusing it and putting it at rest without any major incident?
A. Yes, sir, I have.
Q. Does that happen quite frequently?
A. Absolutely, daily.
Q. Let me ask you about now specifically about July 8th, 2007. What shift were you working on that day?
A. I was assigned as the evening watch operations lieutenant and that would be from four in the evening until midnight at night.
Q. So after the warden and--the old warden was gone, you

basically were in charge of the prison and responsible for the prison?
A. That is correct.
Q. Now was there an occasion when you--when--when a problem was brought to your attention I guess fairly early in the shift around 5 or so?
A. Yes. I as I recall it was approximately 4:45 on that evening.
Q. And what brought this to your attention? What was your first indication of a problem?
A. We use portable radios, walkie talkies, if you will, as one of our means of communication and I heard one of my unit officers contact me and say I've got an inmate that I'm sending to see you and I could--I could tell by his--his tone of voice that there was something unusual. There was concern in his voice enough that instead of waiting for the inmate to come to my office, I felt that it might be necessary for me to respond to the unit and immediately get involved in resolving what might be an issue. And therefore, I left my office and started outside the office toward the--
Q. So it wasn't--wasn't based on what he said but the way he said it gave you this belief from your experience in these matters that you ought to go out and give it some personal attention sooner?

A. Yes.
Q. So what did you do?
A. I came out of my office and started walking toward the compound, the compound being the center area of the institution surrounded by the housing units. My first thought was is that I may have to respond if the officer had to use his body alarm which is a function of the walkie talkie that sends an electronic signal to our communications hub that identifies that we have an emergency in a particular area and a lieutenant is the only one that can investigate and clear those body alarms. That means that we have to be there to say we have enough staff or to direct responding staff as to what we need them to do and so forth.
And my thought process was this sounded like I want to get a head start before I have to run across the compound to that unit, I'm going to get a head start getting over there because something--I could tell by the officer's tone of voice, again, that it was not a usual event.
Q. And when you got out onto the compound, what did you do?
A. When I first got out on the compound, as I was leaving the office, I switched to a frequency on the radio or walkie talkie to my communications or control center, and I told the control center to put a camera on the front of that unit because again I felt like I might have a situation developing there and I wanted to get a camera on it so that

we could--we could get some more eyes on the situation to get a better handle on what was happening there.
Q. Did you have to go all the way over to the B Unit?
A. No, sir, I didn't.
Q. Tell us--now when we say compound, we're talking about--well, let me--let me show a--when we refer to a compound, you're referring to this yard area?
A. Yes, that's the area that is fenced in, if you will, with the sidewalks, the green grass areas, generally that entire area is what is called the compound.
Q. Okay. So where's your office here?
A. If you concentrate your cursor on the right door in the center top part of the picture--
Q. Here?
A. --that--yes, sir, that door just to the right of the cursor is the associate warden's office and directly across that small breezeway to where the pointer is now is the lieutenant's office or the lieutenant's complex. There's multiple offices in that section of the building.
Q. Okay. Somehow I've made an orange arrow to appear. I'm sorry I don't know how I--how I did that, but we'll use our white arrow. Thank you. Now is that you coming out in the compound?
A. It appears to be.
Q. So you were walking toward Housing Unit B at the point

and then you met this person?
A. Yes.
Q. Who is that?
A. That was Inmate Gore.
Q. And at this point, the two of you men are standing there to each other's face, what was going on that time?
A. I spoke with Inmate Gore in an attempt to find out what was going on, what his concerns were that caused him to have to come see me that the officer was unable to resolve for him.
Q. Okay. And do you remember what things were being said?
A. At first, I couldn't really understand or tell what the issue initially was. He--he kind of jumped around in his--in his sentence. What I got was that he was very upset because he felt that the officer were asking him questions that he felt was inappropriate as I understood it. I was attempting--I talked with him to say, well, what was asked of you, is it possible that--I think one of his concerns was that he was asked where he was from or where he lived.
And after listening to what he was telling me and what his version of the situation was, then I repeated back to him what I thought I heard and if it was possible, for example, if the question was, where do you live, in prison slang, if you will, instead of asking well, do you live in Maryland or Washington, D.C., it's not uncommon for, well,

what house do you live in or where do you live? Meaning, what housing unit do you live in? That's a common question especially for the frontline correctional officer because inmates are prohibited from being in any other housing unit except the one in which they are assigned.

And for obvious--well, it may not be for obvious reasons, there's exchange of contraband and again for accountability purposes, they need to be where we can find them and they need to be where they're supposed to be because obviously one of our primary tasks is to make sure we keep them where they're supposed to be.

So I was in the process of trying to determine if perhaps Mr. Gore had misinterpreted the officers' intention by the questions they were asking or if there was something else that was going on that I hadn't quite figured out yet.

Q. Were your attempts to diffuse this with this explanation in calming him down about these questions, was that successful?

A. No, sir, it was not.

Q. Well tell us--tell us what then progressed in the conversation.

A. After that segment of time where I listened to his concerns and when I started to address them and it appeared to Inmate Gore that I was taking the officer's side because I was asking him is it possible that they meant this, that,

the other thing, he became even more agitated and he was extremely agitated when he got to me in the first place.

Q. Now when you say extremely agitated, what were you observing that gives you that--that opinion that that's what his state was at that time?

A. His demeanor was that he was angry. He--his body language as he walked, as he spoke, his hand motions. The way he drew himself up. He was tense and again his verbiage, sentence structures, I was having a hard time following where he was at because he was mad and he was venting and I wasn't quite understanding where he was coming from or where we were going with the conversation.

Q. Okay. Well, what--what then happened toward the end of this when the talking was about over? Pick up there and tell us what happened.

A. During the course of the conversation, the compound officer, Officer Feathers, came from the dining hall area and came over to where I was standing which is customary because we always attempt to have at least two people present for safety and security reasons. So Mr. Feathers came over. At this point, I knew that I wasn't going to be able to communicate with Mr. Gore. That we were not going to be able to resolve this issue.

He become frustrated and more angry and he said, just lock me up, go ahead, just put me in the SHU, or put me in

the hole, which is our special housing unit is where we place inmates for disciplinary action.

Q. Mr. Gore said that?

A. Yes.

Q. And after he said that what did you do?

A. I motioned that area that I walked through the canopy, if you will, is referred to as a smoke shack, and it's exactly that. It's there for staff smokers. They must be out in that area. And normally we would place an inmate on a wall, and search them, and place hand restraints on them, and then secure our compound which means we would get the other inmates off the compound so that while we're moving an inmate that is restrained, he doesn't come in contact with another inmate who's not restrained and risk the possibility of that inmate getting assaulted or injured. So we stop everything and go from there.

So I started to--I pointed to the trashcan in the smoke shack area and instructed Mr. Gore to put his hands onto the trashcan so we could search him. He started and then he stopped and started to turn. I repeated the command. I said just put your hands on the trashcan. We'll shake you down and then we'll take you to the hole.

And he started to turn and I noticed that Officer Feathers had reached up and grabbed his right arm and I grabbed his left arm in an attempt to bring his arms behind

his back and place hand restraints on him. And at that point, he began to pull away or attempt to pull away from the officer and when you are unable to get an inmate under control, that is fighting in that situation, in the absence of a wall to put them against so that you can pen them on the wall and get their arms behind their back without injury is-- the whole point of the exercise is to get them restrained so they can't hurt us or themselves. The other option when you don't have a wall is you have to go to the ground and then get them secured on the ground, get their hands behind their back, apply the hand restraints, and get them calmed down, get the compound cleared, etcetera.

Q. Okay. Did you--did you do anything to cause the compound to be cleared going into these events that you referred to?

A. Yes. After Inmate Gore made the statement well, just--just lock me up, throw me in the bucket, or throw me in the SHU, then all--I called--we utilized a lapel microphone with our portable radios and I called our control center. We have a PA system that transmits all over the institution and I called the control and told them to announce that I needed a clear, a secure compound, and by that, again as I explained, we move the inmates out of the way so that when we restrain one, we can move them from Point A to Point B without risking their safety or ours.

Q. And did I understand that you told Mr. Gore twice to get in a position where he could be restrained prior to the physical altercation?
A. Yes. The primary thing obviously is to search the inmate, to pat search an inmate to insure that they are not carrying some sort of a homemade weapon that they can utilize to injure us or another inmate. So it's--the routine is common to put them in a search position, check them for weapons and contraband, and then place them in hand restraints, and then move them from one point to the other.
Q. Do you recall the language you would've used to give him these instructions?
A. Yes. It's, as I testified, I told him put your hands on the trashcan so we can shake you down which is the slang terminology that prison staff use for the pat search.
Q. Would he--would he understand that? Is that part of his language as well?
A. Absolutely.
Q. Okay. So you've indicated that Mr. Feathers went to restrain one arm--hand and you went stain--restrain the other with the intention of putting his hands behind his back initially was the intent to put cuffs on him, is that right?
A. That's correct.
Q. So what happened from that point?

A. Again he started to resist very aggressively, tried to pull away from the officer and after I got a hold of his arm then we went to the ground. And as we landed on the ground, the officer ended up underneath Inmate Gore and I ended up on top of Inmate Gore. The inmate, as I recall, was face down on top of the officer. I--with the help of the officer trying to get out from under the two us, I rolled Mr. Gore over to try to free the officer. And when I did so, Inmate Gore's right hand became free and he began to strike me in the face and head.
Q. And how long did that continue or what was the sequence from that point on?
A. He struck me. There were three distinct strikes to my face and head that I recall at the time. Later, after review, there were approximately a dozen strikes within a very short period of time; I would estimate twenty-five, maybe thirty seconds.
Q. Did you--did the three strikes that you recall, did they affect your sensory abilities at that time?
A. Yes.
Q. In what way did they affect you?
A. As I said, I was obviously hit several more times after the first initial blows that I recall and I was able to tuck my head down to protect--to protect the side of my face, and I just--all I could do was put my hand up to try to shield

myself from his blows.

THE COURT: Mr. Godwin, it's five after five. The jurors have been here for a very long day. I hate to interrupt the middle of your direct but I think we're going to have to do that and ask you to resume in the morning. Okay.

MR. GODWIN: Yes, ma'am.

THE COURT: All right, Ladies and Gentlemen, that concludes the testimony for today. We'll resume at 9 o'clock tomorrow morning. Is there any juror who is concerned about your ability to be here by 9 o'clock? No. All right, seeing no hands, then we'll conclude with the following instructions to you.

Please leave your notebooks facedown on your chairs and they'll be there for you in the morning. You'll notice there's a number on the back. No one looks at those notebooks. We put them in the safe overnight. They're stored there anonymously and they'll be returned facedown with the number for your chair.

Secondly, please, when you're asked tonight by your family or workers where have you been, what are you doing, you're allowed to tell them that you've been selected for jury duty in federal court in Clarksburg period and that you can say no more while you're serving on the jury.

Now, next, please avoid any media coverage of the case

should there be any, whether in the local newspaper, on TV, or on the radio. If you are reading the paper, in particular if you're looking for the drumbeat for the Pitt game on Saturday with WVU, you're going to have to have someone in your family look at the paper and make sure that before you look at it that all articles involving this case, should there be any, have been removed from the paper. Literally cut them out and get rid of them.

And should any third person--by the way, if there's anything on the local news, TV, or radio just turn it off. If a third person approaches you and tries to discuss the case, advise them that you've been told by the Court you are not allowed to discuss--discuss the case, walk away from them. If they persist in their contact, get away from them, let me know through court security at your earliest opportunity. It's not necessary for you to let your fellow jurors know about that contact.

And, finally, no Internet research on any of the issues that have been raised in the case today. Do you understand? Thank you.

I want to thank you for your attention during the trial today, your patience with jury selection this morning. We'll see you tomorrow morning at 9 o'clock. Thank you. Please follow the court security officer so that you may leave the courthouse.

(Jury out 5:07 p.m.)

THE COURT: All right, Lieutenant Jensen, you may step down. You remain under oath and you will be on direct when you return in the morning. Please be prepared to resume the stand at 9 a.m.

THE WITNESS: Yes, ma'am.

THE COURT: Thank you. All right, Counsel, are there any issues that we need to take up before the conclusion of the--we conclude for the day, I should say?

MR. GODWIN: I'm not aware of any.

THE COURT: All right.

MR. FITZWATER: Your Honor, this morning you stated that perhaps we would have a jury instruction by the end of the day and I was just--

THE COURT: I think we have a draft of one. Okay.

LAW CLERK: I think we do.

THE COURT: Okay. I haven't seen the latest version of it. I'll have Ryan print it out, and I'll have him give it to you, and then you can look it over tonight. Okay.

Now you were going to decide if you were going to let, is it, Mr. Wegman or Mr. Longwell go? I think it was Mr. Wegman.

MR. FITZWATER: Well, actually, there were several.

MR. GODWIN: Furby, Wegman, and Longwell have all

testified and they're free to go as far as I'm concerned.

MR. FITZWATER: Your Honor, if I could get their phone numbers, I need maybe a half hour to determine. I can think of one question I'd like to ask Furby and one question I would like to ask Longwell. I just need a moment to decide if it's that important to bring them back and call them.

THE COURT: That's something that you and Mr. Godwin can determine. Right now they're under subpoena. Next issue, when do you think you'll finish, Mr. Godwin?

MR. GODWIN: I'm most of the way through Mr.--Lieutenant Jensen. I have Mr. Feathers who will be a witness of similar--

THE COURT: Comparable link?

MR. GODWIN: Yes, to these others and then Special Agent Fox and he's only going to testify about the interview he had with the defendant and the--and the defendant's written statement.

THE COURT: All right. So you may finish by noon.

MR. GODWIN: I would expect, yes. I would expect to be finished well before noon, but--

THE COURT: All right.

MR. GODWIN: --usually it ends up being more optimistic than realistic about those things.

THE COURT: And Mr. Fitzwater, you'll be ready to

go?

MR. FITZWATER: Yes, Your Honor. I'll be ready when Mr. Godwin is--concludes his case-in-chief. And I'm actually going to make some decisions with regard to the other eight individuals that I have under subpoena and call them tonight and determine--first of all, determine who I want and call them. So at this point, if I call all of them, they would be less than five minutes each because I just have one question I can think of if I do call them. And then I have the defendant himself and one or more of the eight other individuals I probably just compare what--

THE COURT: All right.

MR. FITZWATER: --I have as far as my notes go.

THE COURT: I want to say this about the schedule, although neither my law clerk nor I has had the opportunity to carefully evaluate the current draft so there may be, you know, it's been coupled together from other cases as well as this one portion of it that we've been working on, I'm going to have him give you the entirety of the draft, look it over, just out of an abundance of caution in case we have to move quickly into a charge conference because we finish around 2 o'clock tomorrow and we've got a, you know, we can then go into the rest of the case.

But I'll say this if we go beyond--if we go to 3 o'clock or 3:30 tomorrow, I'm going to let the jury go early and

then we'll bring them back on Friday for the conclusion. That'll enable us to do the charge conference and for you all to work on your closing arguments. I'm afraid that if I--that if we finish around 3:30, by the time we have a charge conference, however brief, and then you argue the case, it's going to take us to five or beyond, they're going to be gone, they'll be back on Friday anyway. I'd just as soon start them out fresh. Let them hear your closing arguments and go right into their deliberations, if that makes sense to both of you?

MR. GODWIN: Yes.

THE COURT: Okay.

MR. FITZWATER: Yes, Your Honor.

THE COURT: All right, thank you. Then at this time, the Court remands the defendant to the Marshal's custody. I'll see all of you at 9 o'clock tomorrow morning. If you have any issues that arise, please email Ryan so that he can let me know and we'll take them up before 9 o'clock tomorrow morning. Thank you.

(Court adjourned at 5:12 p.m., 11-28-2007)

CERTIFICATE

I, Linda L. Bachman, Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct partial transcript of the proceedings had in the above-styled action on November 28, 2007 as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 20th day of August, 2008.

Linda L. Bachman, CCR, CVR
Official Reporter, United States
District Court for the Northern
District of West Virginia