IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

Plaintiff,

vs. CRIMINAL ACTION NO. 1:07CR93

MICHAEL L. GORE,

Defendant.

- - -

Testimony had in the Trial of the above styled action on November 29, 2007, at 9:08 a.m., before Honorable Irene M. Keeley, Chief Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE GOVERNMENT: DAVID E. GODWIN, ESQUIRE
Assistant United States Attorney
320 West Pike Street, Suite 300
Clarksburg, West Virginia 26302
304-623-7030

FOR THE DEFENDANT: TRAVIS R. FITZWATER, ESQUIRE
P.O. Box 875
Morgantown, West Virginia 26507
304-296-8510

The Defendant was present in person.

Proceedings recorded by stenomask, transcript produced by official court reporter.

---

## INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (For the Government) | | | | |
| Kevin Jensen | 127 | 138 | 185 | 187 |
| Gregory Feathers | 188 | 207 | 231 | |
| Brian Fox | 233 | 245 | | |
| (Rebuttal) | | | | |
| Christopher McCoy | 305 | 308 | 309<br>312 | 310<br>312 |
| (For the Defendant) | | | | |
| Michael Gore | 257 | 285 | 296 | |

| EXHIBITS | ADMITTED |
|---|---|
| Government Exhibit 3A | 136 |
| Government Exhibit 3B | 136 |
| Government Exhibit 3C | 136 |
| Government Exhibit 4A | 237 |
| Government Exhibit 4B | 242 |
| Defendant Exhibit 1 | 250 |
| Joint Exhibit 1 | 305 |

P R O C E E D I N G S

(11/29/2007, 9:02 o'clock a.m., defendant present)

THE COURT: All right, we are ready to resume. I would ask Lieutenant Jensen to resume the stand. Ladies and Gentlemen, Lieutenant Jensen was being directed by Mr. Godwin yesterday afternoon, and Lieutenant Jensen, I remind you that you remain under oath.

THE WITNESS: Yes, ma'am.

THE COURT: And Mr. Godwin, you may resume your questioning.

KEVIN JENSEN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Good morning, Lieutenant.
A. Good morning, sir.
Q. Yesterday when you were here, we went through some things such as duties and training and experience and then you recounted the events of July 8th and the altercation with Mr. Gore. Where we left off, we were about to--I want to show you the video that has been admitted as Government Exhibit 1. I've advanced this to the point where you and Mr. Gore are standing there talking. Now you've reviewed this video with me in the pre-trial interview, did you not?
A. Yes, sir.
Q. I want--I want us to review this now with the jury.

THE COURT: We'll get it, Ladies and Gentlemen. This is when we need the 10 year old who knows how to operate all the equipment. There we go.

BY MR. GODWIN:

Q. Now this is Mr. Gore and this is you?

A. Yes, sir.

Q. Now let me just go down on this. Now do you recall what was occurring here at this point?

A. That's where we were having a discussion regarding our attempt to decipher why he was so angry and what--what the issues were that we were trying to address and the questioning of was it possible that you misunderstood the questioning that the officers were doing and that's what continued to make him even more angry.

Q. Okay, I stopped it here. Who's this that's approaching now?

A. That was Officer Feathers who was the compound officer. They're generally--their assignment is to monitor the compound and supervise inmate movement and so forth.

THE COURT: All right, Mr. Jenson, you're going to need to speak up so that all the jurors can hear you please.

THE WITNESS: All right, ma'am, sorry.

MR. GODWIN: Pull that microphone closer to your mouth and that will help a lot.

BY MR. GODWIN:

Q. You--was this within his duties to come and assist you in a situation like this?
A. Yes, sir, it is.
Q. This is part of the compound where he has responsibilities, is that correct?
A. That is correct, sir.
Q. Now you see--look up here. I've put it on still. You've just made a motion with your radio. What was occurring at this time?
A. I believe that at that point is when I radioed our control center and told them to announce a secure compound over the PA system.
Q. Okay. Had--had Mr. Gore already told you, well, send me to--just send me to the hole?
A. Yes.
Q. And then what was the purpose of securing the compound?
A. The reason for that is when we place an inmate in restraints and there are other inmates on the compound, we want to insure that the restrained inmate is not assaulted by an unrestrained inmate that might take that opportunity. So we secure the compound and take the other inmates off the compound before we transport a restrained inmate to the special housing unit or wherever it's necessary they need to be moved to.
Q. Continue the video. Now at this point, do you know what

you were saying in relation to that point?
A. Yes, sir, that's when I first directed Mr. Gore to put his hands on the trash can so we could shake him down, conduct a pat search for contraband and or weapons.
Q. Did he begin to comply?
A. No, sir, he did not.
Q. Okay, we'll advance it. Now he's turned facing you again?
A. Yes. At that--at this juncture is when I again told him I need you to put your hands on the trash can so we can shake you down or to search you.
Q. This is--this is the initiation of contact from behind by Mr. Feathers?
A. Yes.
Q. And you're taking the hand around. And what was the purpose of this conduct?
A. That would be once--to gain compliance from the inmate, to bring his arms behind his back and to place the hand restraints on him so that we could safely transport him to the special housing unit.
Q. This is after he twice refused to do it voluntarily or without--without assistance?
A. That's correct.
Q. Now looking--this is you?
A. Yes, sir.

Q. And is this at the point I think you've testified that eventually you rolled over where Mr. Gore was on the bottom?
A. Actually Officer Feathers was on the bottom and my concern initially was that Mr. Gore was on top of him facedown where he could possibly injure the officer so I, with the assistance of the officer, flipped Mr. Gore off the officer. Unfortunately, Mr. Feathers remained underneath and as you can see Inmate Gore got his right hand free and began to strike me in the face and head.
Q. So this is his hand here and that's your head?
A. Yes, sir, it is.
Q. And that's when you sustained the injuries?
A. Yes, sir.
Q. These gray covered legs over here, are the legs of the defendant's, is that right, or--strike that. That's an incorrect question. Now, is this you?
A. Yes, it is.
Q. You seem to be a little wobbly there. What was--what was your state at that point?
A. I had received at least a dozen blows to the face and head area, and I was dazed and near--consciousness was kind of an iffy proposition about that point.
Q. Could you see the defendant's face when he was hitting you?
A. Yes, I did.

Q. Could you describe his demeanor, please, at the time he was--at the time he was hitting you?
A. Again when I first rolled him over, we were within approximately 18 inches and I could see his face and look into the man's eyes, and it's really difficult to explain but it was as if there were no emotion, blank, dead stare. It was--you could tell that he was a man that had snapped, just--there is nothing there emotionally conscious.
Q. This is the way he appeared--his face appeared as he was striking you--
A. Yes.
Q. --before--
A. He had just a blank determined look.
Q. At least up to the point you lost your sensibilities--
A. Yes, sir.
Q. --after the third strike? At this point, the altercation is over from your point, is that correct, and these other officers take care of Mr. Gore?
A. Yes, that's correct.
Q. And then at this point, did you have to remain on duty?
A. Yes, I did.
Q. For how long?
A. I don't know exactly. It seemed like perhaps 45 minutes to an hour. I'm not--not certain.
Q. And why was that?

A. In my capacity as the operations lieutenant at that time of day, I was the only supervisor on duty and by our policies at minimum we have a GS11 operations lieutenant on duty and in the facility. We physically have to remain so I remained on duty until they were able to contract Lieutenant Bell, who lives closest the institution in terms of our supervisors. And Lieutenant Bell came in to relieve me so that I could be taken for medical attention.

Q. And describe what medical attention you got first in the prison and then any elsewhere.

A. We have medical staff on duty at the prison and one of the RNs at the time did a preliminary assessment and assisted in helping me control the bleeding and an icepack for the swelling--immediate swelling that was occurring in my face and my head, and basically prepared me for transport.

Q. Where did you go?

A. I was taken by a government vehicle to Stonewall Jackson Hospital in Weston, West Virginia.

Q. Did you receive any medical treatment there?

A. Yes, sir, I did.

Q. What medical treatment did you receive?

A. I was again assessed by two emergency room doctors. They took a CT scan of my head, preliminary eye examinations. They had to stitch a fairly severe laceration

in my mouth and prescribed pain medications and did other cursory check--checks to establish how badly I was injured.
Q. Did you have any lasting--effects that lasted beyond that day?
A. Yes, I did.
Q. What were they?
A. For approximately six weeks after this incident, I had memory loss. I was unable to articulate. I would be in midsentence and couldn’t think of a word, what have you, and I was very concerned about not being able to regain full mental function, if you will, as far as memory was concerned. I also had severe headaches for that same period of time and I continue to have an issue with scar tissue inside my mouth that was caused by the incident and it rubs on my teeth and there’s just really nothing you can do it about it.
Q. This occurred almost five months ago. Do you still have any effects today?
A. Yes, I do.
Q. What are they?
A. Again the scar tissue inside my mouth is constantly irritated by my teeth and without having to have further surgery that’s probably going to be a constant.
Q. But the memory problem and headaches have dissipated?
A. Yes, they have.

MR. GODWIN: Your Honor, if I may approach the witness?

THE COURT: You may.

BY MR. GODWIN:

Q. I'd like to show you, Lieutenant, three pieces of paper that has been marked on the back for identification purposes Government Exhibit 3A, and 3B, and 3C. Would you please first examine each of the three?

A. Okay, sir.

Q. And do you recognize those?

A. Yes, sir, I do.

Q. What are they?

A. They are photographs taken post incident by staff, which is customary in this type of incidence of photographic evidence etcetera and here we're documenting the injuries for these proceedings.

Q. Is the upper part of your body the image that's depicted on each of the three photographs?

A. It is.

Q. And were you--so obviously you were there when the photographs were taken?

A. To the extent that I can remember, I was.

Q. Did--to your knowledge, does--do those photographs accurately depict the images of you on that day, July 8th, 2007?

A. Yes, sir, they do.

MR. GODWIN: Your Honor, I move the admission of Exhibits 3A, B, and C.

THE COURT: Is there any objection, Mr. Fitzwater?

MR. FITZWATER: No, Your Honor.

THE COURT: All right. Government Exhibit 3A, 3B, and 3C are admitted.

(Government Exhibit 3A, 3B, and 3C admitted)

MR. GODWIN: I request permission to publish them by means of projection.

THE COURT: They may be published.

BY MR. GODWIN:

Q. Can you recall 3A? Did you have any injuries prior to being struck in the face by Mr. Gore on that day?

A. No, sir, I did not.

Q. So all of this discoloring, swelling, and bleeding, is that all the result of the assault on you?

A. Yes, sir, it was.

Q. And can you describe just generally what--what injuries here we're seeing?

A. As you can see again the bleeding. We were having trouble controlling the bleeding underneath my left eye. The swelling and bruising had started immediately as well as the bleeding from my mouth area. At the time this photograph was taken, there was gauze inside my upper lip to

control bleeding from having two of my front teeth driven through my upper lip, which caused two lacerations, one of which is visible in this photograph.

Additionally, you can see on my forehead and back, which extended on back to the back of my head, where I had sustained several blows to my head area and the top of my head during this incident.

Q. Are you saying that this cut right here was cut from the inside out?

A. That’s correct.

Q. Now this photo is actually after you’d been cleaned up some, is that right?

A. That’s correct, sir.

Q. Let’s look at what’s been admitted as Exhibit 3B. This is the same image prior to removal of some of the blood and this is more like you were right after the assault?

A. Yes, sir, that’s correct.

Q. Other than that, it’s fairly much the same thing as the image before?

A. Yes, sir.

Q. Let’s look at Exhibit 3C. What does that depict?

A. That was the laceration caused by my teeth being driven through my upper lip and it created a cut pretty much from the center on to my left side and it required several stitches to close on the inside and adhesive stitching

material, if you will, on the exterior laceration.

Q. So that cut we saw in Exhibits--in--particularly in Exhibit 3A is above this area right here and it was caused by your teeth being forced through this flesh?

A. Yes, sir.

MR. GODWIN: I have no other questions, Your Honor.

THE COURT: All right. Mr. Fitzwater, you may cross examine.

CROSS EXAMINATION

BY MR. FITZWATER:

Q. Mr. Jensen, my name is Travis Fitzwater and I represent Michael Gore in this case. I'm going to ask you some questions sort of following up on the testimony that you just gave. If you can bear with me just a moment, I've got a hodgepodge of notes here from yesterday and today and I kind of sort of need to get my bearings.

A. Certainly.

Q. My questions will probably not go in any fact order from the beginning to the end of the incident but I'm going to be asking you some questions about the situation where you and Mr. Gore and Mr. Feathers were--were standing and talking and then leading up to the scuffle as it has been previously described.

You testified earlier that you made a call when you were heading out to the compound to have a--to ask that a video--

that the video cameras be trained on where you were going to be, is that correct?
A. That's correct, sir.
Q. And who did you make that call to?
A. I made that radio call to our control center. Again that's our communication hub and that's also where the controls for our close circuit TV cameras utilized to obtain these videos are literally controlled throughout.
Q. And do you know who in the control center--who was in the control center when you made that call?
A. The officer that responded was Officer Furby who at the time was assigned in the control center as a telephone monitor and was also a trained control room officer, a very good one, so she was the one that acknowledged and began to train the cameras as I had directed her.
Q. To your knowledge--well, did she respond--did she actually respond and acknowledge that she received your--your radio request to train the cameras on you?
A. I believe so. Actually what I instructed her to do was to train the camera on the front of the housing unit in which the officer had called me from. My concern--at that point, I didn't know where Mr. Gore was at and my concern was based on what I heard from the officer's radio transmission, I was concerned that his safety might become an issue or that there might be an incident immediately in

front of that housing unit that I was starting to walk toward. So initially I had--that was my initial order was to put a camera on the Bravo 1 housing unit which was where I was walking to when Mr. Gore and I met near the--what I described as the smoke shack yesterday.
Q. To your knowledge had Ms. Furby already been videotaping the area of the--of the incident before you radioed to her?
A. The close circuit TV cameras that are positioned all over the institution are continuously recorded and some of them are fixed and some of them are movable. So she was--the cameras are running all the time and the officers routinely watch those monitors in the control center and watch inmate activity in specific areas where those cameras have been placed to give us additional sets of eyes to help us supervise our inmate population.
Q. Well, there was--there was testimony earlier in the trial that Ms. Furby trained the cameras on Mr. Gore in response to hearing Mr. Longwell’s radio communication. And so I’m asking you if you were aware of that?
A. No, not at the time.
Q. I’m going to take you through some of the parts of the video that you’ve already been testifying about if I can make it work. I’m going to take you back--take the video back to when you--when we first see--okay, so you see here that we’re--let me take you back to where we see Mr. Gore

walk out of the screen which is I believe at 1 minute 13 seconds into the video, so I'm going to go back to 1 minute, 12 and start it and I'm going to ask you to pay attention to what you're seeing on the video.

We're at a minute and 12, a minute and 13 seconds. Well I went--I think I went back too far or not far enough, I'm sorry. There's Mr.--is that--do you recognize this person here?

A. Yes.

Q. And that's Mr. Gore?

A. Yes, it is.

Q. Okay. So we're at 1 minute, 6 seconds into the video and I'm going to hit play and we're going to see what happens to Mr. Gore. I just stopped it at 1 minute, 14 seconds and it's fair to say Mr. Gore had just went out of the frame of the video, is that correct, sir?

A. Yes.

Q. So I'm going to start it again and at this point, I'm going to stop it and ask you, at this point, you're walking to meet Mr. Gore, is that correct, from the other direction from what we see on the video?

A. Yes, sir.

Q. Okay. And I'm going to ask you specifically to watch the video and you saw where Mr. Gore was on the compound there and you know from your memory, I assume, that where--

about where you were walking towards him and you also know where you met. The reason this is important is I’m going to ask you how long do you think you were speaking to Mr. Gore before we see--before the camera retrains and we see the two of you speaking.

So sometime after we see him leave the screen about 1 minute, 13 seconds into this video up to the point where we see you speaking to him, you all would’ve met and presumably begun some sort of discussion. So I’m going to ask you if you have an idea or memory about when that would’ve happened. So we can watch the video here and see how much time passes before we actually see you on the video.

Now we’re about 2 minutes and 17 seconds into the video. We saw Mr. Gore walk out of the screen at about 1 minute, 13 seconds. So we’ve had about a minute and three seconds that we couldn’t see. Now the video is retraining and the two of you are standing there, is that correct?

A. Yes.

Q. Do you know within that about a minute and three second period how much of that time was spent with Mr. Gore covering the distance where we saw him go off the video and arriving where the two of you are standing? And then also do you know how much therefore--what--how much of the time left out of that minute and three seconds would you all have had to be talking with one another before this camera is

actually now at the point where we can see the two of you?
A. If I understand your questions correctly, sir, you want me to identify an approximate time it took from the time he went out of the screen to reach the point that he is now at, is that accurate?
Q. Yes sir.
A. Okay. Where he walked out of that frame if you will look just below your cursor there's a garbage can there.
Q. Yes.
A. And then there's another inmate that you can see just to the left of that garbage can and back toward the housing unit--
Q. Yes.
A. --about there.
Q. Okay.
A. That would've been approximately where Mr. Gore was when he walked out of the frame so that distance between us and that point at--I can only speculate how long it actually took him but he walked directly over to where he stopped--
MR. GODWIN: Your Honor, I just want to offer the objection that there's--the best evidence is in the other part of Exhibit 1 where the actual motion is recorded by a time table.
THE COURT: All right. The jury will be advised of that and they'll have that in the jury room with them to

take a look.

MR. FITZWATER: Can he answer or should I put the other video up?

THE COURT: Well, he’s saying he’s speculating. I don’t think that’s helpful to the jury. I don’t know if you want to put the other video on or how you want to do it. I’m not sure what you’re looking for.

MR. FITZWATER: Well, if I--the only issue is if I put the other video on, we don’t when he left--we’re seeing his entire--

THE COURT: What is it that you’re trying to ascertain?

MR. FITZWATER: Well, I’m trying to ascertain how much time Mr. Jensen and Mr. Gore were actually speaking to one another before we--we had it--well, I suppose we can get that from the other video because we can see when they meet and then count from there. That’s correct, Your Honor, I apologize.

BY MR. FITZWATER:

Q. Mr. Jensen, I’ll take you to the other video if I can find it up here. Okay, Mr. Jensen, we’re now looking from another angle and I’m going to ask you--I’m going to stop--

THE COURT: For the record, Mr. Fitzwater, which exhibit are we now viewing? Is this the same exhibit--

MR. FITZWATER: No, this is--

THE COURT: --that we were just on or is this--

MR. FITZWATER: I don't know how this exhibit has been--well, this exhibit was entered on one disk I believe, Your Honor, and I can grab the disk.

THE COURT: All right. So--

MR. GODWIN: The disk was entered as Government Exhibit 1 and this is a part of Government Exhibit--

THE COURT: Part of it. Okay, so this is the other--

MR. GODWIN: Both videos are part of Government Exhibit 1.

THE COURT: This is the other video though?

MR. GODWIN: Yes, Your Honor.

THE COURT: All right. Ladies and Gentlemen, it's Exhibit 1, one disk with two videos on it. Okay? So we've moved to the other video now.

MR. FITZWATER: And I just--I just examined the disk, Your Honor. There's no notation on the disk itself--

THE COURT: As to which is which.

MR. FITZWATER: --as to--as to the designation of the two separate videos.

BY MR. FITZWATER:

Q. But this--I would represent to you that this is--this is the view from the rec yard and I believe Ms. Furby, when she testified as to these videos, described it as such whereas

the other more close up few is the view from the--I believe it's called the command center or the other angle. But this is from the rec yard, the long range view that we're looking at.

And I stopped it at about a minute and 30 seconds into the video and I'm going to ask you if you can identify the person that I'm pointing to with the cursor at this point?

A. That would be me, sir.

Q. Okay. So I'm going to now start the video and I'm going to stop again. Now I'm going to ask you, there--do you see two--two figures standing?

A. Yes, sir, I do.

Q. Okay. Now these figures are standing next to a structure and I'll represent to you that this has been referred to as a smoke shack, is that--is that accurate?

A. Yes.

Q. Okay. And the figure closest to the smoke shack, who is that, sir?

A. Again that would be myself.

Q. And the figure just to your right, is that Mr. Gore?

A. Yes, it is.

Q. Okay. Now we're at about a minute and 31 seconds into this video and I'm going to hit play. Okay, I'm going to stop the video now. Is it fair for me to represent that I've stopped the video just as the two of you met each other

and stopped walking?
A. Yes.
Q. Okay. And the video--the video clip at this point shows that we are on 1 minute and 35 seconds into the video, is that accurate, sir?
A. Yes, sir, it is.
Q. Okay. So at 1 minute and 35 seconds, when--well, let me back up. When you arrived--when the two of you arrived and stopped, you met each other, after stopping and meeting there, how long did it take, if you can remember, sir, before you all begin a conversation?
A. Immediately.
Q. Immediately, okay. So I'm going to push play. My purpose for this is to try to determine how much time passes between the beginning of your discussion and the point at which a physical contact is made and later I'm going to go back to the other video and ask you step by step what's occurring during the--
A. Okay, sir.
Q. --conversation. I'd ask you at this point to focus on this line. Previously this has been referred to as a red line. Can you see where I'm pointing, sir?
A. Yes, sir, I do.
Q. Now I'm going to stop the video here. Do you know who just crossed that red line? There's a figure there. Do you

know who that is heading toward you and Mr. Gore?
A. From this view, I can’t be certain.
Q. Okay. I’m going to push play again. And the figure continues to go closer to you and Mr. Gore. I’m going to stop it again. Now can you say who that person is?
A. Yes, sir; that would be the compound officer, Mr. Feathers.
Q. Okay. Now I’m going to push play again. And about 2 minutes and approximately 45, 46 seconds, Mr. Feathers has arrived and is now standing with you and Mr. Gore, is that correct?
A. Yes, sir, it is.
Q. Okay, I’m going to push play again. Now the three of you are--you moved a little, and then you stopped, and then it looks like there’s a lot of movement. Is it--we’re about 2 minutes and 56 seconds into this video, is it safe--is an accurate description for me to say that now you all are scuffling or should I back it up and let you look at it again to make sure that we’ve got the timeframe down?
A. It appears it’s very close.
Q. Okay. So at approximately--when we looked at earlier, and if you would like me to go back I can and we can verify, but approximately a minute and 32 seconds, you and Mr. Gore begin to talk. And then at approximately 2 minutes and 56 seconds, the scuffle begins. Is that--is that a fair

representation of what we're seeing in the video, sir?
A. It appears to be.
Q. So is it then a fair representation to say that there was approximately a minute and 24 seconds between the time that you and Mr. Gore began discussing the situation to the time that a physical altercation was under way? I mean if you'd like, I can back up and review those numbers again because I know I just did a little math and I'm asking you to verify that.
A. That would appear correct, sir.
Q. Okay. So now we have sort of the stage. We know that there's about a minute--I need to write this down or I'll forget it--a minute and 24 seconds which sets the stage for whatever has happened which leads up to this--this physical altercation.
I'm going to go to the other video if I can figure how to switch out here. Okay, now I'm back to the video which eventually becomes a close up of what happened and I'm going to take you--I'll try to take it up to the point where we can see having a conversation. I believe that's about 2 minutes and 20 seconds in. Okay.
Now first let's--let's look at this and see how much of the conversation--we know that there's about a minute and 24 second total span. But if we look at how much we have on this close up, then we can ascertain how much we don't have,

is that accurate, sir, in terms of how much we don't have in terms of a close up video of the--of the interaction?

A. What is your question exactly, sir?

Q. I'm going to rephrase it. I'm asking you if you agree that if we look at the close up video and we calculate how much of this interaction we have on actual video from a close up angle and we compare that number to what we ascertained from the long range, we--we got our outside parameter when we looked at the video from long range, we just go--we determined that the total time from your meeting Mr. Gore to the altercation was approximately a minute and 24 seconds, is that accurate?

A. It would appear so.

Q. And so what I'm saying is that if we look at the close up video and we ascertain how much of that minute and 24 is on the close up, then we can subtract it from the total minute and 24 and then we can ascertain how much of this event we do not have video. How much of a close up we do not have on video. Is that--is that a fair representation of the videos that we have and what they mean for our understanding of this interaction?

A. As I understand your question that would seem to be correct.

Q. Okay. I'm going to back it up and I'm going to ask you to verify the point at which we first see in close up your

interaction with Mr. Gore. I need to back up a little farther it appears. This is starting at about 2 minutes and--2 minutes, 14 seconds. I'd ask you to watch the time. I'm going to pause it and I'm going to ask you if it's an accurate representation that at approximately 2 minutes, 18, 2 minutes, 20 seconds we can now see a close up of you and Mr. Gore?
A. That would be correct, sir.
Q. Okay. I'm going to start the video and we're going to watch this through to the actual physical connection. I'll back it up in a minute and ask you some specific questions about what's--what's occurring but right now I want to set the stage. Let me stop and just verify that's Mr. Feathers.
A. Yes, it is.
Q. Okay. We're at about 2 minutes, 50 seconds, 2 minutes, 49 I would say is when Mr. Feathers actually makes a physical contact with Mr. Gore. Am I fairly representing what we're seeing in this video, sir?
A. Yes.
Q. Okay. So, on this video we see from approximately 2 minutes, 20 seconds to approximately 2 minutes, 50 seconds, we see that as the time which it took from what we can see on this video from where we see you and Mr. Gore speaking to the point at which the altercation begins. Is that a fair representation, sir?

A. Yes.
Q. And that would be 30 seconds, is that accurate, sir?
A. It would appear so.
Q. Okay. So out of the total 1 minute and 24 seconds which we established was the total time that, from the period where you and Mr. Gore began speaking to the point where there was an altercation, only 30 seconds of that do we see in a close up video, is that fair, sir?
A. Yes.
Q. Let me back up to what we see on this close up when we first see you and Mr. Gore speaking. Do you see Mr. Gore? He was gesturing with his arms and he’s still gesturing with his hands. I’m stopping the video now at about 2 minutes and 27 seconds and I’m going to ask you, sir, what transpired from the point where Mr. Gore and you first met one another, if you can remember up to this point, I see that you--well, let me ask you, I’m pointing the cursor to your radio. Is that your hand on the--on the part of your radio there on your shirt or should I play it to verify?
A. I believe it is my hand on the--what we refer to as the lapel mic.
Q. Lapel mic, okay. Do you remember what transpired--we know we have about 30 seconds between this point and the point where the altercation began. We know that you and Mr. Gore were together for approximately a minute and 24

seconds. So that means we have approximately 54 seconds that we don't have a close up for. Is that a fair representation, sir?
A. Yes.
Q. Do you know what occurred during that timeframe before we see--when you all were together speaking, yet before we see, do you a have a recollection as to what was happening?
A. Yes, sir, I do.
Q. And can you describe that for me, sir?
A. Yes, sir. When Inmate Gore got within speaking distance, he began and I asked him, you know, what's going on? Tell me, you know what's the issue? And he began to tell me what was going on, what his concerns were, why the officers were asking him questions, and I utilized that time to allow him to articulate what he was upset about. Obviously if I'm going to referee a situation, if you will, you have to listen, give them an opportunity to tell their story and very often that's all they really want to do is tell somebody what's going on to somebody that's in authority that might be able to help resolve their issue.
Q. And so during that period--as far as you knew during that period was--did it appear to you based upon what you observed at the time that Mr. Gore wanted to have somebody hear out his side of the story?
A. He was responding to my questions in terms of, you know,

what is this about, why--because I have to determine why he felt it necessary to come see me as opposed to the unit officer resolving his issues.

Q. Do you know who his unit officer--I mean when you say his unit officer, you mean there's a specific unit officer assigned to--to be the first--the first person an inmate would go to with an issue or are you referring to the unit officer that sent him to you?

A. The unit officer--in this particular situation, our unit officer assigned to specific pods. And in this case, he was not inside his unit but he had made contact with the unit officers from that B building, if you will, the Bravo housing unit and had initiated a conversation with them and it was that conversation that I had arrived at was the issue that he wanted to speak to me about.

Q. So if he had an issue with the unit officer that he--that he was initially dealing with and he wanted to speak to somebody with some senior authority to that unit officer, would you be the first person in line to receive that, let's say, call it a complaint or whatever the issue was to hear the issue?

A. Yes.

Q. Okay. Can you tell me again who was it that first made you aware that you needed to come out and deal with an issue?

A. Officer Longwell actually made a radio transmission to notify me that he was sending an inmate to my office.

Q. Sir, there was some testimony earlier in the trial that Mr. Gore requested to speak with a lieutenant. Did Officer Longwell relay that information to you?

A. What he said was I'm sending--to the best of my recollection, he said I'm sending an inmate to see you.

Q. And you testified yesterday that you determined there was a heightened need or a heightened--and correct me if I mischaracterize your testimony, please, sir--but essentially you testified that because of the tone in Mr. Longwell's voice you deemed that this was a heightened situation which would justify the need for you to leave your office and go out to the compound, is that accurate, sir?

A. Yes.

Q. I imagine you deal with quite a number of situations where an inmate is not--an inmate and a unit officer aren't able to resolve an issue and therefore your intervention is needed, is that accurate, sir?

A. It doesn't happen what I would characterize as frequently because my officers do an outstanding job of taking care of their areas of responsibility. But, yes, it does occur.

Q. You testified that you've been in corrections for 18 years, and I'm wondering in how much of that time have you

been in the position of a lieutenant?
A. Approximately four and a half.
Q. And during that four and a half years, what percentage of the time that you've had to actually intervene in a situation involving a unit officer and an inmate, what percentage of those occasions did you deem it necessary to actually leave your office and go out to the compound such as in this situation?
A. I would have no idea, sir.
Q. Is this the first time that--that you made that determination?
A. I couldn't say.
Q. So it's possible--it's fair to say then that it's possible that this would be the first occasion upon which you actually left your office to go and intervene in a situation which was occurring somewhere out on the compound?
A. That wouldn't be accurate. I don't recall how many times that has happened because it does happen on about the same percentage as the unit officers having to send someone to see me to resolve an issue. If that makes--makes sense.
Q. Well, I--I believe I may be confused and I'm going to try to clear that up. I believe you just testified that the necessity for you to leave your office and go--go out to the compound in person when it's--when you're going to intervene in a situation, I believe you just testified that occurs

with the same frequency as the number of calls from a unit officer asking you to come out. And if that's--if I heard you correctly, that would mean that 100 percent of the time you leave your office and I don't--I don't think that's consistent with what you were saying before so would you mind clearing that up if you can, sir?

A. Based on the way you phrased that I may have misspoke. I'm trying--trying to answer your questions best I can.

Q. I understand that, sir. I know some of these questions aren't--aren't all that easy to grasp and at any point if you want me to rephrase a question to make it easier to understand, please feel free to do so.

A. Okay. I'm trying to get at--to clear it up as best as I can as I understand Counsel's questions. You want to know how often it's--I have deemed it necessary to leave my office and go to an area where a situation may be developing. And there is a frequency--it doesn't happen often, but it does happen on a day to day spectrum. Based on what I have learned and have been trained to do and my experience is that we are taught to listen very closely to our radio traffic because that one radio transmission may be the only chance that an officer has to summons assistance in a situation.

During the course of that, I also evaluate what--through their voice inflexions or what they say or how they say it

that there may be cause for concern and that happens, not frequently, but it does happen as part of the routine as the supervisor in this setting.

Q. Thank you, Mr. Jenson. I now want to ask you--you indicated that you've been in corrections for 18 years and you've been a lieutenant for four and a half years. And you mentioned yesterday that you've completed several training programs and you also mentioned that there's a yearly forty-hour refresher course that you take. Is it--is it fair then for me to say that you're--you're well trained in your position?

A. Yes, sir.

Q. And so is it fair to say that you would be knowledgeable of the training and what is--what the procedures would be in dealing with heightened situations concerning inmates?

A. Yes, sir.

Q. In your training is there any--is it ever taught that an inmate who is being sent to see a lieutenant should be escorted?

A. It will depend on the situation. It's--it's just as common for them to be sent unescorted. It's more likely that they would be escorted by a staff member when that compound is secured because they're not supposed to be out there unless they're directly supervised.

Q. As a lieutenant is it fair for me to say you have direct

supervisory authority over the unit officers?
A. Yes.
Q. When a unit officer takes an action that you believe falls below your expectations, do you take steps to let them know?
A. Yes.
Q. Did the fact that neither Officer Wegman nor Officer Longwell accompanied Mr. Gore after he was sent to see you fall below your expectation of what they should have done?
A. No, sir.
Q. Not even in hindsight?
A. No, sir.
Q. And why is that, sir?
A. Because those officers were assigned to that area and they are not to leave that area. They are specifically-- their areas of responsibility are their housing units and their immediate environment outside their housing unit doors. So they were in an area--they were in the area where they were supposed to be conducting pat searches and attempting to control contraband and supervising the inmate movement. As you saw, there were quite a number of inmates on the compound at the time. So to answer your question, no, they were doing what they were supposed to be doing.
Q. If either Mr. Wegman or Mr. Longwell had accompanied Mr. Gore and therefore had left their--their post would that

have fallen below your expectation of what they should do?
A. It would depend on the circumstances. If they deemed it necessary and I concurred with that necessity, then they would--it would not be a low expectation. I--I expect my officers to do what they need to do and I trust their judgment, experience, and training and I'm not going to second guess what they do until I've clearly evaluated the entire situation and I have as much information as I can obtain to determine if they're doing the correct thing or not.
Q. Officer Feathers who--who joined you and Mr. Gore during your conversation, he's a compound officer, is that correct?
A. Yes, sir, it is.
Q. As a compound officer was he required to maintain any particular post as were Officer Wegman and Longwell?
A. Yes.
Q. And what post would that be, sir?
A. That would be the entirety of the compound.
Q. And when you say "the entirety of the compound", does that include these grassy areas and these walk--these concreted walkways that we've seen?
A. Yes, sir, it would.
Q. So when Officer Feathers showed up he was doing what he was expected to do within his assignment, is that correct?
A. That's correct, sir.

Q. According to the procedures that you've testified you have good knowledge of, did the procedures contain anything which would allow Officer Wegman or Officer Longwell to request that a compound officer such as Officer Feathers escort an inmate such as Mr. Gore when that inmate was being sent to see the lieutenant?

A. If I understand your question correctly again, sir, if--again, it is not--it would depend on the circumstances. It would depend on the situation and the judgment of the officer if he deemed it necessary to call the compound, but if you're asking are they required to, that is not part of the procedure. Again, they react to the situation, make the judgment call, and decide based on that what needs to be done.

Q. So it's discretionary then?

A. Yes.

Q. You testified that based upon Officer Longwell's tone of voice during the radio call you felt a heightened sense of--let me see if I can find your--your words--but you essentially said there was a heightened sense in your mind that the situation warranted--you actually testified, "I could tell by the officer's tone of voice that something unusual was happening", and then that caused you to leave your office and go out to the compound.

When you saw--when you saw Mr. Gore walking to you

unescorted is it safe to assume that you would have in that moment realized that Officers Wegman and Longwell used their discretion to either not leave their post and escort Mr. Gore and also to not ask for a compound officer such as Officer Feathers to escort Mr. Gore?

A. Again short of an emergency, they are not to leave that area so it's not incumbent on either of the unit officers to do the escort. They would only call the compound officer to escort the inmate if the situation warranted. In this particular situation and as it happens from time to time when an inmate is not satisfied with the exchange that's going on with the staff member, they will take it upon themselves because it was an open compound, by that, again I refer to the inmate movement, inmates are able to come and go to a degree because we were serving the evening meal so they were allowed to be out there. Often they choose to come to the lieutenant's office to resolve issues that they are having and if they're not escorted then it's not necessary to escort them under those circumstances.

Q. So when you saw that Officer Gore was unescorted did that cause you to change the assessment that you had just previously made that something unusual was happening?

A. It didn't change my perception at all.

Q. And why is that?

A. At that point I did not have enough information to

ascertain what was going on.
Q. So at the point here on the video where you and Mr. Gore are talking and Mr. Gore is indicating his disagreement with the questions that were asked by Officer Wegman, did anything that Mr. Gore told you cause you to believe that Mr. Wegman had said or done anything that would fall below your expectations as his supervisor?
A. No, sir.
Q. You testified yesterday that an inmate can face disciplinary actions with consequences if they don't answer questions of the correctional officers, is that correct?
A. Yes.
Q. Is there any limit to the kinds of questions that an inmate must answer of a--from a correctional officer?
A. Only those dictated by law. Specific questioning in which the inmate might be criminally asked to--if the officer, of the Fifth Amendment, if you will, to incriminate himself. They must act as the law enforcement would in that respect if they're going into an area where the inmate's rights need to be protected.
Q. Now I believe you testified that the purpose of a pat down stop was to determine if there was contraband and I believe you said such as food in the possession of the inmate, is that correct?
A. I think I testified to contraband and/or weapons.

Q. Well would a weapon be a subset of contraband?
A. It’s all--anything not authorized for an inmate to have in their possession is a loose definition of contraband.
Q. So they’re looking for weapons, and drugs, and--
A. Exactly.
Q. --food and things of that nature?
A. Yes.
Q. Okay. And part of that--the purpose of that pat down to look for those things is to secure the safety of the inmates and the officers, is that correct?
A. Yes, sir.
Q. If a correctional officer asks an inmate how are you doing, is that inmate subject to disciplinary action with consequences if they refuse to answer that question?
A. Not at that point.
Q. Now you testified that your main goal when you--when you’re going on to a situation--you testified yesterday that your main goal when you are coming out to mediate a situation involving an inmate who has a grievance or an issue or to mediate a situation where there’s a disagreement between a correctional officer and an inmate that your main goal is to quote, “mediate a situation before it gets out of hand”, is that accurate, sir?
A. Yes.
Q. And that you try to get both sides of the story and try

to get the situation quote, “resolved”?
A. Yes.
Q. What are the possible resolutions? You say you get the situation resolved, what are you hoping to accomplish? What would, in your mind, be the definition of a resolved situation?
A. It would be to determine, based on the information provided by the inmate and/or the officers, again to determine what the issues are, first of all, and then to address those issues and try to resolve to whatever means the particular situation requires so that we can restore the operation of the facility and our day-to-day work and keep it a safe environment for the inmates and for the staff.
Q. What questions did you ask Mr. Gore to try to develop the sides of the story in order to hopefully get that situation resolved?
A. Initially I asked him to tell me what was going on.
Q. And do you recall what he said?
A. He began to ask why the officers were asking him certain questions and he was very animated about why did they ask me this or what--why would he have to answer that, or that sort of thing. That seemed--seemed to be the primary issue although, as I testified previously, I was not getting what the core issue was right away so there again I allowed him to speak and to try to explain to me what his primary

concerns were.
Q. So after you gave him the opportunity to speak, do you believe that you were able to ultimately ascertain what that core issue was?
A. It seemed to me that it surrounded some of the questions that were asked by the correctional officers when they had stopped him on the compound.
Q. Did you tell Mr. Gore that the questions, as he was relating them to you, were appropriate in your mind from the standpoint of the supervisor of these officers?
A. At that point I was trying to determine if the officers had asked him anything inappropriate or more particularly what he felt the officers--why he felt what questions the officers asked him was inappropriate, so again I was trying to get at, well, if they ask you where do you live or-- again, it’s not where are you from, it’s what housing unit are you assigned to, because again, as I testified yesterday, the inmates are restricted to their housing unit, the one that they are assigned to live in. So common slang, if you will, or verbiage used in the correctional setting is where are you from, or where’s your house, where do you live, which means, what housing unit are you from? And they ask that to determine if that inmate is in an area that they’re not authorized to be in.
Q. Did you personally ask Mr. Gore where he was from or

where he lived?
A. I asked him what unit he was from and I may have used the common verbiage of where do you live.
Q. Did you ask Mr. Gore if he was from D.C.?
A. There was--there was discussion regarding that but prior to that, when I started asking him, is this what the officers meant or where are you from, that's when Mr. Gore became even more agitated and things started to digress.
Q. So when you say there was discussion regarding whether Mr. Gore was from D.C., did you initiate that discussion?
A. As I recall, Mr. Gore was having the discussion of why were they asking me these questions. And I believe that was one where--why do they need to know where I am from.
Q. So to the best of your recollection then you did not, during your conversation with Mr. Gore, ask him if he was from D. C.?
A. I don't--I don't know for certain.
Q. Would the fact that an inmate was from D.C. have any relevance to you in the performance of your duties as an experienced superior officer?
A. Yes.
Q. And why is that, sir?
A. Because it's--there are factions within the inmate population because of the fact that they are, generally speaking, from different parts of the country. And

specifically, it's known that certain elements of the population, for example, if they're from D.C. and they're from, let's say, southeast D.C. they may have issues with inmates who reside in northwest D.C. There's conflicts. There's issues among them just based on where geographically they live.

Very often there's power struggles in the inmate population based on are they a D.C. inmate, what part of D.C., are they an Ohio inmate, because there's the factions and it's important for us to identify what faction might be involved here so that you get a better handle on what might be the core problem.

It might be--there's several different things that can be going on in these interactions that you have to evaluate and the geographic location of which an inmate is from is important in determining some of the factors because there may be some hidden agenda in what the inmate's trying to accomplish by coming to see us. To expound on that just a little bit is if for example they were having issues on the compound, they may purposely confront a staff member or know that if they go so far as not following the rules that they're going to get taken off the compound or removed and placed in the special housing unit. Sometimes it's important for them to do that for their safety and to save face, they will confront staff knowing that staff will

remove them from the general population and thus they will be safe without having to lose face in front of their peers.

Q. So one of the things that you thought may be occurring is that Mr. Gore may have been wanting to end up in this special housing unit for some internal purpose of his own?

A. Yes.

THE COURT: Mr. Fitzwater, we're at 10:30. I think it's an appropriate time to take a recess and give the jury a break. Ladies and Gentlemen, we'll continue with cross-examination upon your return. Please be prepared to return to the courtroom at 20 till 11. Do not discuss the case among yourselves during this recess and thank you for your attention this morning.

(Jury out at 10:30 a.m.)

THE COURT: Lieutenant Jensen, you may step down. You're on cross-examination and should not discuss your testimony with anyone during the recess.

THE WITNESS: All right.

THE COURT: Mr. Fitzwater, I'd like you to estimate how much longer you plan to be on cross-examination with Lieutenant Jensen, if you can?

MR. FITZWATER: I would say--estimate less than 20 minutes and I can say on a note of time, Your Honor, I released all eight of the other witnesses I had with the exception of one. So I had eight witnesses lined up but

only one of them I'm going to call so my actual--when I put on the defendant's case should not be very--it should not take nearly as long as it looked like it may have yesterday afternoon.

THE COURT: All right. This Court stands in recess for 20 minutes. Thank you. I'm sorry, 10 minutes, 20 till.

(Recess from 10:31 a.m., until 10:40 a.m., 11-29-2007)

THE COURT: Thanks, please be seated. All right, Lieutenant Jensen, if you'll please resume the stand. Are the parties ready to proceed? We can bring the jury in, thank you.

(Jury in at 10:42 a.m.)

THE COURT: All right, welcome back, Ladies and Gentlemen. Mr. Fitzwater, you may continue your cross-examination.

MR. FITZWATER: Thank you, Your Honor.

BY MR. FITZWATER:

Q. Mr. Jensen, earlier this morning when Mr. Godwin was asking you questions, Mr. Godwin was showing you this video and I'm going to take you up to the point where you were and then I'm going to ask you about an answer that you gave. At about 2 minutes, 41 seconds, Mr. Feathers walks over and this--now we're at 2, 42 on the video's clock that tracks how far we are into the video.

Earlier you testified that at this point Mr. Gore had

already told you that he wanted to go to the hole, is that accurate?

A. Yes.

Q. We're at 2 minutes and 42 seconds into the video. I'm now going to take--I'm going to push play and I'm going to stop it when the physical connection is made. Now we're at about 2 minutes, 50 seconds and this physical altercation has begun. Do you know, if you'll recall or if you'll agree with me, earlier we established that from the time you started speaking with Mr. Gore up until the point that we see here on the video that the physical altercation begins there's approximately a minute and 24 seconds? Do you know at which point during that timeframe when you just testified that at 2, 42 by that point he had told you that he wanted to go to the hole, do you know how long--so that would place the timeframe in which he would've--he would've indicated to you that he was willing to go to the hole somewhere within a minute and 16 seconds?

And I'll tell you how I arrived at that and see if you agree with me. We have a minute and 24 seconds give or take a second total time. Eight seconds before the physical altercation begins, you say that he's already told you that he would go to the hole. So we take eight seconds off that minute, 24, we have a minute, 16. Do you know at which time within that minute and 16 seconds, Mr. Gore indicated to you

that he wanted to voluntarily go to the hole?
A. I believe it was just before I made the radio call to secure the compound.
Q. Okay. I'm going to back up and we can identify when that radio call was made. You've got your hand on the lapel mic at this point. Is that when you were calling for the compound to be secure?
A. That was when I was preparing to, it would appear.
Q. So is it safe to say then at some point prior to your hand hitting the lapel mic is when Mr. Gore--excuse me, I seem to have lost my pen and I'm going to need it. Just one moment please. Found it. Does that mean that prior to your hand hitting this lapel mic at some point Mr. Gore had announced that he was willing to go to the hole?
A. Just prior to making the radio call, the statement he made was just take me to the--just lock me up, put me in the SHU, or put me in the hole, something of that verbiage.
Q. So earlier you recall that I paused the video at 2 minutes and 50 seconds and that was when the physical altercation had just begun, is that accurate, sir?
A. Yes.
Q. And some time prior to 2 minutes and 22 seconds into the video your testimony is that you believe Mr. Gore indicated to you that he would go to the hole or asked you to take him to the hole, is that correct?

A. Yes.
Q. And then 2 minutes and 22 seconds is about 28 seconds before 2 minutes and 50 seconds, is that correct?
A. Yes.
Q. So if our total relevant timeframe is a minute and 24 seconds and subtract that 28 from a minute and 24 that would mean at some time during the first 56 seconds that you and Mr. Gore were discussing the situation, he indicated to you that he wanted to go to the hole, is that correct?
A. As I testified, it was just prior to me calling for the secure compound as I recall.
Q. So then it's fair to say then that given those timeframes and given the fact that we can see your--your hand is on the lapel mic and it's 10 minutes and 22 seconds into the video and we know that between the time you and Mr. Gore began speaking to the time that there was a physical connection, you have about a minute and 24 seconds. And we can ascertain that Mr. Gore would've had to have told you he was willing to go to the hole or asked you to take him to the hole within the first 56 seconds that you and Mr. Gore were speaking to one another, is that correct?
A. That doesn't--doesn't sound correct to me.
Q. Okay. Well--
THE COURT: Mr. Fitzwater, didn't you go through all of this a while ago?

MR. FITZWATER: Well, I did but now the witness--

THE COURT: No, I mean maybe an hour ago. Are you redoing the same area again?

MR. FITZWATER: No, Your Honor, I'm not. Your Honor, I'm trying to ascertain when Mr. Gore indicated to Mr. Jensen that he was willing to go to the hole. This is something I hadn't yet covered, Your Honor.

THE COURT: All right. I'm sorry, I thought you had and I thought you had already gotten the answer that Mr. Jensen thought it was right before he made the radio call to clear the compound.

MR. FITZWATER: And I'm just asking Mr. Jensen if he agrees with the timeframe. I think it can be inferred. I just was hoping to get his--his testimony. I'll move on, Your Honor, because I do believe the record reflects accurately about the timeframe.

THE COURT: All right.

MR. FITZWATER: Thank you, Your Honor.

BY MR. FITZWATER:

Q. To your knowledge were--did Mr. Gore suffer any injuries as a result of this scuffle that occurred?

A. Not to my knowledge.

Q. To your knowledge were there any pictures taken of Mr. Gore, which would prove or disprove that he suffered any injuries after the scuffle?

A. I don’t know if there were or not.

Q. You testified earlier that you believed you’d received quote “at least a dozen blows to the face and head area”. Is that based upon your actual recollection of what happened or is that based upon what you seen in the video after it happened?

A. My interpretation was based on the video that I saw after the fact.

Q. Before you saw the video, did you have a different opinion as to how many blows may have connected with your head or face area?

A. I believe I testified that after approximately the third blow, I wasn’t coherent to the point of really knowing what was going on.

Q. So based upon your actual recollection of the event, without looking at the video, you would only with certainty be able to say you were hit three times, is that correct?

A. The--it continued as I’m fighting for consciousness but I don’t remember how many more times or how long after the third blow.

Q. I’m going to take you now back to the part of the video where the physical connection is first made. Right now we’re at 27 seconds and going and it’s going to be about 2 minutes and 50 seconds, so just in a few seconds you’re going to see the point at which the--there’s Mr. Feathers.

Let me ask you a question first about this. Mr. Feathers has a cup in his hand.

THE COURT: I'm sorry, what was the question?

MR. FITZWATER: Oh, I'm sorry, Your Honor. I'm formulating it. I'm trying--I'm trying to formulate these questions as clearly as I can.

BY MR. FITZWATER:

Q. Given the fact that Mr. Feathers had a cup in his hand, you as his supervisory officer, would that fall below your expectation of what Mr. Feathers should've been doing at this moment?

A. No, sir.

Q. I'm going to back up just a little bit. Mr.--is it fair to say that Mr. Feathers just walked over at this point at 2 minutes and 39 seconds into the video?

A. Yes.

Q. Now I'm going to play it again up to the point where the contact is made. Now we're at 2 minutes and 50 seconds into the video. Did you see that as I played it just now, sir?

A. Yes.

Q. Can you tell me whether you or Mr. Feathers took the first step which initiated the physical contact?

A. My recollection was that it was almost simultaneous. I believe, as I recall, that Officer Feathers started to reach for the hand which would've been to bring them behind the

back of the inmate and then I took his other arm which would be customary.

Q. Are there any signals that correctional officers have which would enable you to signal to Mr. Feathers that it was time to initiate a physical contact with Mr. Gore?

A. No, sir.

Q. So when Mr. Feathers went to grab Mr. Gore’s hand, you had not attempted to communicate to him that you wanted him to do that, is that correct?

A. That’s correct.

Q. We saw that Mr. Feathers walked up to you at 2 minutes and 38 seconds into the video. From the standpoint of somebody who was there, based upon your observations, were you able to determine in your mind if Mr. Feathers was close enough to you before he got to you at 2 minutes and 38 seconds to hear what you and Mr. Gore had been saying to one another?

A. I don’t know that I can answer that.

Q. All right.

A. We were having conversation within perhaps a few steps. I would surmise that he might be able to hear but I couldn’t say positively.

Q. Fair enough. Did it fall below your expectations as a supervisor of Mr. Feathers that he initiated the physical contact to restrain Mr. Gore when he had not been present

during your conversation with Mr. Gore?
A. No, sir.
Q. So then is it fair to say that you agree with Mr. Feathers' decision to initiate contact with Mr. Gore at the moment that he did?
A. Yes, sir, I would.
Q. I'm going to ask you to look at this video and tell me, if you can, what out of Mr. Gore's actions from the time Mr. Feathers shows up to the time Mr. Feathers initiates contact and you can do this by looking at the video or supplementing what we see on the video with your recollection of the events, justifies Mr. Feathers' decision to initiate that contact.
I paused it. You just saw the timeframe from about 2 minutes, 38 seconds to 2 minutes, 50 seconds, the timeframe at which Mr. Feathers arrives to the timeframe that the physical connection begins and I've asked you to tell me, if you can, what you believe justified Mr. Feathers' decision to initiate the contact with Mr. Gore?
A. Based on the fact that the inmate was not responding to my verbal commands and the fact that instead of proceeding as he started to walk that he stopped and started to turn, would signal that he is not compliant and therefore we're going to have to regain control of the situation.
Q. Did you have handcuffs on your person during this period

where you were talking with Mr. Gore?
A. Yes.
Q. To your knowledge did Mr. Feathers have handcuffs or other restraints on his person during this time?
A. Yes.
Q. And if you can, sir, can you tell me, given your training, whether there is training as to what point during an attempt to restrain an inmate an officer should produce the handcuffs?
A. You will not until you've gained control of the inmate to where you have a free hand to actually get them out of their--their holder on your belt and then apply them. It's important that you have control of the inmate prior to producing the handcuffs so that the inmate or inmates don't get a hold of them and use them as a weapon against you.
Q. When an inmate is going to be taken to the special housing unit or the hole, did the procedures require that they are always restrained while they are being taken to the hole?
A. Yes. They are required to be in hand restraints before they are placed in the housing unit sally-port.
Q. Now does the requirement dictate that they are placed in the handcuffs from the point at which they, you know, at which there's initially a determination that they're going to go to the hole or--answer that question first and then

I'll go on. I'm sorry.
A. What you're asking is procedurally do we put them on as soon as we know that they're going to the hole?
Q. Yes.
A. Not necessarily.
Q. You testified earlier that you asked Mr. Gore to allow you to search him during this moment in time that you and Mr. Gore were speaking, is that correct?
A. Yes, sir, it is.
Q. You also testified that you knew Mr. Gore was upset as a result of a pat down search by Officer Wegman, is that correct?
A. Yes.
Q. Why did you feel it necessary to ask Mr. Gore to allow you to search him given the fact that he had just been searched by Officer Wegman?
A. If you look at the distance between the housing unit and my position and the number of inmates that he walked through and close to from the housing unit to the point where we met, it is very possible that he could've obtained a weapon during that space of time and distance.
Q. Are you certain that Mr. Gore heard you ask him to submit to another search?
A. Yes.
Q. If you'll bear with me for just one moment, I'm almost

done, Mr. Jenson. At which point did you view--did you first see this video of this incident?

A. It was after I returned to duty approximately two weeks later.

Q. And would it have been before or after--well, first let me ask, did--at any point were you interviewed by Mr. Brian Fox with regard to this incident?

A. Yes, sir, and I misspoke in my previous answer. I remember that I was brought in within a couple days I believe for an interview and as I recall now I may have looked at that video prior to that. So I would’ve seen it within a couple of days, two or three days of the incident. And to answer your question, yes, I did have an interview by Mr. Fox.

Q. Okay. I think I may have just one or two more questions for you. Had Mr. Feathers not initiated the physical contact with Mr. Gore when he did, can you say--well, first, were you intending to initiate physical contact with Mr. Gore regardless of what Mr. Feathers did at the moment that this--this interaction was occurring between you and Mr. Gore?

A. The incident was clearly digressing and to be in control, yes, I would have had to physically get control of his arm and attempt to restrain him myself had it been just me there by myself, so, yes.

Q. You've seen this video now several times in court today and yesterday and also you just testified you've seen it prior and you were there. Did Mr. Gore exhibit any physical actions during this occurrence, which caused you to believe that he would initiate some kind of physical violence against you?
A. Yes.
Q. And what was that?
A. That was when he, after my second order that he stopped and began to turn, at that point, I was very concerned that I might be assaulted at that point.
Q. I'm gong to back it up so we can see what--what it is you just spoke about. Is that what you were just speaking about where he stopped and turned?
A. Yes.
Q. I'm going to back it up one more time and I'm going to ask you a question about a gesture and it looks like you're saying something. As Mr. Gore first starts to walk, you gesture with your arm and you say something. I'm going to ask you if you can recall what it was that you were saying at that moment.
A. Yes, I told him to place his hands on the nearby trash can so he could be searched.
Q. Okay. So let's look at this again and then I'm going to ask you. You see Mr. Gore. We're at 2 minutes and 42

seconds, he begins to walk. And then about 2 minutes and 45, 44 seconds, you point--well, let me back it up again. And before I play it, I'm going to--I'm going to represent to you that before Mr. Gore stops and turns, you point and say something to him and you've just indicated that what you've pointed and said was that you wanted him to place his hands on a trash can to be searched.

I'm going to--I'm going to play it again and ask you if that's accurate what you've--if you--if I'm accurate in my understanding of what you were saying. We've backed up to about 2, 38. Am I fairly and accurately representing what's happening on this video by saying that Mr. Gore did not stop until after you raise your hand and speak to him while he's walking? Or shall I play it, again, sir?

A. Say that again.

Q. I'm saying is it a fair representation of this video that Mr. Gore did not stop and turn until after you raised your hand and gave him the command to go and put his hands on the trash can so that he could be searched?

A. The point depicted in the video is the indication of the second order and again a repeat of my primary action to identify where I wanted him to go and what I wanted him to do.

Q. And I'm asking you after you gave that second order, I'm asking you is it true that he did not stop and turn until

after you initiated that second order?

A. Yes, that would be correct.

Q. So if that's the case then why did you interpret his stopping and turning as an act of aggression?

A. Because he was not continuing to walk toward the trash can where I had instructed him to place his hands so he could be searched and when he stopped, that was an initial indication of noncompliance because he was--didn't continue to walk and the fact that he turned back toward me was cause for my concern.

Q. In your every day interactions with other persons, do you not expect that they would stop and turn towards you when you address them?

A. In a normal setting that might be the case.

Q. One last thing, Mr. Jensen, and then I'm done. You testified several times that you had extensive training. You've even testified that you had training in the Quest program, which involves moving inmates from one facility to another. And you've testified that your goal is to try to subdue a situation, that's your primary goal. And I'm just going to ask you, after seeing how quickly this all transpired and in light of all your training, do you--as you sit here today, after having looked at this video several times and we've gone over the events of what happened, do you believe that you handled this situation in the manner

which was most likely to resolve in a peaceful resolution?
A. Yes.
Q. Thank you, Mr. Jensen.
MR. FITZWATER: Your Honor, I have no further questions.
THE COURT: All right. Redirect.

REDIRECT EXAMINATION

BY MR. GODWIN:
Q. Lieutenant Jensen, I just want to ask you about one little area. You--you brought up the issue of weapons. Now officers, including yourself, don't have weapons like guns and knives and billy sticks and things of that sort on the compound, do you?
A. No, sir.
Q. But you indicated in your answer on cross-examination that it was possible that Mr. Gore was armed because he had passed by other inmates, do you recall that?
A. Yes, sir.
Q. Are the inmates allowed to have weapons?
A. No, sir.
Q. Do you make efforts to prevent them from having weapons or keeping them?
A. Absolutely.
Q. What type of weapons do you find them in possession of?
A. They will take any metal object they can find and use a

sidewalk, a rock. They'll steal sandpaper from the carpentry shop where they work or if they're not being supervised properly, they will get to a metal grinder if possible to sharpen a metal object and place a handle on it to use it as a homemade knife or a homemade weapon. They will also utilize a piece of broken plastic, Plexiglas, aluminum, wood, dominoes, anything that we can conceivably think of that they might have access to, they've been known to make very effective weapons out of these day-to-day routine things that they come in contact with in a correctional environment.

Q. Is that the reason why they have to go through a metal detector in and out of rec?

A. Yes.

Q. And these kinds of weapons are actually found on a fairly routine basis, are they not?

A. Yes, they are.

Q. And in your experience, have officers and inmates actually been assaulted and injured with these kinds of weapons?

A. Yes, they are.

Q. So is it fair to say that in a situation like this that an officer can't assume that the angry inmate he's talking to is not armed?

A. That would--that would be correct.

MR. GODWIN: I have no other questions, Your Honor.

THE COURT: Further cross-examination on those issues?

MR. FITZWATER: Yes, Your Honor.

RECROSS EXAMINATION

BY MR. FITZWATER:

Q. Mr. Jensen, you said that frequently officers and inmates are injured with weapons that the inmates make or they fashion out of whatever objects, is that accurate?

A. Yes.

Q. Does that happen frequently at Gilmer?

A. It happens more frequently that they will utilize these homemade weapons on one another.

Q. To what extent does it happen that these weapons are utilized against correctional officers?

A. It happens somewhere in the country almost daily.

Q. Has there experience--has that been an experience which has occurred at Gilmer?

A. Not during my tenure that I recall.

Q. And how many years have you been at Gilmer, sir?

A. I've been at the FCI Gilmer for approximately two years.

MR. FITZWATER: That's all I have, Your Honor. Thank you, Mr. Jensen.

THE COURT: All right. Anything further?

MR. GODWIN: No, Your Honor.

THE COURT: All right. Is Lieutenant Jensen excused? I think you had a subpoena on him so I just want to make sure, or a summons I mean.

MR. FITZWATER: Yes, Your Honor, I--I don't intend calling Lieutenant Jensen.

THE COURT: All right. Thank you, Lieutenant Jensen. You may step down and you're excused as a witness.

(Witness excused)

THE COURT: The Government may call its next witness.

MR. GODWIN: Gregory Feathers.

THE COURT: Gregory Feathers. Mr. Feathers. Please approach the front of the courtroom to the Clerk who will administer the oath before you take the witness stand.

GREGORY FEATHERS, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you, you may take the witness stand. The witness is Gregory Feathers, F-e-a-t-h-e-r-s.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Mr. Feathers, where do you live?

A. I currently reside in the Morgantown, West Virginia area.

Q. And how are you employed?

A. I work for the U.S. Department of Justice, Federal Bureau of Prisons. I work at the United States Penitentiary

in Hazelton, West Virginia.
Q. And what is your position with the Bureau of Prisons?
A. Currently, I'm a Senior Officer Specialist. We're also known as GS8.
Q. What--how long have you been employed by the Bureau of Prisons?
A. I was employed with them in 2000, in July of 2000, ever since.
Q. And did you have prior either law enforcement or corrections officer experience prior to 2000?
A. Yes. I worked as a State of Delaware correctional officer since April of--I'm sorry, April of 1997.
Q. And then in 2000, you became a federal employee of the Bureau of Prisons?
A. Yes, sir.
Q. Now where were you assigned in--earlier this year in July of 2007?
A. I was at FCI or Federal Correctional Institution in Gilmer, West Virginia.
Q. And what was your position there?
A. There I was a Senior Officer.
Q. Senior corrections officer?
A. Yes, Senior Correctional Officer, I apologize.
Q. So your--your duties were in the day-to-day management and supervision of the inmates?

A. Yes.
Q. Did you receive the Bureau of Prisons training for your position?
A. Yes. I received two weeks IF training, initial familiarization with the institutional correctional practices, and then went to GLENCO for three weeks.
Q. Okay. And do you receive continuing education from time to time?
A. Annual refresher training every year.
Q. And you've attended all your training?
A. Yes. And I actually instruct some classes there.
Q. Let me ask you now about June--excuse me, July the 8th, 2007, particularly the evening shift, which was the 4 to 12 shift. Were you on duty at FCI Gilmer on that shift?
A. Yes, I was. I believe, to the best of my knowledge, I was on overtime due to staff shortage.
Q. And what were your--what were you--what were your assigned duties during the 4 to 12 shift?
A. I was the Compound One Officer so my duties encompassed the security responsibility of the inner compound yard.
Q. Okay. The compound is referring to the grassy and the concrete areas on the outside or outdoors part of the prison, on the interior of the prison?
A. Yes. I was responsible for the security within the open visual area in between the fences and the buildings,

basically any open area inside the inner compound.
Q. And does the--does the dining facility enter out onto that compound?
A. Yes, it does.
Q. Now after the evening meal that day, what specifically--what specific duties were you performing?
A. Compound I officers sort of monitor the chow, also call units down to chow. There’s 12 units in the institution and we call them one at a time based on how many inmates are in the chow hall and if it’s enough space to fit another unit in. So I’ll go in the chow hall and monitor activities. If I feel that there’s enough space to add another unit, I’ll call for that unit to chow in sequence.
Q. Okay. Do you have any role in the supervision of the inmates?
A. Yes. Upon exiting the chow hall, it’s my responsibility to perform random shakedowns for any items of contraband whether it be coming from the chow hall or just an item that they should happen to be carrying around in the institution on them.
Q. And is that a--that’s a normal expectation, that’s one of your duties that you’re--
A. That’s a standard operating procedure for a compound officer. That’s a standard operating procedure for a correctional worker.

Q. Let me show you what's already been admitted into evidence as--it's a video from one of the cameras, the one at the main building over the associate warden's--that camera and it's already been admitted as part of exhibit--Government's Exhibit 1. Now do you recognize this part of the--
A. Yeah, that would be the chow hall or mainline as we call it.
Q. So I would take it that right now you couldn't tell us which one of those people you were?
A. No, not with certainty. I could tell you which area I more than likely would be in with--without saying that I didn't step into the chow hall at this specific point. You can see in the center of it, there is a little roof and it's held up by four by four posts. It's referred to as the smoke shack, but it's a staff area, off limits to inmates. It's also shelter for us in the rain because we have to stand out there and monitor activities on the compound.
Q. So am I pointing--
A. Yes, right there. And you can see the little black thing's a trash can. I would've been positioned right there observing inmates exiting, trying to identify what may be bulky--bulky items under their clothing and or abnormal behavior.
Q. Now--okay. Did the--did an event on the compound come

to your attention during that evening meal?
A. No. Originally it was a transmission over the radio that I heard. Something to the extent, and without exact verbiage, was there was an inmate with an attitude of some sort. There was an issue basically from I believe it was the Bravo 1 officer and the transmission was to the operations lieutenant, Lieutenant Jensen.
Q. Okay.
A. And it was asking him if he could send the officer over to see him, which would indicate--
Q. Send the officer or the inmate?
A. I'm sorry, send the inmate, I apologize. Send the inmate over to see him because he was having problems with him.
Q. And so back up here, you're on--you're somewhere in this area or that's your area of duty. Whether you were--
A. That's correct.
Q. --there that particularly moment, we don't know, is that right?
A. I'm sorry.
Q. We don't know if you're actually there that--this particular moment?
A. I can't pick myself out, no.
Q. And this is the Alpha building or A building?
A. Yes.

Q. So this problem is occurring over here where the--where the cursor is, is that correct?
A. Well, actually that's--that's the first half of Alpha unit. You can see two signs in the center of the building. That's Alpha 1 and Alpha 3 above it. And then the other side of the building would be Alpha 2 and Alpha 4. Oh, I'm sorry. I touched your screen. I apologize.
Q. There. Now we're on the B--
A. That's B unit. That would be Bravo.
Q. This is the other part of Alpha you were just saying--
A. Yes.
Q. --you couldn't see.
A. Uh-huh (yes).
Q. So this is where the problem was?
A. Yes.
Q. So what did you do when you heard the--the call and determined there was a problem on the compound?
A. I made the determination that if they were going to send an inmate over there that we should, out of precaution, have another staff member there. So I couldn't just leave my post. I stepped into the chow hall to get another staff member. Usually at mainline, depending on staffing levels which sometimes you're short, we'll have a counselor or a case manager or another correctional worker, the activities lieutenant was in there, I stepped in there to ask one of

them to step out and monitor activities while I went up and, you know, just basically observed or offered support for the lieutenant.

Q. So--

A. It's a normal correctional practice.

Q. So when you heard the call and knew that a--that an inmate was being sent to the lieutenant, you got a substitute for your particular post so that you could go and back up the lieutenant?

A. Yes, it's a practice to offer support and/or it's just another set of eyes and ears.

Q. And had you seen Lieutenant Jensen come out of his building--out of his office?

A. When I came out of the chow hall, it took me a second to actually find somebody because it's very busy, several hundred inmates and just a few staff. I did--I came out and I observed--I could not pick out the inmate specifically coming across the compound. I did see the Lieutenant come out of his office so I remember cutting across the grass, which we normally, under all intents and purposes, attempt to use the sidewalks but sometimes in emergency situations we'll run across the grass. In elevated situations, there's things--when we need to, we'll cut across the grass.

I remember cutting across the grass because I wanted to make sure I could get up there to him. In my--in my attempt

to get up there, I did observe which inmate because there's a red line on the compound that inmates aren't supposed to cross unless instructed to do so by staff, and I observed an inmate walk pass that line and I assumed that he would be the inmate that was sent over to the lieutenant's office.

Q. Okay. So you did--you then did go in that direction across the--to this location that you just described?

A. Yes.

Q. Let's pick up from here and look at the video to help explain the events from that point on. Do you recognize this as being Lieutenant Jensen?

A. I'm sorry. I don't have anything on here.

THE COURT: There's nothing on it.

MR. GODWIN: Oh, I'm sorry. I was really enjoying that.

THE COURT: Carole, the camera's turned off.

BY MR. GODWIN:

Q. Let me jump to the scene here a minute. Okay. Now this--this is Lieutenant Jensen?

A. That is correct, sir.

Q. And Inmate Gore?

A. Yes, it is.

Q. And this is you that's appeared?

A. That's correct.

Q. You have a coffee cup. Is that a coffee cup?

A. Yeah, more than likely I have water in it. You spend eight hours on the compound walking. I cover several miles a night. Obviously we don't get any breaks, so you pretty much carry what you need.
Q. Is that a Styrofoam cup?
A. Yes, it is.
Q. So it's not really a dangerous implement?
A. No.
Q. Now you just walked up to this encounter--
A. Uh-huh (yes).
Q. --between the lieutenant and this inmate?
A. Right.
Q. Would you describe--did you hear anything as you--as you approached the two men?
A. Upon approaching, obviously, I identified what motor skills the inmate had and what I mean by that is he was--as he was walking and even initially talking with the lieutenant, he has his sweatshirt back and forth in his hands. It was a warm day so I might not have understood why he had a sweatshirt. So he had his sweatshirt. He was, you know, back and forth with his sweatshirt in his hands, threw it over his shoulder, just little things in the correctional environment we have to identify. It could be somewhere where he could conceal a weapon and/or contraband. Just little things that we have to look at like that. So coming

up on the scene, I took notice to that.

The other thing was when I got within approximately 10 feet from him, I heard Lieutenant Jensen ask him are you from D.C. referring to District of Columbia, and the inmate’s reply was no, I’m not from fucking D.C.

Q. Okay.

A. And at that point in time, it elevated my awareness that it might be a situation obviously in the way he was--he was talking.

Q. So then at this point that we’re at in the events here, this is just soon after that--that statement about D.C.?

A. Yeah, after he made the statement I’m not fucking--excuse me--I’m not fucking from D.C., the lieutenant cut off all communication, that’s when I actually walked to him and stepped to the side and then the lieutenant went with the radio transmission.

Q. Now is that--

A. That’s what he’s doing there. That’s a shorter mic that’s hooked to his radio on his side.

Q. Okay, so he--he made the radio transmission immediately before the movement?

A. Yeah, before the movement, he made a radio transmission.

Q. Now, you’re walking here behind Mr. Gore.

A. Yes.

Q. Do you know what--were you saying anything at this time?

A. No, sir, I had not made--I had not made one statement at that point in time.

Q. And do you know if Lieutenant Jensen was saying anything?

A. I don't recall other than he gave him a direction to step over to the lieutenant's office. I couldn't tell you the exact verbiage but the indication was to step over to the lieutenant's office which is an isolated area where we usually shakedown our inmates prior to taking them in the lieutenant's office or whatever else we would do.

Q. Okay. Now do you recall what's being said at this point?

A. No, I do not. I cannot recall. I can only see that the indication--the indication was he was pointing towards--towards the special housing unit. And I--I can recall what Gore's--I was keyed up on the inmate. His--his motor skills, his, you know, his verbiage, how he was acting.

Q. And how would you describe his demeanor at this point in the encounter?

A. Well, the transmission the lieutenant gave over the radio to control center was he asked the control center--he said, you know, operations to control, secure the yard, which is an indication for everybody to step out from wherever they're at and pull their inmates in and put them behind a locked door.

Q. But what I want to know is your observations of Inmate Gore's demeanor at this--at this point in the events? You said you were watching his motor skills and that sort--
A. Yeah, after he was given direction to go towards the lieutenant's office that's basically the same as a direct order, given direction by staff. He stopped and bladed off to the lieutenant which is a--is a threatening position in a correctional environment.
Q. Okay. Now it appears as though that you and Mr. Jenson laid hands upon Mr. Gore very soon in time.
A. Yes.
Q. Perhaps you first. I'm not--it's hard to tell. Do--do you know?
A. To the best of my knowledge, I made first contact with the inmate. It would be his right hand. I did make verbiage at that point in time. Once he--he had took up a defensive position or an offensive position--I'm sorry. He took up an offensive position by bladeing off to the lieutenant and making the statement, why are you putting me in the hole or why are you sending me to the SHU. I don't know the correct verbiage but something to that extent.

I noticed his right hand. I checked for weapons because I mean ultimately that's what we want to--want to insure that nobody gets hurt. I noticed his--his hands. I felt that the situation was deteriorating quickly and I gave him

the verbal order to put his hands behind his back to be cuffed, in other words, to apply hand restraints to him, which is a normal, common every day practice even for nonemergency situations.
Q. So you said those words to him standing right behind him?
A. Yes, I did as soon as he bladed off to the lieutenant.
Q. And what did he do?
A. At first I thought he was going to comply with it. It happens--I mean it happens 100 times a day in a correctional environment. He dropped his hands to his side and--and my demeanor, I believed he was putting his hands behind his back. I identified with his right hand. He clinched his fist at which point in time I attempted to reach down and gain control of his wrist to apply the hand restraints. He ripped his hand--he ripped his hand from mine resisting my physical direction to apply hand restraint. At that point in time, I took it to be a threatening behavior and I attempted to gain control of his upper--upper body torso by grabbing his arms.
At the same time, I don't know what the lieutenant--I can't--I mean I can watch the video and assume some--something to the extent, he--he felt the threat was there, too, because we both pretty much reacted almost simultaneously. I mean just--just the fact that the inmate

turned and bladed off and failed to abide by the order showed that he wasn't--he wasn't attempting to do what we expected out of him.

Q. Now you said his right hand--

A. Yes.

Q. --so that's this hand that we can see?

A. Yes, that hand there.

Q. It's the hand away from the lieutenant?

A. Yes.

Q. And you say you saw this hand clinch in a fist before you touched his wrist?

A. Yes. Little things that probably normal people don't think about but in a correctional environment a seasoned staff member will identify as, you know, sometimes they'll obtain a weapon in their waistband, in their pocket, so once he bladed off the lieutenant, my first reaction was to check and make sure he did not have a weapon.

Q. And you've said bladed off, you're referring to when he turns to the side--

A. Yes. When he turns his upper torso and his whole body in the direction of the lieutenant, in other words, facing off to him or an attempt to face off to him.

Q. And this is where you have control--tried to control the back of his arms and ended up on the ground?

A. Yes. Actually when I attempted to gain control of his

upper arms for whatever--I was unable to do so. He broke free like I wasn't even there. I went to his upper torso. I believe--well, I don't believe--I gained control of his neck area with my right arm and up through his left arm with my left arm.
Q. Is--how would you describe the strength of Mr. Gore?
A. At the moment unbelievable. I underestimated--unfortunately we try not to but we try to give the benefit of the--I underestimated his capabilities and I regret that to this day.
Q. Is this going to the ground the result of his exercise of his strength against you?
A. Yeah, it's--it's a normal--it's a practice that we find--once he--I feel I lost control of him or could not control him to the point where we could get hand restraints on him, we do--we do attempt to take the inmates to the ground because usually hopefully we can get some staff there and get control of them. It's just--it's a normal procedure.
I felt after I gained control of his neck and his left arm, he still was getting--getting away from me so I made the decision--and not identifying with what Lieutenant Jensen was doing because I was involved in what I believed to be my restraint--my restraining techniques, I slipped my hips through and tried to take him down to the ground. Unfortunately, I believe Lieutenant Jensen was probably

trying to control his left arm at the same time and when I attempted to do that it kind of acted as an anchor and we all three went straight to the ground and on top of me, me being on the bottom.

Q. So this is--you--which--this is Lieutenant Jensen, right?

A. Yeah, that's Lieutenant Jensen. Actually initially when we went down if you would've saw, I was on the bottom and the inmate actually got the upper hand on top. At which point in time, I knew the situation went south or went bad very quickly. I attempted to use a technique where you apply pressure to the rear of your head and your feet and arch your back in attempt to regain the top position or control of the inmate, and that's where you see my right now, my left leg swung over the inmate.

Unfortunately, I had no control because I was still controlling his neck and his left arm and both my hands were tied up, that left his right arm free.

Q. That's his right arm there--

A. Yes, it is.

Q. --that's punching Mr. Jensen?

A. Yes. And I know it appears to be very quick and very--I mean extremely quick. It seemed like forever. I mean the thoughts that raced through my head I could--I mean I specifically knew when I was on the bottom, I could feel the

thrusts from him hitting and then when I gained--even when I got up on top, I mean, like I said, it seems like a split second but it seemed like forever. I attempted to stop his right arm when I did get my left arm free from hitting but he was too powerful. I couldn't control him with the position that I was in.

And then I--and then the best I could do was I reached up and attempted to gain control of his head area because I knew I couldn't stop his arm. I didn't--I didn't even know at what point in time or where he was hitting or making--or even if he was making contact with--I didn't know where on the lieutenant. I knew--I could feel by the thrusts that he was hitting something and it wasn't me.

Q. All right. Am I correct that this is you, if you know?

A. I'm sorry. I didn't see the last part. Is it possible to rewind that a little bit? Yes, that was me. That's me right there.

Q. Here?

A. Yeah. I threw my sunglasses out. I actually had sunglasses on and they got in the middle of--we were trying to put hand restraints on him and he was still physically fighting and actually on his behalf doing a very good job of it. And I remember my sunglasses falling and I threw them just to get out--get them out of the way, out of our way. But even up to this point with this many staff members on

him, he was being still abusive and attempted to resist the actions to comply with hand restraints. I mean like at that point in time, I mean he was extremely strong and extremely determined.
Q. Okay. Well, from this point on he was eventually subdued, put in--
A. Yes. And we applied--
Q. --restraints and escorted away?
A. We applied hand restraints and I--I actually gave the direction for them to apply leg restraints or also known as shackles. An inmate, once you get them to their feet sometimes--he had displayed aggressive behaviors, they'll attempt to try and kick somebody, so we'll apply leg restrains or shackles so that they can't get one leg up or the other so that they have to stay together. And I remember telling staff to apply the leg restraints to him to transport him.
Q. Did you--officers when they're involved in a matter like this normally will get medical assessment not long after that?
A. It's a requirement--
Q. And did--
A. --due to the situation.
Q. Did you get a medical assessment?
A. Yes, I did.

Q. Did you have any injuries as a result of this?
A. I had abrasions on both elbows, both knees. I had a laceration to my head or an abrasion on my head. I was told I had an abrasion or a cut in the back of my head that was bleeding but I mean I was unaware of it. I mean other than what I could see after the fact.
Q. So you were injured but they were skin injuries?
A. Yes. It was--it would be minor abrasions.
Q. And they all occurred as a result of this encounter?
A. Yes, that's correct.

MR. GODWIN: I have no--no other questions, Your Honor.

THE COURT: Cross-examination.

MR. FITZWATER: Yes, Your Honor.

CROSS EXAMINATION

BY MR. FITZWATER:
Q. Mr. Feathers, my name is Travel Fitzwater and I represent Mr. Gore in this case and I'm going to ask you some questions just to follow up on what you've been testifying about--
A. Okay.
Q. --here today. Forgive me, because I can't recall, are you currently still employed at Gilmer?
A. No, sir. I'm currently employed with the United States Penitentiary in Hazelton, West Virginia.

Q. In Hazelton?
A. Yes.
Q. And again I can't recall, did you testify why you transferred to Hazelton?
A. Actually it was for a promotion.
Q. And what is your current position?
A. Senior Officer Specialist.
Q. And how--is there a way that you can describe for me how significant that promotion was for you?
A. Actually it--it's funny because Hazelton's a rougher--it's a penitentiary and people think--I mean it's a tougher prison to work. It's good for the experience. It wasn't--it was a promotion but it was an exception to merit promotion.
As I understand the system, I was a GS8 for five years. So it was a promotion but it wasn't because I was exception to merit promotion. I had already held that GS title in another department so it wasn't significant. It had nothing more than--I mean I made about $1500 from the move.
Q. Okay.
A. In yearly wages.
Q. So if your current designation is Senior Officer Specialist, what was the title that you had prior to the promotion?
A. At Gilmer it was a senior officer.

Q. So what--what distinguishes a senior offer--excuse me--a senior officer specialist from a senior officer?
A. A senior officer is a GS7 and then you have to compete for your GS8, which is a senior officer specialist. To speak layman's term, in a state system it would be the equivalent between a corporal and a sergeant. The thing is I'd already received that GS8 in 2002 when I came to Gilmer the first time. I was promoted to inmate systems officer which is like a sergeant in booking and receiving at the institution. So once I held that title for more than a year, I'm what they call exception to merit promotion. When a position comes open, I put in for it with, you know, with exceptional yearly evaluations I'm afforded that position.
Q. Okay. What I'm trying to get at is how much authority you had on July 8th when you were designated as senior officer?
A. How much authority?
Q. Yes, sir.
A. The compound officer has control of the compound. In the event of the absence of the lieutenant--the operations lieutenant and the activities lieutenant, obviously for the sake of control. I was also one of the most senior staff on shift.
Q. Okay.
A. If not the senior staff on shift.

Q. Did you have any supervisory authority over the unit officers?
A. Over the unit officers, other than I was GS8 and I offer direction and advice to officers on correctional practices, yes.
Q. Okay. So--
A. Not--not officially to--I held no position to discipline and/or advise. I mean I'm an officer like them but it's--it's in essence a position where they look for direction if they need it.
Q. In addition to them looking to you for direction, was it within your job description or did you consider it to be within your job duties to offer direction even if it wasn't solicited by the unit officers?
A. That is an expectation of the Bureau that if you see practices that you feel can be better attained, you offer advice.
Q. Was one of your duties as the compound officer on July 8th to escort inmates who were being sent to see the lieutenant?
A. To escort, yes. If they call for me to escort them over, yes, I--I escort them over. A normal practice is we like to escort them over. Unfortunately with approximately 20 staff and 1500 inmates and all the different activities that we have to go through, it doesn't always happen that

way but, yes, we do like to see the--the inmates escorted but I mean it’s almost infeasible to escort inmates everywhere.
Q. So if it’s part of your duty to escort then, based upon what you just said, it’s a discretionary requirement that you can escort an inmate being sent to the lieutenant so long as you deem that to be the best thing for you to do within your discretion at the time, is that correct?
A. It’s a practice we like--yes. It’s a normal practice we like to do.
Q. So it’s not an absolute obligation?
A. It depends. If you look at the post orders for the position, we’re--we’re responsible for escorting across the compound but the compound is for open movement. So I think--if the compound was closed and there’s no inmate movement, yeah, we need to monitor the inmates across the compound. But it was open movement with 2 to 300 inmates on the compound.
Q. And is your--your position and designation on July 8th to describe that as the compound officer, am I accurate?
A. Compound 1, yes.
Q. And would that also be called your post?
A. Yes.
Q. The point on the compound where Mr. Gore and Mr. Jensen met one another, was that within the area which would

comprise your post?
A. Yes.
Q. You mentioned a little bit earlier in your testimony, when Mr. Godwin was asking you questions, that you had to look for somebody to cover your post before you went over to where Mr. Gore and Mr. Jensen were.
A. Uh-huh (yes).
Q. Can you explain why that's the situation if the area that they were was within your post?
A. Ultimately the whole compound is the responsibility of the Compound 1 officer. During open times of movements, the officers from the units will stand outside the units to observe the inmates moving. I mean this is ultimately the time when we have fights. We have them moving contraband. They--they engage in illegal activities and we all work together to provide security for the compound.
Obviously I'm at the chow hall running chow during an open movement, I can't be up at recreation as fast as say an officer from the Charlie unit, which is closer if there was a fight. So that's my primary responsibility of security on the compound outside the recreation area, it's a job we all do together.
Q. I may have missed some of that but I'm just going to ask you, can you explain for me why you felt that you were the person which should go out, you as opposed to any other,

say, compound officer or any other officer, you decided that you needed to go out to this area? You testified earlier that that was because you felt it was the best practice to have two people--
A. Yes.
Q. --dealing with the inmate. I'm asking you why were you--why was Officer Feathers--why was yourself the person that was--that was the best candidate to go out and be the one to stand with Officer Jensen or Lieutenant Jensen?
A. At the point, I was the one that identified that it would be a better practice for us. There is a Compound 2 officer. Their responsibility is outside the parameter, offer support for us on there, but I was the one that identified or felt as though it was a good practice to walk up there. So thus I did so. I mean ultimately we look out for each other as best we can, but we've got our own duties to--to perform.
Q. When you arrived at the point where Mr. Gore and Mr. Jensen--I mean you were approaching that point.
A. I'm sorry. I didn't hear you.
Q. When you were approaching the point where Mr. Jensen and Mr. Gore were, how close--how close were you when you were first able to hear what was being said between the two men?
A. I was approximately 10 feet away.
Q. And tell me again what the first thing was that you

heard.

A. I heard Lieutenant Jensen ask him are you from D.C.

Q. In your experience as a correctional officer were you able to--did you know why he was asking--I'm not asking you what was in Mr. Jensen's mind.

A. Uh-huh (yes).

Q. I'm asking what was in your mind from your experience as a correctional officer, is the question are you from D.C. a standard question that is used by correctional officers in the prison setting?

A. Is it--in a series of questions, it would be for me. If I was to come across an inmate that for whatever reason I had to talk to about a certain--I mean it comes in a series of questions where they're from. You're trying to identify what their reg number is, or who they are, or--I mean there's a whole series of things that goes on. That is a normal question to ask them where they're from.

Q. Is it a normal response that an inmate would become agitated when asked if they're from D.C. in your experience?

A. Is it a normal what--I'm sorry. Could you repeat the question?

Q. Sure. Sure, certainly. Anytime you--you want me to rephrase a question or make it easier, it's important to me that you understand what I'm asking so. You testified that asking an inmate if they're from D.C. is--would be within

the standard series of questions that you might ask and you testified as to why. I'm asking you the response that Mr. Gore gave Mr. Jensen according to the testimony, did you consider that to be an average response that an inmate might give to a question concerning the District of Columbia?

A. Actually I'd like to clarify. What I said was asking the inmate where they're from is a normal series. I don't know--I don't know why. I wasn't there for the conversation between Inmate Gore and Lieutenant Jensen, why he asked him from D.C.--is he from D.C. so I don't know what the series of questions was that led up to that. But asking an inmate where he's from is a normal question.

Q. Okay. I think I must have misunderstood some previous testimony so I'm going to try to clarify. Have you ever asked an inmate the specific question, are you from D.C.?

A. Yes, I have.

Q. And there's a reason for asking that specific question that that reason would be based upon your experience as a correctional officer, is that a fair statement?

A. To identify if he's from D.C. or not.

Q. Okay. But there's a significance to that fact if the inmate is in fact from D.C. to you as correctional officer?

A. It depends on the situation. I mean I could identify an inmate that's with several other inmates and I want to know if he's hanging with these guys that are from D.C. or I mean

it’s a situation that dictates the question so.
Q. At any point-- you’ve testified that you have asked inmates if they are from D.C.?
A. Yes.
Q. At any point did you experience an inmate becoming agitated in response to that specific question?
A. That I’ve asked?
Q. Yes. In your--well, first I’m going to ask that anytime you’ve asked it and then I’ll ask you if you’ve ever seen it asked. But the first question is, is in response to you personally asking an inmate are you from D.C., have you ever witnessed any inmate, in response to that question, become agitated?
A. Yeah, Inmate Gore.
Q. Other than Inmate Gore, I’m sorry.
A. At this point, I can’t recall any. I don’t--it’s not a significant part of my career. I don’t--I can’t testify to or against.
Q. That’s fair enough. Well, now I--just because I said I would, I’m going to ask you have you ever seen any other inmate who was asked by any other correctional officer that specific question, are you from D.C., in that scenario have you ever seen an inmate become agitated?
A. Not that I can recall. I mean I’m sure--I don’t--I mean I don’t understand the significance of the question. Maybe

I'm missing you.
Q. Well, I'm just trying to find out if there's some--something about that question which, in your experience, causes inmates to become agitated?
A. I don't know. I can't--I can't testify to that. I don't know what--
Q. That's fair enough.
A. --inmates go through.
Q. I'm just asking you to testify--
A. I understand.
Q. --to that which is within your--within your experience. So--
A. Right.
Q. --if it's not, then that's all you have to say and I appreciate the--
A. Thank you.
Q. After you--you say you were about 10 feet away and you heard this interchange about whether Mr. Gore was from D.C.--
A. Correct.
Q. --what did you hear after that? What was the next thing that you heard?
A. After the exchange or after--you're saying after Lieutenant Jensen asked him?
Q. Immediately after the question and answer regarding

D.C., what happened next?
A. The lieutenant made a transmission over his mic for the compound to--or for control to secure the compound.
Q. Okay. Now I'm going to take us to this video if I can make it play.
A. Okay.
Q. I'm going to back the video up to the point where you arrive or just prior to that point about 2 minutes and 32 seconds into it. And you recognize this as Mr. Gore and Mr. Jensen, correct?
A. That is correct.
Q. And here you are about 2 minutes and 38 seconds in you arrive, is that accurate, sir?
A. I can't testify to the time. I'm not--I mean I don't see where it's at on the screen. I'll take--
Q. Watch my pointer. Here's--
A. Okay. Okay.
Q. --the--here's the--
A. Yes.
Q. And I'll back it up a little bit and you can--you can watch it as you show up.
A. Okay.
Q. We're at about 2, 35 and counting here.
A. Okay. Yes.
Q. About 2, 37 or so you come up to the two men. Now, do

you see the lapel mic that Mr. Jensen has in this frame?
A. Yes.
Q. We're at 2 minutes and 39 seconds.
A. Yes.
Q. I'll represent to you that Mr. Jensen testified he was operating his lapel mic at this point. Do you--can you concur with that statement?
A. Yes.
Q. Okay. So would that be the transmission that you just referred to which occurred right after the interchange concerning the District of Columbia?
A. To the best of my knowledge.
Q. Okay, that's fine. Now I'm going to ask you what occurs after this point. At this point, have you said anything to Mr. Gore?
A. No.
Q. Now we're at 2 minutes and 41 seconds. Now I'm stopping it again. I'm at 2 minutes and 43 seconds.
A. Okay.
Q. At this point, have you said anything to Mr. Gore?
A. Not to the best of my knowledge.
Q. Okay. I'm going to play again. Do you know whether you said anything at this point?
A. No, I did not say nothing at that point to the best of my knowledge because he hadn't yet to blade off to the

lieutenant. I didn't interact until he bladed off to the lieutenant.
Q. Okay. I'll push play. Now you're out of the screen?
A. Yes.
Q. And there you've--we're at 2 minutes and 49 seconds.
A. Correct.
Q. And you've got your arms behind Mr. Gore, is that accurate?
A. Yes.
Q. And is it fair to say that your right arm is now at this moment around Mr. Gore's right arm?
A. Yes.
Q. To your knowledge had you instructed Mr. Gore at this point to put his arms behind his back to be cuffed?
A. Yes, as soon as he--as soon as he started to blade off to the lieutenant, I told him to put his hands behind his back.
Q. Now you're using a terminology and I--and I confess I'm not sure what you're saying. You said he started to do something off to that lieutenant. Could you--
A. I'm sorry?
Q. I'm not sure the word you're using. You said he--as soon as he started to blade off or I'm not sure what--
A. Okay. The lieutenant gave him a direction. I saw him pointing toward the lieutenant's office which is an area.

He’s already called for a secure compound. We have physical direction and we have verbal direction in a correctional setting. If you give them physical and verbal directions towards that area, the inmate stopped his movement towards that area and turned towards the lieutenant, in other words, bladeing his body off to the position at the lieutenant.

Q. Okay, but what’s the blade? Is that spelled b-l-a-d-e?

A. I assume so.

Q. Okay. I mean I’m spelling phonetically.

A. I don’t know. I mean it’s just a terminology. Okay, he turned his body to square off with the lieutenant--

Q. Okay.

A. --which is an--an aggressive offensive position in a correctional environment.

Q. Now I’m going to back it up just a few seconds.

A. Okay.

Q. Back to when you first walk up.

A. Uh-huh (yes).

Q. And there you are and I’m going to ask you just to watch the video.

A. Uh-huh (yes).

Q. Did you see as Mr. Gore was walking--

A. Uh-huh (yes).

Q. --Mr. Jensen pointed and gave a--so he gave him a physical and it looked like he was speaking and therefore

giving him both physical and verbal instruction.
A. Uh-huh (yes).
Q. Do you know what that instruction was at that moment?
A. At the moment I did, but I don't--I can't testify to that now. I don't recall. I was keyed up on the inmate's actions, his positioning his body.
Q. Do you recall giving a statement to a Mr. Brian Fox as part of the investigation of--
A. Yes, I did give a statement to Mr. Fox.
Q. Do you recall telling Mr. Fox that Jensen made a radio call to the control center to have the compound secured and then directed Gore to walk toward the lieutenant's office?
A. Yes.
Q. After my bringing to your recollection having made that statement, now when you--and I'll back this up, I'll ask you again to see if that refreshes your recollection about what was being said by Mr. Jensen to Mr. Gore. I've backed it up to 2, 40 and now it's playing. There he points the finger and he says something. Do you know what he's--at this point now can you say what he was saying?
A. At this point in time?
Q. Well, after--after we've just referred to your statement that you gave--
A. Right, that he was pointing towards the special housing unit. I recall the inmate saying--

THE COURT: Just a minute. Just a minute. Ladies and Gentlemen, I think I have something I need to take up with Counsel about this whole line of questioning and in order to do that, I think it's just better to let you go to lunch right now. It's the noon hour anyway.

So please during this noon hour, do not discuss the case among yourselves and please avoid any media contact, if there is any, about the case whether it's on the newspaper or TV--in the newspaper, on TV, or on the radio. And don't let any third person approach you to discuss the case. Should someone try to do that, you must walk away. If they persist in trying to talk to you, just tell them that you've been ordered not to talk to them, go let court security know, who will then let me know. You don't have to let your fellow jurors know about that contact. Thank you for your patience this morning. I'd like to have you back ready to resume at 1 o'clock. Thank you.

(Jury out at 12:00 p.m.)

THE COURT: Officer Feathers, you may step down. You're on direct examination and I expect you to be prepared to resume the stand at 1 o'clock.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

MR. FITZWATER: Your Honor, may Officer Feathers be directed that he's not to discuss his testimony during the

break?

THE COURT: If there's no objection. He's on direct examination. If he has counsel, he's entitled to consult--

MR. GODWIN: He's not. He's on cross.

THE COURT: I'm sorry. He's on cross-examination, correct, you can't talk with anyone. I apologize. What's got me going, Mr. Fitzwater, is I think you know how to refresh a person's recollection through a document--

MR. FITZWATER: I should have let him read his statement and I didn't.

THE COURT: And if you--I wanted to stop you before you continued to do that. I expect you to follow the Rules of Evidence. Okay. And the evidentiary manner--you can step down, sir--in which you're to do that is to show that document to the witness, allow them to refresh their recollection, if they can, and then you have to ask them is your recollection refreshed. Depending on what they say, you're then allowed to ask your question again. You can't quote from the written document. That's hearsay.

MR. FITZWATER: Well, but I can quote--I'm sorry, Your Honor, may I--

THE COURT: No, you can't.

MR. FITZWATER: Well, for impeachment--

THE COURT: You can ask him if that document

refreshes his recollection. Yes. Then if it refreshes his recollection, you can ask him your question again and based on his refreshed recollection he can answer it.

Now if you're trying to impeach him because he's now said something contrary to what he said in an earlier statement, that's a different set of circumstances.

MR. FITZWATER: I apologize, Your Honor. I was miss--I should not have referred to refreshing his recollection. I was--I was blurring the two techniques, Your Honor. He actually stated on his direct that he gave--I could have used his testimony under oath on direct. He stated on direct that he gave directions to step that--excuse me--that Jensen gave directions to step over to the lieutenant's office and then on cross, he stated he did not know what he was saying--

THE COURT: Then you--then you show--if you've got a written document, you can show it to him. But if you're just taking what he said on direct and trying to impeach him with it, you have to ask him, isn't it true--use a leading question every now and then, it helps--go ahead and ask him, isn't it true that on direct you said thus and such. Remember, I'm going to tell that jury it's up to them to remember what was said, okay?

MR. FITZWATER: Okay.

THE COURT: So you go ahead and try to do it that

way, but I heard you say refreshed recollection.

MR. FITZWATER: And I did say it and that was a mistake on my part, Your Honor. I've actually--he's actually--it's in two different--the statement's in two different documents and it's on his direct that he made--I've got three places where--

THE COURT: If you're using the statement he gave to Special Agent Fox and you want to impeach him with it, you still have to follow the rules on impeachment.

MR. FITZWATER: I have a memo that he, himself, wrote, so actually I'll go to that when we come back and I should--

THE COURT: Remember, that's--that's still hearsay because it's an out of court statement.

MR. FITZWATER: When it's not admitted for substantive use, it can only be--I can only read it and ask him--

THE COURT: You would have to first establish that there's an inconsistency. Okay. You can't just use it because it's there. You've got his testimony. Now if that testimony here is inconsistent with what he said or wrote at an earlier time, he still gets to see it. You have to show it to him and ask him if--or you have to ask him if he recalls giving that statement. Do you remember what you said in that statement? No, I don't. Well, let me show you

the statement. Take this opportunity please and read and tell us specifically what you want him to read.

Now in that statement, then you can go ahead and ask did you say something different. But you know you can't use the statement because it's not admissible. Okay.

MR. FITZWATER: I thought--I'm sorry, Your Honor. I must have misread the rule. I reviewed the rules--

THE COURT: You're using it for impeachment.

MR. FITZWATER: Yes, Your Honor.

THE COURT: Okay, I'm going to tell this jury in the final instructions that that impeachment is to test credibility. It's not substantive evidence as to the issue.

MR. FITZWATER: I understand, Your Honor. It's not a concern to me whether the jury believes that Jensen indeed directed Mr. Gore--in fact Mr. Gore will testify that he was not directed to go either to the trash can or to the lieutenant's office.

THE COURT: You know what I wish everyone would focus on are what are the elements of what we're discussing here. Now I realize you're setting things up for credibility, but keep in mind, as you're going to see with the charge that I'm about to give you, we're talking about present or imminent risk of substantial bodily harm or death. Okay. That's what this case is all about in terms of your case of self-defense justification.

And all I’m trying to say to you is if you’re impeaching the person on a credibility issue try to follow the rules on it. If you’re refreshing their recollection with regard to a prior statement, whether it’s consistent or inconsistent, however you think you can use it under the rules, you still have to follow the rules of--you can’t just quote the statement because you want to. You can’t read it in front of the jury. The jury isn’t allowed to know it unless there’s a particular limited exception in which you can actually use those words. Okay.

MR. FITZWATER: Your Honor, I--

THE COURT: Why don’t you go--why don’t we talk about this after you have a chance to go--

MR. FITZWATER: I review--

THE COURT: --look at those rules and then I’ll be ready at anytime prior to 1 o’clock if you think that I’m giving you some misdirection here.

MR. FITZWATER: Okay. Thank you, Your Honor.

THE COURT: Thank you. Court stands in recess until 1 o’clock. I’m sorry, until 12:15 for me.

(Recess from 12:10 p.m., until 1:12 p.m., 11-29-2007)

THE COURT: Thank you, please be seated. Officer Feathers, would you please resume the stand? I’ve provided to your--had Ryan provide to you the latest draft of the charge. Some substantial revisions. Take a look at it. I

think we're going to probably need to do the charge conference tonight, you know, if--depending on where we are with the case. But if we're finished with the evidence or close to it, we're going to need to do it tonight so that we can move seamlessly tomorrow into the end of the evidence and then right into the instructions and the argument. We can bring the jury in.

Mr. Fitzwater, I should've asked, do you have any questions about what we were talking about before lunch?

MR. FITZWATER: No, Your Honor. I've decided that I've addressed the issue regarding the statement sufficiently. I'm going to ask him some non-related questions and move on from there.

THE COURT: Okay. Mr. Fitzwater, I'm having my law clerk give Mr. Gore a copy of that charge so that he can be aware of what's in it.

(Jury in at 1:15 p.m.)

THE COURT: Well, Ladies and Gentlemen, good afternoon. I had a hearing during the noon hour so I have no idea what the weather's like outside. I hope if you went out, it's nice. Good. Any maybe it will stay that way through Saturday evening. Okay. Mr. Fitzwater was on cross- examination with Officer Feathers.

BY MR. FITZWATER:

Q. Mr. Feathers, after the incident, did you take any

photographs?
A. I'm sorry?
Q. Did you take any photographs after the incident?
A. Did I personally take photographs or did I--was I photographed?
Q. Well, first, did you personally take any photographs?
A. Yes, I did.
Q. What did you photograph?
A. I took photographs of the blood on the ground, the cement outside where the incident took place in case they needed it for evidence. I did that--I can't tell you exactly at whose direction it was. I believe it was Lieutenant Bell that showed up on scene, but I took pictures of that. Other than that, I can't testify that I took any other pictures. I did not take pictures of Lieutenant Jensen.
Q. And that--and you didn't take pictures of Mr. Gore's injuries?
A. No.
Q. Did you see any injuries that Mr. Gore received during the scuffle?
A. No, after he was restrained, I had no further contact with him. The only--the only thing that was when they were escorting him out, I was actually--I was unaware that they were escorting him out of the institution. I went to come

out of the lieutenant's office, as soon as I seen him, I turned around and walked back in, didn't even make eye contact or nothing.

MR. FITZWATER: That's all the questions I have, Mr. Feathers. Thank you.

MR. GODWIN: Just one very brief thing.

REDIRECT EXAMINATION

BY MR. GODWIN:

Q. Mr. Feathers, the inmates are required to carry on their person an identification card, aren't they?

A. That is correct.

Q. Now in your direct, you mentioned when you were talking with Mr.--or when Mr. Fitzwater was asking you about where an inmate is from, you said I like to get his registry number.

A. That is correct.

Q. You called it a reg number.

A. It's--it's the Marshal's registration number. It's assigned to an inmate upon entrance into the federal system.

Q. And that's on--that's on an inmate's identification card, right?

A. That's correct, along with their photo and name.

Q. And the last three digits of that number tell you where they came from, doesn't it?

A. Actually it doesn't directly tell you where they came

from. It tells you where they were--
Q. Where they were sentenced, right?
A. Yes, that--that is--
Q. That's an--
A. --correct.
Q. --an indicator of which part of the country they're-- they're from?
A. Yes, it is.
Q. So if--if an inmate's wearing their identification, like they're supposed to, a lot of these questions don't have to be asked, is that right?
A. No, not at all.
MR. GODWIN: Thank you.
THE COURT: Is there anything further, Mr. Fitzwater?
MR. FITZWATER: No, Your Honor.
THE COURT: All right. Thank you, Mr. Feathers. Is Mr. Feathers excused from all subpoenas?
MR. GODWIN: As far as I'm concerned, yes.
MR. FITZWATER: Yes, Your Honor.
THE COURT: You can step down then and you're free to go.
(Witness excused)
MR. GODWIN: I call Special Agent Fox.
THE COURT: Special Agent Fox, would you come

before the Clerk who will administer the oath to you before you take the witness stand?

BRIAN FOX, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you, you may take the witness stand. The witness is Brian Fox, F-o-x.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Mr. Fox, you live here in the Harrison County area?

A. Yes, I do.

Q. Assigned to the Clarksburg office and a Special Agent in the FBI just like--like I said you were earlier?

A. Yes.

Q. I was correct, those--those are your credentials?

A. That's correct.

Q. How long have you been here in the Clarksburg office?

A. Just over three years.

Q. And how long have you been a--an FBI agent?

A. Approximately eight and a half years.

Q. What--what training do you get as a Special Agent in the FBI?

A. Our initial training is new agents' training which is done at Quantico, Virginia and that's anywhere from 14 to 16 weeks long and that's our initial training. And then we have a two year probationary period where we receive additional on-the-job training and there's annual refresher

training and there are specialized continuing education training opportunities available.
Q. Where have you been stationed other than Clarksburg?
A. My first office was in Chicago, Illinois.
Q. And you--then you came here, did you say three--three years ago?
A. Three years ago, so I spent five years in Chicago.
Q. Now, offenses that occur--criminal offenses or alleged criminal offenses that occur on the premises of a correctional institution in the district fall within the investigative jurisdiction of the FBI, don't they?
A. Federal correctional--
Q. Federal--
A. --facilities.
Q. --corrections.
A. Yes. Yes, sir.
Q. And how do those things come to your all's attention?
A. Normally we are notified of an incident at a federal institution through the special investigative services staff which are employees of the Bureau of Prisons.
Q. Okay. So then you work with them and you do your own investigation and develop a case file on it?
A. That's correct.
Q. And then how is that then--well, that's enough of that. Were you the investigator in this case?

A. Yes, I was.
Q. And in the course of your investigation did you go to the prison, and see what was available, and talk to the people who might know about it, that sort of thing?
A. Yes, I did.
Q. As a part of your investigation, did you ask the defendant if he would submit to an interview?
A. Yes, I did.
Q. When did you do that?
A. I spoke with Mr. Gore on July 10th of 2007.
Q. That's two days after the assault?
A. That's correct.
Q. So he had been moved to a different location by that time?
A. Yes.
Q. Had--was anybody with you?
A. Yes. Bureau of Prisons' employee, Special Agent Investigative Agent Brian Antonelli.
Q. And this was up at Hazelton, was it not?
A. Yes, United States Penitentiary, Hazelton.
Q. When--when an interview like this occurs--now you're an investigating officer, basically a police officer of the United States although you're not really called that. You're a law enforcement officer?
A. Yes, I am.

Q. And Mr. Gore was in custody at the time, was he not?
A. Yes, he was.
Q. How do you go about initiating this--this interview or this contact with him? He has certain rights at that point, does he not?
A. That's correct. He has rights that are protected under the Fifth Amendment against self-incrimination.
Q. Okay. And what--the existence of those rights causes you to do what?
A. We conduct what we call an advice of rights and basically we advise him of what his Constitutional rights are. We insure that he's aware of the fact that he's not required to speak with us, that he is able to have representation by a lawyer before he answers any questions, and that he can stop answering questions at anytime if he decides to.
Q. Did you orally advise him of these rights?
A. I used a printed form. We--it's referred to by a form number, an FD395, advice of rights form.
MR. GODWIN: Your Honor, if I may approach--approach the witness?
THE COURT: You may.
BY MR. GODWIN:
Q. I've laid two pieces of paper in front of you, but for right now I just want you to address the first one which has

been marked for identification as 4A--Government's Exhibit 4A. Do you recognize that document?
A. Yes, I do.
Q. And what document is that?
A. This is the advice of rights form that I used to give Mr. Gore his Constitutional rights advisement.
Q. And how do you know that it's the specific form?
A. Mr. Gore signed this form. I signed the form and Mr. Antonelli signed the form as a witness.
Q. So Mr. Gore signed a form that he waived his rights?
A. That's correct.
Q. And did he--did he say anything orally that was contrary to that? Did he say, no, I want to see a lawyer or I don't want to talk to you? Did he say anything like that?
A. No, he did not.
MR. GODWIN: Your Honor, I move the admission of 4A.
THE COURT: Is there any objection to the admission of Government Exhibit 4A?
MR. FITZWATER: No objection.
THE COURT: Government Exhibit 4A is admitted.
(Government Exhibit Number 4A admitted.)
MR. GODWIN: And I'd like to publish it by--
THE COURT: It may be published.
BY MR. GODWIN:

Q. Okay. Here at the top, this is--this is--who wrote this there?
A. I wrote that--I'm sorry. I wrote that.
Q. And at what time--at what point in the process did you write this time, 11:25 a.m.?
A. I wrote that right when I began the rights advisement before I had reviewed the form with Mr. Gore.
Q. And these are--these are the rights that you--you read to him?
A. Yes, sir.
Q. Now down at the bottom, whose signature is that?
A. That is Mr. Gore's signature.
Q. You saw him write it there?
A. Yes, I did.
Q. Whose signature is this?
A. That is my signature.
Q. Whose signature is that?
A. That is Mr. Antonelli's signature.
Q. And why is the time 11:30 written there?
A. Because that was the time at which we had reviewed the form together and everyone had signed it.
Q. Okay, so this process took about five minutes?
A. Approximately five minutes, yes, sir.
Q. At the conclusion of this process, did you then begin talking with Mr. Gore?

A. Yes, I did.
Q. And what was the purpose of your interview?
A. In order to determine the course of events involving the assault or the incident that occurred with Mr. Gore and the corrections officers at FCI Gilmer on July 8th.
Q. Did he make oral statements to you and you asked him questions and he answered them?
A. Yes.
Q. And then at the conclusion of that did he reduce his statement to a writing?
A. Yes, he did.
Q. What did he tell you happened? Orally what did he tell you had happened on this occasion on July 8th?
A. Would you like me to summarize it or--
Q. I'd like you to summarize his oral statements.
A. Okay. Basically what he told me happened was he was returning from the evening meal about 5:30 in the afternoon, and he was going back to his housing unit. He was stopped by one of the corrections officers for a pat search, and he believed at the time the officer's name was Wegner, I believe, which turned out to be Officer Wegman. And in the course of the pat down, there was a verbal altercation between Mr. Gore and Officer Wegman. At the conclusion of that, Officer Wegman sent Mr. Gore to see Lieutenant Jensen who is his supervisor and there was some--some verbal

exchange between Lieutenant Jensen and Mr. Gore, and that--that led to a physical altercation during which Mr. Gore struck Lieutenant Jensen several times in the face and head.
Q. So that's a summary of the oral statements he made?
A. Yes.
Q. At the conclusion of that, did you ask him to document that in writing?
A. Yes, I did.
Q. And in what manner was that done?
A. I--
Q. I'm asking like who did the writing, who--that sort of thing.
A. I gave Mr. Gore pen and paper and he provided the statement in his own handwriting.
Q. Who--did you tell him what to write?
A. I told him how to begin the statement. I told him to start out by stating his name and his date of birth, and I said just tell what happened, basically the same information he'd just given me orally.
Q. And did he--did he do that?
A. Yes, he did.
Q. Did he object to that?
A. No, he did not.
Q. In fact was he cooperative throughout the interview?
A. Yes, he was.

Q. So did he complete the written statement?
A. Yes, he did.
Q. And did he sign it?
A. Yes, he did.
Q. And was that done in your presence?
A. Yes, it was.
Q. Now please draw your attention to the other piece of paper I left with you which is marked for identification purposes as Government's Exhibit 4B.
A. Uh-huh (yes).
Q. Do you recognize that piece of paper?
A. Yes, I do.
Q. And what is the piece of paper?
A. This is the written statement that Mr. Gore prepared at my request on July 10th, 2007.
Q. Is that the original?
A. Yes, it is.
Q. So that's the actual piece of paper written by Mr. Gore?
A. That's correct.
Q. And was it witnessed and dated or anything of that sort?
A. Yes. I witnessed it and Special Investigative Agent Antonelli witnessed it.
Q. And when was that prepared? We know the advice of rights was about--was 11:30. When would this whole process have been completed?

A. The statement was written at the conclusion of my oral interview with Mr. Gore. I would say I probably spoke with him for half an hour, maybe 40 minutes, and this written statement was prepared immediately following that.
Q. So this whole process was probably done and finished between 12:30 and 1?
A. That’s a fair approximation, yes.
Q. The actual time’s not recorded on the written statement?
A. No, it isn’t.
MR. GODWIN: Your Honor, I’d move the admission of Government’s Exhibit 4B.
THE COURT: Is there any objection to the admission of Government Exhibit 4B?
MR. FITZWATER: No, Your Honor.
THE COURT: All right, Government Exhibit 4B is admitted.
(Government Exhibit Number 4B admitted.)
BY MR. GODWIN:
Q. Since it’s a--would you read from the original as we view this electronic projection?
A. Would you like me to start at the beginning and--
Q. Yes.
A. --read the whole thing?
Q. Yes.
A. Sure. My name is Michael Leon Gore. My birth date is

8/13/31. On July 8th, 2007, I was coming back from the dinner meal at the chow hall. As I walked down the walk toward B walk, I was stopped by Officer Wegner, I believe his name was. He told me to stop so he could pat me down. He asked me how I was doing. I said nothing just held up my hands to be patted down. When he got done patting me down, he asked me my name. I asked him did my name have any relevance, what did I do? He said, I asked you a Goddamn question. I told him that I didn't disrespect him, why was he disrespecting me? He apologized. I thought the situation was resolved and tried to walk away. He told me to get back here, I'm not done talking. I walked back and told him what's this, abuse of authority, 3420-09? He said write it up. I'm going to write you up. He then told me, as a matter of fact go to the lieutenant's office. Then said, hit the road jack. I told him you're acting like a bitch. He then said, oh, he's cussing me out now and got on the radio. I walked toward the lieutenant's office. The lieutenant asked me what happened. I told him all of the above. He seemed preoccupied with looking--with locking me up. I told him and he said I don't know how you do it in D.C. I cut him off. I'm not from D.C. He said where's your ID? I told him I didn't have it. I had on sweats. He said you're going to the hole. I told him he was acting like a bitch. He reached for my arm. Out of reflex, I

pulled away. The other officer started wrestling me to the ground. As I fell to the ground, the lieutenant was over me. I panicked and grabbed his shirt, punching him four times. After that I tried to kick him. The officers made it there and cuffed me and then they took me to the hole. I have made this statement voluntarily. End of statement.
Q. Whose signature is this?
A. That is Mr. Gore's signature.
Q. And the date? You wrote the date?
A. No, Mr. Gore wrote it.
Q. Okay. And these are the two witness signatures, you and Mr. Antonelli, is that right?
A. Yes, sir.
Q. There are several places where there are mark throughs and the letters MG beside them. Who made those corrections?
A. Mr. Gore did.
Q. Is this completely in his handwriting?
A. Yes, sir, it is.
Q. And with the exception of telling him that he should start with who he is, and birth date, and the date of the event, did you tell him what to write more or less?
A. I asked him to add the last two sentences. I asked him to put something to the effect that he made the statement voluntarily and that that was the end of the statement.
Q. Did he have any objection to that and say, wait a

minute, this isn't voluntarily?
A. No, he did not object.
Q. Is--is any of the substance--any very significant difference from what he told you orally?
A. No.
MR. GODWIN: I have no other questions, Your Honor.
THE COURT: All right. Cross-examination.

CROSS EXAMINATION

BY MR. FITZWATER:
Q. Mr. Fox, you've heard me tell every witness who I am and what I'm getting ready to do, so I'll spare you that.
A. Okay.
Q. I heard you testify that--I heard you testify that it took about--from about 12:30 to 1 p.m. And what I--what I did not catch was whether you were referring to your entire meeting with Mr. Gore or just the time in which he wrote out his statement. Could you clarify that for me, sir?
A. The entire thing, I began talking to him about 11:25 and we did the rights advisement, which took about five minutes. Then the rest of the process of interview--interviewing him took between an hour and an hour and a half in its entirety. I--I--the--the verbal interview that I conducted took probably 30 to 40 minutes and then to prepare the witness statement and go over it and make sure that everything was accurate in it took maybe another 20 minutes to half an

hour. Probably closer to a half an hour.
Q. And you testified you have approximately eight and a half years of experience at the Bureau?
A. Yes, sir.
Q. And approximately, if you can tell me, what portion of that eight and a half years have you been engaged in the kinds of things which require you to interview witnesses?
A. Over the entire course of my career.
Q. And over the entire course of your career have you--has it been one of your job duties to interview persons who are suspected of committing crimes?
A. Yes, sir.
Q. Has it been your experience that not all persons whom you are interviewing because they are suspected of committing a crime are cooperative with you?
A. I'm sorry. Could you clarify?
Q. Rephrase it?
A. Yes, please.
Q. Let me rephrase it. I'm trying to be specific and sometimes that just--it's hard to follow. Have you experienced people that you've interviewed making it difficult for you to get at what you consider to be a complete statement from them?
A. Have I interviewed people who did not--who were not cooperative?

Q. That's a fair way to restate the question, yes.
A. Yes.
Q. Did you feel that Mr. Gore was in any way reluctant to give you a statement?
A. No, I didn't.
Q. Did you feel that Mr. Gore was in any way uncooperative during the time which you were taking his statement?
A. No, I did not.
Q. Did it appear to you that Mr. Gore wanted to give you a statement based upon your observations of his demeanor and actions during your interview of him?
A. He was very cooperative.
Q. Through the course of your investigation, did you uncover any evidence that Mr. Gore was injured during the scuffle that we've been talking about during the past two days of trial?
A. I asked Mr. Gore specifically about any injuries he received and he said there were a couple of bruises and scrapes but nothing significant.
Q. Did you include in your report of the investigation all of the documentation that you were able to obtain concerning this event?
A. Yes, sir, I did.
Q. And did you obtain any medical--any documentation which would've been prepared by healthcare providers regarding

injuries sustained by the participants of this event?
A. I obtained all of the records that FCI Gilmer provided me from their medical services unit.
Q. And through your course of preparing this investigation, did you review carefully all of the documentation which you were able to receive?
A. I did not review all of the medical records that I obtained. Honestly, I didn't go through that file very thoroughly.
Q. Do you know sitting here today whether the--the file you prepared contains a medical record which outlines the injuries which were received by Mr. Gore?
A. No, sir, I don't know.
Q. Okay. If I were to show you your--your file, would that help you remember whether there was a record concerning Mr. Gore?
A. It may if I listed it. I still cannot say for certain whether I reviewed it in detail but that may help.
MR. FITZWATER: Your Honor, may I approach the witness?
THE COURT: You may.
BY MR. FITZWATER:
Q. Mr. Fox, I'm going to give what I'm going to represent to you is a copy of your file. Now I have it in sheet protectors to make it easier for me to go through it.

A. Uh-huh (yes).

Q. And I'm going to open it to Page 138. This is the number that was inserted on this, I'll represent to you, by the United States Government and just for the sake of time, I'm going to ask you if you recognize that document and if you recall--well, I'm going to ask you to review that.

THE COURT: Is that a Bates number on the page?

MR. FITZWATER: Yes, Your Honor.

THE COURT: All right, Ladies and Gentlemen, since--I don't know if you'll need to know this or not but a Bates number on a page is simply a manner of organizing the number of pages in the file and it's a stamp number usually on the lower right hand corner from 1 to whatever covering them. So a Bates number just simply means that's Page 138 in the series.

THE WITNESS: Okay.

BY MR. FITZWATER:

Q. May I go ahead?

A. Yes.

Q. Mr. Fox, does reviewing that document refresh your memory as to whether there was a medical record concerning Mr. Gore which you obtained through the course of your investigation?

A. That does appear to be a medical assessment that was conducted by the staff of FCI Gilmer on Mr. Gore. So that

would have been part of the documentation I obtained.

MR. FITZWATER: Your Honor, I'd like to mark this I guess for identification as Defense Exhibit Number 1.

THE COURT: It may be so marked.

MR. GODWIN: Now, can you just give me a moment? I'll see if I have a better copy.

MR. FITZWATER: This copy's difficult to read, Your Honor, so.

MR. GODWIN: Your Honor, I don't--I'll stipulate the foundation of this as a business record of FCI Gilmer.

THE COURT: All right.

MR. FITZWATER: Your Honor, given the stipulation, I would ask that Defense Exhibit Number 1 be admitted.

THE COURT: Any objection?

MR. GODWIN: No.

THE COURT: Government--Defense Exhibit Number 1 is admitted.

(Defense Exhibit Number 1 admitted.)

BY MR. FITZWATER:

Q. Mr. Fox, do you routinely investigate crimes involving inmates of the Bureau of Prisons?

A. Fairly routinely, yes. It's--it's something we do frequently here.

Q. Through your experience in investigating these sorts of incidences, have you become in any way familiar with the

rules and regulations which govern the operation of prison facilities by the Bureau of Prisons?
A. I'm aware of some of their policies and procedures.
Q. When Mr. Gore told you that he asked Officer Wegman, which is included in his statement, whether he was abusing his authority under a specific number, did that number mean anything to you?
A. No, it did not.
Q. Did you ask Mr. Gore to explain that particular statement that he had made?
A. Yes, because he first told me about that while I was conducting the verbal interview with him and when he said whatever the number was, I said what is that, and he said that's misuse of authority.
Q. Did you take any steps to investigate whether there was such an authority designated with such a number?
A. No, I didn't.
Q. When you investigate incidents which occur between inmates and correctional officers do you look to see if there's any evidence that a correctional officer may have done something inappropriate during the course of your review of all the facts?
A. Yes.
Q. Would it be a--you're employed by the Federal Bureau of Investigation, correct?

A. Yes, I am.
Q. And would it be--would you consider it to be one of your responsibilities, one of the mandates of somebody in your position to insure that a member of the Bureau of Prisons or any other federal agency was doing his or her job appropriately?
A. It would be within my purview to insure that no violation of federal law occurred. It would not be within my purview to make determinations on whether or not all Bureau of Prisons’ policies were complied with.
Q. Give me one moment, please, Mr. Fox. There has been some reference to a Lieutenant Bell. Do you recall that, sir?
A. Lieutenant Bell was the lieutenant that they called to respond to the institution after Lieutenant Jensen was injured, yes.
Q. And do you recall that there were memos prepared by some of the individuals involved which were addressed to Lieutenant Bell?
A. Yes.
Q. Did you speak to Lieutenant Bell?
A. No, I did not.
Q. Thank you, Mr. Fox.
MR. FITZWATER: I have no further questions, Your Honor.

THE COURT: All right. Is there any redirect?

MR. GODWIN: No, Your Honor.

THE COURT: Thank you, Special Agent, you may step down.

(Witness excused)

THE COURT: After Special Agent Fox are there any other witnesses for the United States?

MR. GODWIN: Not in my case-in-chief.

THE COURT: All right, then is the Government resting?

MR. GODWIN: Yes, Your Honor, the United States rests.

THE COURT: All right. Ladies and Gentlemen of the Jury, the United States has rested its case-in-chief and it's now necessary for me to take a legal motion outside of your hearing. So if I could ask you to briefly follow the court security officer back to your jury room. This is not your mid-afternoon recess but it will probably be a five minute recess. So please don't discuss the case among yourselves during this--at this time and I'll be bringing you back in shortly. Thank you.

(Jury out at 1:48 p.m.)

THE COURT: All right, is there a motion?

MR. FITZWATER: Your Honor, for the record I'll make a motion for a judgment of acquittal.

THE COURT: Okay. Any basis?

MR. FITZWATER: Your Honor--

THE COURT: Has the Government failed to make a prima facie case on the elements of the case--of the two counts?

MR. FITZWATER: Frankly, I don't know if it's--if my--if my--if I can argue that there's evidence which would--which would establish a justification defense at this point because that would be the basis of this--this--

THE COURT: Well, this is only on the Government's case-in-chief, so you--whether--whether your defense of justification is going to carry to the jury will depend on what you do. I agree with you on your--on the Government's case alone, you're not getting to the jury on a self defense justification issue, so--

MR. FITZWATER: In that case, I'll just make the standard motion for judgment of acquittal, Your Honor, based upon--

THE COURT: Okay.

MR. FITZWATER: --the argument that the Government failed to establish a prima facie case.

MR. GODWIN: And I--and I object to the motion.

THE COURT: All right. The Court denies the motion. The Court finds that in looking over the relevant or the essential elements of Counts 1 and 2 that the

Government has made out the following prima facie case that the defendant--as to Count 1, that the defendant forcibly assaulted Lieutenant Jensen, that the defendant committed the assault voluntarily and intentionally and that the assault resulted in bodily injury and at the time of the assault, Lieutenant Jensen was doing what he was employed to do by the federal government.

As to Count 2, the Court finds that the Government has made out a prima facie case on the following elements, that the defendant forcibly resisted, opposed, or impeded Lieutenant Jensen or Senior Correctional Officer Gregory Feathers and that he did so voluntarily and intentionally and that the resistance, opposition, or impediment resulted in bodily injury, and at the time of the defendant’s actions both Jensen and Feathers were doing what they were employed to do by the federal government.

Okay. Anything else at this time? I’m going to bring the jury back in. Are you ready to go?

MR. FITZWATER: I’ll notify the Court that Mr. Gore is going to testify and I don’t know if the Court--

THE COURT: Well, you don’t have to call him until you’re ready to call him. Is he your first witness?

MR. FITZWATER: He’ll be my first witness, so.

THE COURT: Okay. Then are you ready to go or do you need a couple of minutes to talk to him?

MR. FITZWATER: We're ready, Your Honor.

THE COURT: All right, very well. Let's bring the jury back in.

(Jury in at 1:52 p.m.)

THE COURT: How's my credibility? I told you it wouldn't be very long. All right, Ladies and Gentlemen, we've established the Government's case-in-chief. We're now ready to move on. Remember that I had mentioned to you that the defendant bears no burden of proof in this case. He may put on a witness but he's certainly under no obligation to do so, so I will ask Mr. Fitzwater, does the defendant plan to put on any evidence?

MR. FITZWATER: Your Honor, at this time the defendant will put on a case and our first witness will be the defendant, Mr. Gore.

THE COURT: All right, Mr. Gore, would you please approach the Clerk who will administer the oath to you before you take the witness stand?

MICHAEL GORE, DEFENDANT, SWORN

THE CLERK: Thank you, you may take the witness stand.

THE COURT: All right, Mr. Gore, if you'll take that witness chair, and pull the microphone close to you as have the other witnesses so that the jury can hear you, and speak in a loud clear voice. Thank you.

THE DEFENDANT: Yes, ma'am.

DIRECT EXAMINATION

BY MR. FITZWATER:

Q. Mr. Gore, I'm going to ask you some background questions to sort of set up--set the stage for what happened on the evening of July 8th, 2007. First, let me ask you, how long had you been at the facility in Gilmer up to the point of July 8th, 2007?

A. Four years, sir.

Q. And you are aware of the approximate number of inmates who are kept or housed at the facility at Gilmer?

A. I believe anywhere from 1600 to 1800, sir.

Q. And in the facility that you were in on July 8th, what I mean by that is the housing unit, how was it designated? Was there a number or letter, something like that?

A. Yes, sir. Four--four units per block, three blocks. Twelve units all together, A block, B block, and C block.

Q. Okay. Which of the blocks were you housed in at the time?

A. In B1, sir.

Q. And so there's--would there be a B1, a B2, a B3, and a B4?

A. Yes, sir.

Q. How many people would've been in the B1 unit of the B block? Approximate.

A. Approximately 128.
Q. And had you spent the entire four years at Gilmer in the--your regular place where you were living in Gilmer, was it B1 that whole time?
A. Yes, sir.
Q. And did you ever have occasion to interact with inmates who occupied other units other than B1?
A. Yes, sir.
Q. So you feel like you had a pretty good understanding of, based upon your interaction with other inmates, of how things worked and how things, say, went down at Gilmer?
A. Yes, sir.
Q. Now on July 8th before you were stopped by Officer Wegman had anything unusual happened that day to you before that point?
A. No, sir.
Q. What had you--what were you doing just before you were stopped by Officer Wegman?
A. I was coming back from the chow hall, sir, and that was after dinner.
Q. Yes. And were you upset or agitated about anything at that moment before you saw Officer Wegman?
A. No, sir.
Q. Nothing bad had happened to you that day, earlier in that day or that week?

A. Not at all, sir.
Q. How would you describe your--your attitude before you saw Officer Wegman that day?
A. My attitude?
Q. Were you feeling positive? Were you feeling gloomy? You know, just how would you--if you can, can you describe kind of the mood you were in?
A. I was--I was really--I was really focused on getting back to the block.
Q. And was there a particular reason why you were focused on that?
A. I think I--I think I just wanted to use the phone or something. I just wanted to get back to the block real, you know, continue on with--with my day.
Q. Now when Officer Wegman stopped you, did you feel--did you recognize that as a routine stop?
A. Yes, I did, sir.
Q. How--how often are you stopped for a routine pat down?
A. All the time.
Q. Would it be at least once a day?
A. Some days--some days we might not get--a person might get missed. I might get missed. Not every day, I can say we get patted down, you know, some days I get patted down every day. Some weeks go by where I get patted down every day and sometimes I don’t. Some days I don’t.

Q. Do you ever get patted down more than once in any one day?
A. Definitely.
Q. Could you give me a number as to the most times that you've been patted down in any one day?
A. Maybe three to four times.
Q. Okay. On this particular day, on July 8th, before Officer Wegman patted you down, had you been patted down anytime earlier in that same day?
A. No, sir.
Q. Now I'm going to ask you to--to tell me what happened from the moment Officer Wegman stopped you through the point where you were--you were leaving the area where Officer Wegman was and walking away, okay?
A. Yes, sir.
Q. Tell me what happened first.
A. Okay, I was coming up the block from the chow hall. I had my sweatshirt with me because I take my--even though it was summertime, I take my sweatshirt because when you go in and out of, you know, going in and out of doors or whatever, you know, it's, you know, the temperature may range, you know, it's difference in the temperature so I usually take my sweatshirt with me if I--if I'm going to the chow hall or whatever.
So I was coming back up the walk and Officer Wegman

stopped me and asked me--asked to pat me down. So I turned around and raised my hands up for him to pat me down. So he proceeded with the pat down but as he was patting me down, he asked me how I was doing and I didn't respond. The reason why I didn't respond was because I felt as though it was irrelevant as to why he was asking me how I was doing.

And I really didn't--I really--my main focus was to get back to the block and go on ahead about my business. The reason why I was--he said I was tense, the reason why he may have perceived me to be tense was because, I don't know, I mean I'm getting--somebody's putting their hands on me so naturally, you know, my body was tense.

After that, I proceeded to try to walk away and he said stop. I asked you a Goddamn question. I said--I said I didn't disrespect you. I said please don't disrespect me or don't disrespect me. He was like, okay, well, I apologize if you feel as though I disrespected you.

So I proceeded to walk away again. He stopped me again. Get back here I'm not done talking to you. So I asked him what is this abuse of authority under program statement 34-20-09 which is basically--the program statement is the conduct from staff towards inmates and how they're supposed to conduct themselves, and I felt as though he was abusing his authority by continuing to--to badger me unnecessarily.

So--so at that point, you had a question?

Q. Oh, no, I was--well, I was going to ask you at any point did you notice another officer nearby, another correctional officer?
A. I really--I really wasn't--I really was just concentrating on--I know--I know that before I walked away that who I now know to be Officer Longwell had walked up, but I really wasn't paying attention. I was engaged in conversation with Mr. Wegman.
Q. Wegman.
A. Okay. And Officer Wegman--then he told me after I told him--after I spoke about the abuse of authority, he told me, well, go ahead and write it up because I'm going to write you up, a matter of fact go to the lieutenant's office.
Q. And did you respond in any way?
A. I was like--you know, I--you know, I questioned him as to--as to why, you know, why would I be going to the lieutenant's office, but I later thought--I later thought about it and I understand that certain officers are under probationary periods when they first come into the institution and any type of--any type of grievances towards that officer can be damaging to his or her record.
Q. So then did you start to walk towards where you knew to be the lieutenant's office?
A. Well, Officer Wegman said hit the road, Jack and he pointed towards the lieutenant's office. So I turned

around--I started to walk away and I stopped and I turned around, I told him, you're acting like a bitch, and I proceeded towards the lieutenant's office.

Q. Okay. Now when you said that to him, is there another way that you can phrase that so that the jury knows what you were trying to communicate?

A. I was--

Q. Can you explain why you said that?

A. I was trying to communicate to him that he was--well, at this point, I had already tried to deal with--resolve the situation in a reasonable manner that I felt like and he continued to badger me and, you know, ego--I don't--I don't know what--I don't know what it was that--that led him to conduct his self unprofessionally, so that's why--that's when I said that right there. I felt as though he was acting outside of his professional capacity so I told him he was acting like a bitch.

Q. Did he respond to that in any way?

A. He turned and oh, he's cussing--he got on his radio and said, oh, he's cussing me out now and said something on the radio, and I just kept on walking.

Q. Now other than what you just stated, did you hear anything else that either Officer Wegman or Officer Longwell would've--may have said on their radios before you left where they were?

A. No.
Q. To your knowledge, did anybody notify the lieutenant that you were on your way?
A. Yeah--yeah, they--I mean they--they got on--he got on the radio but already I knew that--I already knew that I was being directed to the lieutenant’s office. I--he got on the radio and said something. I believe he was saying go to the lieutenant’s office or--
Q. Not what--
A. --that’s what I assume. When--when they get--when--when officers get on the radio and a discussion with an inmate or whatever is usually a directive to--to--to go to the lieutenant’s office so that’s what I assumed when he got on the radio that’s what he was saying.
Q. Now what was your intention? Did you have an intention as to what you were going to do when you got to the lieutenant’s office?
A. Did I have an intention?
Q. Did you have a plan on what maybe you might say to the lieutenant?
A. Well, I just wanted to explain to the lieutenant about the situation that occurred hoping that he would understand. I mean Officer--Officer Wegman was not working in the block and so I figured it was possible that--that after I explained the situation to the lieutenant that he may send

me on back to the block.

Q. When you arrived at where Lieutenant Jensen was standing--I'm going--I'm going to pull a video up and walk you through your recollection of what happened upon arriving, if I can get it to work here. Okay, Mr. Gore, what I'm doing is I'm playing what we have been referring to or what I've been referring to as the close up video of what happened on July 8th, and this is--this video has been introduced as you know into evidence. And I'm going to now fast forward.

Right now we're seeing a wide angle view and I'm going to bring it forward to the point where we see you and Lieutenant Jensen. Now on this video, we don't see the entire conversation between you and Lieutenant Jensen because at first the video is not directed directly on you and Lieutenant Jensen. But earlier testimony established that there would've been a period of time and you can infer from the video that there was a period of time, and from the other angle during which you and Mr. Jensen were talking.

So now I'm stopping here and through other testimony it's been established that you and Mr. Jensen, from the time you arrived to where Mr. Jensen was up into the point that Mr. Feathers initiated physical contact with you, was about a minute and 24 seconds. And up to this point, I'm just looking over my notes here, but up to this point there was

approximately 30 seconds that we don't see where you and Mr. Jensen were speaking. Do you recall up to this point, just to be clear we're at 2 minutes, 27 seconds into the video so we don't see--Mr. Feathers isn't here yet, so I'm asking you up to this point, do you recall what was said between you and Lieutenant Jensen?

A. When I--when--when I walked up to--up to Lieutenant Jensen, I proceeded to explain what happened at the unit between the officer and I.

Q. Okay. And did you tell him exactly what you testified to here a few minutes ago as to that interaction?

A. Yes, sir.

Q. Was there anything that you told Lieutenant Jensen when you were explaining what happened with Officer Wegman that you left out of your testimony today?

A. No, sir.

Q. How did Lieutenant Jensen respond?

A. When I--Lieutenant Jensen had his hand on his--

Q. Lapel microphone?

A. Right. On his--on his microphone the whole time so as I was explaining to him, it seemed--it seemed as if he already had a preconceived notion that he was going to send me to the hole.

Q. I've got the video stopped and it looks like you're gesturing. Were you assuming a fighting stance?

A. No, sir.
Q. I'm going to continue the video, and at this point, we're about 2 minutes, 37 seconds in and we see Officer Feathers coming up from behind you from your left. Do you see your hands in this video?
A. Yes, sir.
Q. From your recollection and from what you can see in this video, were you balling your hands into fists at this point?
A. No, sir.
Q. You've got your hands to your side and it looks like you're standing straight up at this point.
A. Yes, sir.
Q. Is this--is this stance that you're in right now, do you consider it to be a fighting stance?
A. Not at all, sir.
Q. The day that you were standing there, were you--at this point, were you positioning yourself into a fighting stance?
A. No, sir.
Q. Now at this point when you're explaining to--to Lieutenant Jensen and it is--and you've just testified that it's apparent to you that Lieutenant Jensen has already made up his mind, what was your intention? Before they initiated contact with you, what was your intention to do in response to your determination that they were going to send you to the hole?

A. Just trying to explain my way, you know, try to explain my way out of the situation, you know, because I know that based on--I know--I know that officers are going to take each others--they're going to take each others situations. Well, they're going to take situations with other officers and they're going to support the officer.
Q. So at this point you were not aware of what had been communicated to Lieutenant Jensen during the time that you were walking across the yard to meet him, do you--excuse me, did you? Should I rephrase that?
A. Please.
Q. At the--at the point that we see on the video, nothing had occurred which would allow you to know what if anything had been communicated to Lieutenant Jensen by anyone else during that time that you were walking to meet Lieutenant Jensen? You did not know that anything had been said to him, did you?
A. No, sir.
Q. Were you wondering in your mind maybe what had been said to Lieutenant Jensen about you?
A. Yes, I was.
Q. Were you afraid that perhaps the true nature of your interactions had not been conveyed to Lieutenant Jensen?
A. Yes.
Q. Now I'm going to push play again. We're at 2, 37. I'm

going to push play. Now it looks like you were speaking still to Lieutenant Jensen at that point. Were you saying anything there that you haven't already described here on the stand that would be--that you want to tell me now?
A. Can you--can you--
Q. You want me to rewind?
A. Yeah, just take it back just a little bit from--
Q. I'm going to go back to 2 minutes and 35 seconds. Okay. So can you tell me--you just gestured with your arm, your left arm, is that accurate? Would you like for me to rewind it?
A. Yes, please.
Q. Sure. I'm going to go back to about 2, 37 and I just ask you to watch what's happening on this video. I'm going to stop it. Did you see that you made a gesture with your left arm just then?
A. Yes.
Q. I mean as we look at it--as we look at it on the video, it's on the right hand side but on your body, it would be your left arm.
A. Right. If you--if you can--if you can take--if you can take it back a little bit further, I can explain--
Q. Sure.
A. --that's what I'm trying to say.
Q. Oh, I'm sorry.

A. I can explain what happened.
Q. I'll take it back to 2 minutes and 30. Tell me--tell me if you'd like me to stop at any point so that you can explain.
A. Right now while he's talking to me, he's saying, I don't know how you do it in D.C. or wherever you're from.
Q. I'll note that somehow on the screen there are these red arrows and I--
THE COURT: They can be erased. It's just something that happens when you touch the screen.
MR. FITZWATER: Okay. I just didn't want to confuse either the witness or the jury, Your Honor.
BY MR. FITZWATER:
Q. Okay, so at this point, could you please state--state what you just said, Mr. Gore?
A. When--when Mr.--when Jensen was wave--doing--waving his head like this just now speaking to me, he was saying, I don't know how you do it in D.C. or wherever you're from.
Q. Let me rewind that because I--I don't--you're speaking of just right there?
A. Yes.
Q. The moment right before Officer Feathers arrives?
A. Yes.
Q. Do you know why--strike that--because you don't know. Are you from D.C., Mr. Gore?

A. No, sir.
Q. Had you met other inmates who had been from D.C.?
A. Yes, sir. I already know that--I know that there is--there is a preconceived notion with inmates from D.C. and I believe--I believe the reason why he was asking me was because really--really I didn't know--at that time, I didn't know why he was asking me but in hindsight I believe that he was asking me because of how I was explaining to him what happened and it's a--it's a--it's like a preconceived notion or a--or a category that inmates from D.C. are placed in to where they're considered to be more aggressive inmates, more aggressive than inmates from other states or whatever.
Q. Okay. I'm going to push play. We're at 2, 37 and I'm going to ask you to look at your body language and you gesture with your arm and I'm going to ask you if you can remember what that gesture meant if anything.
A. At the time, I'm telling--was telling him I'm not--I'm not from D.C.
Q. Okay. And then--
A. He said--he said, well, you're going to the hole, and then he got on his radio and said something.
Q. So just before this moment we saw you gesture, were you indicating anything with that gesture? Let me back up. If you can remember, were you indicating anything?
MR. GODWIN: Your Honor, I object. It's been asked

about five times. The witness had plenty of opportunity to tell us whether or not it means anything.

THE COURT: Overruled.

THE WITNESS: I believe--I believe I was just--in frustration--out of frustration just going in--going in that direction because I already knew that he was going--he wanted me in the hole.

BY MR. FITZWATER:

Q. So you were walking towards the hole at this point?

A. Yeah, I was--I was--I think it was just frustration. I think I was just throwing my arm out of frustration that, like.

Q. Okay. And you're walking at this point. Now are you--where are you walking towards?

A. I'm walking towards the direction that they usually take inmates before they send them to the hole.

Q. Okay. So in your mind was it your intent to comply with what you felt was the expectation of the correctional officer at that moment?

A. Yes.

Q. I'm going to push play. Now at this point we're at 2 minutes and 44 seconds into the video. Lieutenant Jensen is raising his right finger and pointing it at you and he's speaking to you. Do you recollect what he was communicating to you with that gesture and with whatever he was saying?

Okay. Now I'm going to push play--

THE COURT: You have to answer out loud.

THE WITNESS: No, I don't.

MR. FITZWATER: Oh, I'm sorry.

BY MR. FITZWATER:

Q. Please answer out loud.

A. No, I don't.

Q. The reason for that, Mr. Gore, is that the court reporter can't record if you shake your head no so we have to have a verbal--

A. Right.

Q. Thank you. Now I'm going to push play. Is there anything you want to add about this before I continue with it?

A. Yeah, I believe--I believe that at some point--at some point in between before Lieutenant Jensen started approaching me, I remember saying--I remember call--I remember saying to him that you're acting like a bitch, too.

Q. Okay, and what--

A. Or something to the nature of--of calling him a bitch.

Q. Okay. And what was your purpose for saying that to Lieutenant Jensen?

A. Because I felt as though after I tried to resolve the situation that started at the unit several times that all of the officers were acting outside their professional capacity

and I knew--I knew that it wasn't--it wasn't a situation with him to where he felt--he felt any type of--it was--it was any emotion or anything dealing with--with this individual right here but I just know he had a--more than likely he had a preconceived notion for sending me to the hole before--before I got up there and that was based on the emotionalism that came from Officer Wegman and I just, you know, I said--I said, you know, that's what I said to him.

Q. Okay. So is it--is it fair to say that you were a little bit frustrated?

A. Yes, sir.

Q. Okay. Was it your intention, given your frustration, to disobey any orders that may have come from Lieutenant Jensen?

A. No, sir. I've been in--I've been in situations like that before and were--were--and verbal exchanges with officers and, you know, the officer may say something to provoke me. I may say something back to him and then I go to the hole. I mean it's happened--it happens all the time.

Q. So I'm going to start the video again and here we see that Officer Jensen is communicating to you. I'm going to push play. At this moment, it appears that you stop and turn towards Officer Jensen. Is that a fair reflection--is that a fair description of what we see at this--at this moment?

A. Yes.
Q. And for the record, we're at 2 minutes and 47 seconds into this video. At this moment, can you tell me if you recall why you stopped and turned back towards Officer Jensen?
A. I really--I really--it's the manner that--the manner that Lieutenant Jensen was--was walking to me in more than anything caused me to turn around. And I--I really--I don't remember him saying anything to me. I just remember the mannerism that he was coming towards me.
Q. Did you feel that--did his actions cause you to believe that he wanted you to stop and--
MR. GODWIN: I object to leading.
THE COURT: Sustained.
BY MR. FITZWATER:
Q. You see that he's pointing here. He's pointing yet again. Were you able--what did you think he was doing when he was pointing just now on this video at 2 minutes and 47 seconds?
A. Honestly I was looking at him. I don't even--I don't even remember him pointing. I remember just concentrating on--on the manner in which--because I'm--because officers don't usually approach you in that manner, but at the same time, I'm thinking in my mind, I just called this man--I just called this man a bitch so and he's coming at me in an

aggressive manner. He pointed at me and then he--and then he pointed somewhere else so whatever I can see it in the video, but I'm concentrated on--on--on what--what exactly it is that--the manner--the manner that he's coming to me in--
Q. Now, at this--
A. --more than anything.
Q. At this moment we can't see your hands. Do you recall whether or not you balled your hands into a fist?
A. No, I doubt it. I don't think so.
Q. Were you--do you recall whether or not at this point you were assuming a fighting stance?
A. No, I wasn't.
Q. Okay. I'm going to hit play again. We're at 2 minutes and 47 seconds. Tell me what just happened on 2 minutes and 49 seconds at this point.
A. Officer Feathers--I felt Officer Feathers grab me around my waist. You can see he didn't grab me--he didn't grab me around my right arm right there. His arm is around my waist. And at this point, I don't know--I don't know what--I don't know what their intention is, what they're doing because I've, you know, I've never been in this situation. I have never been in the situation where officers grab me like that.
Q. Okay, I'm going to push play again. It appears as though you've fallen to the ground there. Is that a fair

representation of what we see?
A. Yes.
Q. Of what we just saw?
A. Yes.
Q. Do you recall how it was that you ended up falling towards the ground?
A. I remember--I remember falling backwards.
Q. But do you recall whether that was--can you recall if it was through the actions of any one of the three individuals which caused you to go to the ground?
A. It was--well, Officer Feathers grabbed me around my waist and was--and was--and was pull--and was pulling me and like he was trying to lift me up in an aggressive manner. And he fell--he fell back on the ground. I fell back on top of him.
Q. Before Officer Feathers grabbed you from behind, had he said anything to you?
A. No, sir.
Q. Had Officer, excuse me, had Lieutenant Jensen said anything to you which would indicate or which to instruct you to allow yourself to be placed in restraints?
A. No, sir. There was no--there was no verbal--there was no verbal instruction before--before they physically contacted me or reached out and grabbed me.
Q. Have you ever been in a situation where the guards asked

you to allow yourself to be placed in restraints for any reason in the past?
A. Yes, I have.
Q. And on those occasions, had you been given any kind of verbal communication from--from anyone before they placed the restraints on you?
A. Yes, they--they usually--they might say, turn around, put your hands behind your back or if you're close to an area where there's a wall, put your hands on the wall or--no, but usually the standard procedure for--for areas that--that I've seen for several years, the standard procedure for--for putting--placing restraints on inmates is they tell you to turn around, put your hands behind your back.
Q. Had--
A. Or put your hands up.
Q. Had either Officer Feathers or Lieutenant Jensen instructed you in any way to allow yourself to be restrained what would you have done?
A. I would've--I would've complied just like other circumstances.
Q. Okay, I'm going to push play again. It's 2 minutes--we're starting now at 2 minutes and 52 seconds. At this point, the screen is not showing any--any persons. It's showing the concrete but it will focus in almost immediately. Okay, I just backed up. I'm at 2 minutes and

55 seconds. I'm going to play it again. I'm just going to ask you to watch this, Mr. Gore, for a moment please. Okay. What just happened, Mr. Gore?
A. I was just--I was just pulled to the ground and I think--I think Feathers' head--Feathers' arm was around my neck or something and I just fell back to the ground.
Q. Okay. I'll push play again. Now we're at 2 minutes and 55 seconds. Do you see anything here that you'd like to make a note on?
A. Well, at this point, I really--I really--I really didn't know, you know, this is--this is outside--this is outside of the norm right here as far as--as far as things that I've seen in prison and as far as concerning officers, but I mean right now--right now I'm in position where I feel--I feel threatened. I'm--I'm panicking. I feel threatened right now at this point.
Q. In your experience--and you mentioned a minute ago that you've been an inmate for seven years, is that correct?
A. Yes, sir.
Q. In that time in your experience as an inmate, did anything in your past experience contribute to the fact that you were--you described this as out of the norm and you described yourself as panicking here?
A. Well, I've seen--I've seen--I've seen incidents where inmates--inmates were in situations or--I more--I more

heard--I really heard of incidents where inmates were in situations with the guards where they would--they were--they've lost teeth. And I know--I know sometimes--I've known officers--I've seen it before, officers that offer inmates up for--offer inmates up--I mean basically offer the inmates to a fight, put their radio down, and offer the inmate to a fight. And that's--and that's--I guess that's--that's because--that in cases where the officer feels as though the inmate is disrespecting--being disrespectful--

MR. GODWIN: Your Honor, I'm going to object. I think he started out by saying what was in his mind but now I think he's giving a rendition of his view of corrections officers.

THE COURT: I'm going to sustain that objection on the basis that there--this is no longer relevant to what happened on July the 8th of 2007.

BY MR. FITZWATER:

Q. Mr. Gore, let's move on. We're at 2 minutes and 57 seconds. I'm going to push play. Okay, Mr. Gore, we're now at 3 minutes. Right before I pushed stop, it appeared to me that you swung a--swung a punch. Do you agree with that description of what just happened?

A. Yes, sir.

Q. Can you tell me why you threw that punch?

A. I threw the punch because I felt--I felt--I was

panicking. I felt as though I was being--I was being unnecessarily abused.

Q. And what was involved with your fear that you were going to be--that you were being unnecessarily abused? Why did that cause you to panic?

A. Because I--because like I just got finished saying before the objection, I've been--I've seen things and I've been in experiences myself, not--not in prison, but before prison where, you know, I was--I was in physical altercations with people. Sometimes it was more than one person against me and so forth so now all I'm thinking is I've got to do something.

Q. And what--what was the reason that you felt it necessary to do something? What would--what would happen in your mind if you had not done anything?

A. I thought as though I was going to be unnecessarily abused. That I was going--that I was going to sustain some type--some type of serious damage.

Q. I'm going to push play and we're going to watch the rest of this altercation. Okay, now we just saw several--several punches that you threw. Do you know whether any of those punches--let me restate that question. Do you know how many of those punches connected with another person?

A. I thought--I thought it was four. I thought--really, I thought it was only four punches that I had threw but I

guess in the heat of the moment, it was more than that.
Q. Do you know--did you know at the time--
A. No, sir.
Q. Okay. And now I'm asking you did you know of the punches that connected, did you know who--who they connected with at the time?
A. Yeah, I knew--yeah, I know they were connecting with the person that was above me or that was on top of me at the time who was Lieutenant Jensen.
Q. Were you injured in this scuffle?
A. Yes sir.
Q. Can you describe the injuries that you received?
A. I had two contusions on my--on my upper right arm. My left arm was--was scraped. I had--I had an abrasion on my nose that I sustained at some point and I had some hair that was ripped out of the back of my head.
Q. Do you recall if any pictures were taken of your injuries?
A. Yes, sir.
Q. Do you know what happened to those pictures?
A. No, sir.
Q. Have you seen any of those pictures since the day that they were taken?
A. No, sir.
Q. There's been some testimony regarding an ID card.

A. Yes, sir.
Q. In your experience in seven years as being an inmate, do inmates usually carry their ID cards with them?
A. No, sir. That's--that's--inmates--I would say out of 1800 inmates on the compound, 1600--if it's 1800 on the compound, at the time 1600 of them don't have their ID cards. That's just something that was said.
Q. Have you ever received a disciplinary action because you did not have your ID card on you in the past?
A. No, sir.
Q. To your knowledge from seven years of experience with the Bureau of Prisons as an inmate, has anyone that you've personally known been reprimanded or received disciplinary action for failure to have their ID on them at any given time?
A. No, sir. On--no, sir.
Q. Do you recall how many days after this incident occurred that you spoke with Brian Fox even if it's approximate?
A. Approximately two days.
Q. And were you willing to speak to Mr. Fox about the situation?
A. Yes, sir.
Q. Can you tell me why?
A. Because I felt--because I felt as though the situation was a situation that occurred due to staff and the excessive

force that they used.
Q. Before you were--immediately before, and I don't think I asked you this question, so immediately before Officer Feathers grabbed you from behind, immediately before that, I'm talking in instances immediately before, did you clinch your fist or take a fighting position or a stance?
A. No, sir.
Q. Was it your intention at any time before your being taken to the ground to enter into a physical altercation with any of the correctional officers?
A. No, sir. If it was, I wouldn't have waited until they got me on the ground.
Q. When you were panicking and throwing punches, did you have a specific intention as to what you were trying to accomplish in that moment?
A. I was trying to get the officers off of me. I was trying to get the people off of me because I didn't know what their intentions were.
Q. Had you ever suffered injuries such as the ones that you described just a few moments ago?
A. Yes, sir, I can--I can remember on occasions on the streets when or on one or two occasions on the streets where when I was--when I was in the streets where I ended up with much worse, looking much worse after that. I mean with worse bruises and things like that.

Q. If the officer had asked you to place your hands on the trash can, excuse me. If Lieutenant Jensen had asked you to place your hands on the trash can, would you have done so?
A. Yes, sir.
Q. And if he had not asked you that but had asked you to go towards the lieutenant's office, would you have done so?
A. Yes, sir.
Q. So if either one of those questions had been asked of you, you would've complied?
A. Yes, sir.
Q. Were either one of those questions asked of you?
A. No, sir, none.
MR. FITZWATER: I have no further questions, Your Honor.
THE COURT: Cross-examination.

CROSS EXAMINATION

BY MR. GODWIN:
Q. Mr. Gore, you have some experience as an inmate. I think you said seven years.
A. Yes, sir.
Q. So you know the rules. You know the set up that you have to obey the officers, right?
A. Yes, sir.
Q. You were asked by your counsel if you'd ever had disciplinary actions for an ID card violation and you

indicated you had not. Do you recall that?
A. You said an E card.
Q. An ID card is what I meant to say, identification card.
A. Yes.
Q. You've never been cited for that?
A. No, sir.
Q. But you have had disciplinary actions regarding insolence and disobedience, haven't you?
A. Yes, sir.
Q. So even to the disciplinary process, you've--you've had experience with the fact that you have a duty to obey these officers whether you like it or not, don't you?
A. Yes, under--yes, I did. Requests are reasonable--commands are reasonable, yes, sir.
Q. Reasonable in your mind?
A. No, reasonable--reasonable within the guidelines of the program statement.
Q. And when Mr. Wegman asked you if you were okay, that was an unreasonable question in your mind?
A. When Mr. Wegman asked me was I okay, I mean I didn't feel as though that was a reasonable question. It had nothing to do with--with duty.
Q. So you're going--
A. With his duty.
Q. You're going to comply to anything that you agree was an

okay thing to be asked of you. Otherwise you just want to be left alone?

A. No, I'm going to agree with the--with the commands that are issued from--from without of the program statement, sir.

Q. The officer had to ask you three times what your name was before you told him. Do you agree that that was disobedient behavior by an inmate?

A. The officer never asked--never asked me my name, sir, three times.

Q. Do you recall cursing at the officer other than calling him a bitch?

A. No, sir.

Q. Okay. Now you were angry on this day, were you not?

A. Yes, sir.

Q. And at what point--

A. I was--I was angry as the situation--

Q. Uh-huh (yes).

A. --progressed, yes.

Q. At what point did you get angry?

A. When Officer Wegman insisted on badgering me.

Q. Okay, when you felt as though he was badgering you that made you angry. Is that what your testimony is?

A. No, when Officer--when Officer Wegman--I became angry when Officer Wegman badgered me.

Q. Okay. And were you still angry when you first

approached Lieutenant Jensen?
A. To a degree, yes.
Q. And then you become even angrier as you talked to Lieutenant Jensen and you decided he--he was just going to put you in the hole any way?
A. I mean I don't believe I became any--any angrier. I, you know, I really would say agitated more than anything. I mean it's not the first time I've been through that as far as verbal altercations with staff members and then going to the hole, so I already understand what it is.
Q. But you got angry with the way Mr. Wegman was asking you questions that you didn't want to answer, right? Is that--that's right?
A. To a degree, yeah.
Q. But you're saying that Mr.--or the lieutenant who you didn't think was listening to you and assumed you were from D.C., that he didn't make you angrier?
A. Not really. My main thing was just to assert to him that I wasn't from D.C.
Q. Now you said that you panicked and that's your explanation for why you pounded Lieutenant Jensen's face when you got on the ground, do you recall that? I think you said that in writing and you also said it here.
A. Yeah.
Q. Now panic is a--is a function of fear. You're saying

you were--you just were so afraid you had to do this?

A. I felt as though it was--really I--really I didn't--I wasn't--I wasn't even thinking at the time. It's just--I felt--I felt--I felt I was panicking and I felt as though the force was excessive and that's why I reacted the way I did.

Q. You reacted with force because you thought that their--that you didn't agree that they should've treated you like that, right?

A. Yes.

Q. And you were angry at the time, weren't you?

A. Not any--not any more--it--it wasn't a thing about anger.

Q. Isn't it--isn't it more correct to say that at the time you didn't panic, you just lost control of yourself because you were so angry at these men? Isn't that more correct?

A. Emphatically no.

Q. Now did you think these men were going to kill you?

A. I felt as though--I felt as though--I felt the serious threat. I felt threatened seriously by these officers.

Q. I asked you--

A. No.

Q. You know that these officers are going to lose their jobs and may be prosecuted if they beat you up unnecessarily, don't you?

A. I don’t--I don’t--honestly I don’t know that.
Q. And you just thought they were going to beat you up out there in the middle of the yard with all those witnesses, the other officers, and all the inmates milling around. Is that what you’re trying to say?
A. It’s happened before.
Q. I didn’t ask you that. I asked you did you think that they were just there taking you down to beat you up in front of all those witnesses?
A. Actually I didn’t take any of that into consideration at the time, sir.
Q. That’s right. You didn’t because really the reason you acted this way is because you were so angry, isn’t that correct?
A. Emphatically no, sir.
Q. Is it your testimony that Lieutenant Jensen, while he’s pointing and while he’s moving his lips as we can see on the video, that he’s not telling--he’s not giving you any commands?
A. You mean when---when he was pointing at me, sir? Like I said I was--I was focused on the manner he pointed at me. I saw that on the video. I was focused on the manner in which he was coming at me, sir.
Q. We can also see on the video that he’s speaking or at least he appears to be speaking. He’s moving his mouth as

if he’s speaking. Now what was he saying?
A. You just asked me that.
Q. Do you know what he said?
A. Like I said, sir, I was--I was focused on the manner in which Mr. Jensen was coming at me, not--not necessarily on the what he was coming at me, he pointed at me, like we see on the video. Then--then he--that’s all--that’s what I’m seeing on the video but I was focused on the aggressive manner in which he was coming towards me, sir.
Q. So let me make sure I understand your answer then. Your answer is no, you don’t know what he said?
A. No. Yes, yes, I don’t know what he said.
Q. So as far as you know he did tell you to go over and put--put your hands on the can?
A. Sir, like I said, I was--I was focused on the way--on the manner in which the officer was coming at me. That--you know, I didn’t hear anything that to notice that he was telling me to go stand--place my hands on the trash can or…
Q. So I guess what you’re really saying is you were so out of sorts at that point that you weren’t even paying attention to what he was telling you, is that right?
A. Well, sir--well, sir, it’s clear--it’s clear that--that Lieutenant Jensen is saying that he wanted me to place my hands on the trash can but Lieutenant Feathers is saying that he wanted me to go to the lieutenant’s office anyway.

I'm not sure just like they're not sure what--what exactly went on at that moment.
Q. But you are sure that whatever they said it was your duty at that time to do what they told you to do, aren't you? You know--you know that, don't you?
A. Yes, sir.
Q. And you know--and now in your recollection, what you can remember back about that, all you can remember was you didn't like the way he was pointing his finger and that's all you could focus on?
A. I wasn't even focused on his finger. Like I said, I saw that on the video. I was focused on the manner in which the individual was coming towards me, sir.
Q. I take it from your direct examination that standing up for yourself and physically fighting has been a part of your life for some time, hasn't it?
A. Yes, sir.
Q. Now one other area, did you use the word disrespected when you were talking to Mr. Wegman?
A. Yes, I did.
Q. Now that term disrespected is an important term on a prison's ground, isn't it?
A. Yes, it is.
Q. You cannot allow yourself to be disrespected by an officer or another inmate and be--and let that be seen, can

you?
A. It’s not--you can but I mean it’s--it’s not good to.
Q. It’s a--it’s an indication of weakness which other inmates will act upon, isn’t that correct?
A. Yes, that’s--yes, that’s correct.
Q. The term has been said here and I can’t remember exactly who said it but about saving face. That’s a related thing, right? You have to have save face in these kinds of incidences, don’t you? Out of your own defense. I mean to maintain your position on the compound.
A. I mean the first rule of--first rule of nature is preservation, sir, self-preservation.
Q. And a part of that in a prison is saving face, isn’t it?
A. Can you define saving face?
Q. Well, maintaining--maintaining so that other inmates don’t think that you’ve shown weakness.
A. I would just say that--I mean, yeah, I guess--I guess--I would just say it’s standing up for yourself, but I guess the terminologies coincide.
Q. And that’s another aspect of when you actually fight with a guard you’re showing the other inmates you’ll stand up for yourself, won’t you?
A. Well, I mean regardless, the officers control the prison so it’s--it’s going to be incidences where officers they make comments towards inmates, there’s going to be

incidences where officers make disrespectful comments towards inmates and it depends on--I mean it depends on an inmate how they react to it.

Q. But standing up to the officers, whether it be Officer Wegman or these officers Lieutenant Jensen and Officer Feathers, standing up to officers is a way that you maintain your status as a strong person on the prison grounds, isn't it?

A. I would say--I would say--I would say that allowing yourself or--I would say that--that in--on prison grounds that individuals should conduct themselves in a way that people don't disrespect them if possible and deal with the situation to where the other party is not injured as far as ego to the point where they may want to do something to you or whatever. They want--they may want to bring you some type of harm. I would say that it's a way that you should conduct yourself to where you shouldn't be disrespected or--or try to prevent the disrespect of yourself.

Q. Isn't it true that the standing up to the officers and in your mind not letting them push you around was just a part of your maintaining your position as a strong person on that campus?

A. Sir, all I wanted--all I want to do--when I'm--when I'm on prison grounds, the only thing I want to do, sir, is just go about my business without any type of friction, without

any type of altercation with anybody on an every day basis.

Q. If that's the case why didn't you just tell Officer Wegman you're okay and go on to your bunk?

A. Sir, I wish I did tell him that.

Q. But you knew that these officers had no reason to want to hurt you, didn't you?

A. How am I supposed to know that, sir?

Q. Well, the officers are there, aren't they, to protect everybody, to enforce the rules?

A. Sir, you got like--like I just spoke on before, sir, you got officers that will--that will offer you to a fight. They'll take the walkie talkie off because they want--because they want to maintain what you say is a level of respect. They don't want--they don't want anybody to disrespect them so they'll take the walkie talkie off and so their intention--the intention is unclear when in a prison environment as to any type of aggression that any--anyone may confront you with whether--whether it be inmate or whether it be officer.

Q. But none of--

A. Realistically.

Q. --neither of--none of these officers did anything like that, like take their equipment off or go behind the building or even--even make any kind of remark to you like they were going to get you or anything. They didn't do

anything like that, did they?
A. No, sir, but--
Q. You had--you had no reason to believe they were going to do anything other than what correction officers are supposed to do and that's maintain order.
A. They were coming at me in an aggressive manner so I had--I had no understanding of what they were--what their intent was.
Q. Let me show the video here. Actually we'll just look at this still. That--that's you down at the SHU area. Do you recognize that, all the officers there around you?
A. Yes, sir.
Q. Now when you're here, there's a recreation area--fence right here where my cursor is, do you agree with that?
A. Yes, sir.
Q. Now when you were here, did you not make a statement to these inmates over here that were watching?
A. No, sir.
Q. Did you not tell them that this is the way we do it?
A. No, sir.
MR. GODWIN: I have no other questions, Your Honor.
THE COURT: Redirect.
MR. FITZWATER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. FITZWATER:

Q. Mr. Gore, did--did you panic and start throwing punches because you were afraid of losing respect or because you were afraid of being seriously injured?

A. Because I was afraid of being seriously injured, sir, as I've testified to before.

Q. Thank you, Mr. Gore.

MR. FITZWATER: No questions--no further questions, Your Honor.

THE COURT: All right, is there anything further, Mr. Godwin?

MR. GODWIN: No, Your Honor.

THE COURT: Mr. Gore, thank you. You may step down and return to your seat.

THE DEFENDANT: Yes, ma'am.

(Witness excused from stand)

THE COURT: Mr. Fitzwater, you may call your next witness.

MR. FITZWATER: Your Honor, I have no further witnesses or evidence to produce.

THE COURT: All right. The defense has rested. Ladies and Gentlemen, I think this is an appropriate time to take the mid-afternoon recess. I'll be able to ascertain if the Government intends to put on a rebuttal case. And when you return to the courtroom, I'll be able to direct you further. Please don't discuss the case among yourselves

during the recess.

(Jury out at 3:02 p.m.)

THE COURT: Mr. Godwin, does the Government intend to put on any witnesses in rebuttal?

MR. GODWIN: Your Honor, I would like to call one brief witness. The rebuttal goes to the last matter of whether or not a statement was made by the defendant. It would be relevant to his credibility but also on a matter that would be relevant to his intent.

THE COURT: All right, Mr. Fitzwater, do you know who this is? Has--

MR. GODWIN: It's Officer McCoy. It's one of the--one of the officers that had been subpoenaed before by the defendant.

MR. FITZWATER: Your Honor, I--I understand why Mr. Godwin is calling Mr. McCoy.

THE COURT: All right. Before we get into that, is there--since it's a limited issue of rebuttal that is going to credibility and the issue of intent, but not everything else, I think we might as well take a motion, if the Government is intending to make one, with regard to the availability of the self defense justification in this case.

MR. GODWIN: Your Honor, I still don't think it's available to him. I don't think there's a showing of any kind of deadly and serious force being used against the

defendant. There's no--

THE COURT: So you're saying there's an absence of evidence--

MR. GODWIN: Absence of evidence. The only thing there is that comes close is he said, actually upon being led, he said, "I was afraid they were going to seriously injure me." His bold statement of that is the only thing that comes close to being relevant to that issue.

THE COURT: Okay. Mr. Fitzwater.

MR. FITZWATER: Your Honor, I believe Mr. Gore's testimony is sufficient to at least allow the question to go to the jury. Mr. Gore testified to what goes on in a prison environment. I thought his statements on--on cross with regard to the intention is unclear in a prison environment and if somebody jumps you, whether it's guards through inmate interaction or the other way around, he testified that guards have been known to challenge inmates to fights. He testified he was willing to obey the commands of the officers. They jumped him and he panicked and responded. I think that the jury should be allowed to decide.

I understand we're going to argue over what the instructions are and I understand that based upon the Court's previous statements that the instruction that the Court is going to ultimately give to the jury will make it difficult for Mr. Gore to prevail, but I don't believe that

the evidence is such that he shouldn't--that the jury shouldn't at least be given the opportunity to make their determination.

THE COURT: All right. The--I think if I rephrase it, the question is whether the defendant has raised a colorable claim of self defense justification under the standard that I earlier indicated to the parties I would apply in this case. And just to remind the parties that it is a very narrow set of circumstances in which the self defense justification is available in the prison environment and that is when an inmate confronts a situation where he reasonably fears present or imminent, serious bodily injury or death from the use of unlawful or excessive force by the correctional officers.

The question is coessentially a factual one and I can't say in this circumstance that as a matter of law I can take that away from the jury. I am going to allow that defense under those limited circumstances to carry to the jury and we'll have to talk about the instructions. You already have the charge in front of you and I've indicated that if we finish sometime after 3 o'clock today, we'd be going--the jury would go home early and we'd take this up with a charge conference this afternoon and then argue the case tomorrow morning. So we'll have a chance to do that this afternoon.

Now I do want to raise one thing with both of you

because I feel almost certain we're--eventually we're going to get a question from the jury if we don't clear up an issue for them and maybe you have anticipated what it is. But Mr. Gore has referenced the program statement of the Bureau of Prisons, 34-20.09 I think is what the number is which he called staff inmate program statement on--I couldn't tell whether it was just how staff's to conduct themselves vis a vis inmates or whether it's both or what.

MR. FITZWATER: If you'd like, Your Honor, there are at least seven bullet points that the program statement--

THE COURT: No, no. I'm just saying there's no evidence in this case right now, other than Mr. Gore's statement and what--and the reason I'm mentioning it, I'm not saying either side has to do anything, but I think it's going to be a real shame if we get into jury deliberations and we get a question, can we see a copy of the program statement 34-20.09? And I don't know whether the parties would like to discuss this during the recess and let me know if by stipulation you just want to put it into evidence or not. Okay. And I'm not suggesting anybody has to do anything. I just want to warn you to think about it because I foresee a possible question from the jury during deliberations. Let's take a ten minute recess. Okay.

(Recess from 3:09 p.m., until 3:20 p.m., 11-29-2008)

THE COURT: Thank you. Did I give you enough time to resolve the issue?

MR. GODWIN: Yes, Your Honor. We've agreed by stipulation to put it into the record.

THE COURT: I think that's the right result. Okay. Given that both sides addressed it and you're in rebuttal but not on this issue.

MR. GODWIN: What I have is a printout. It's a public document. This is a printout from the public website.

THE COURT: Okay. If--if you give it to me, I will tell the jury that you're preparing a stipulation that we'll make part of the record and that this will be in the record.

MR. GODWIN: Could I just move its admission during my case in rebuttal--

THE COURT: Do you want to jointly move its admission?

MR. GODWIN: --and then jointly move its admission?

THE COURT: That'll be fine. I mean technically you both rested your cases in chief and the rebuttal doesn't go to that issue so that's why I was suggesting that there be, but joint--a joint motion takes care of that matter.

MR. FITZWATER: I personally would prefer it if we would allow the Court to announce its existence and the fact that we've both stipulated. The reason for that is, Your

Honor, I don't want the jury to infer that--that--

MR. GODWIN: That I'm a nicer guy than you?

MR. FITZWATER: Well, not so much that but I don't want--I don't want the jury to draw any inference that well, he's the one standing up with this document and he wants us to see it, therefore it must be something--

THE COURT: I'll just tell them that during the break you both jointly moved for its admission and I'm admitting it as Joint Exhibit Number 1. How's that?

MR. FITZWATER: That's fine. Thank you, Your Honor.

THE COURT: Okay. Actually here's what I'm going to do, you should move in front of the jury. I'm just going to have you both jointly move its admission. Okay. Thank you. Let's bring the jury in. I'll call on each one of you.

MR. FITZWATER: I'm sorry, Your Honor?

THE COURT: I'm calling on each one of you. Is there--I understand there might be a joint motion and then I'll ask you two just to stand up.

MR. FITZWATER: All right, thank you.

MR. GODWIN: What's the number for the--

THE COURT: Joint Exhibit Number 1. After you rest--is there going to a sur-rebuttal?

MR. FITZWATER: I don't believe so, Your Honor. I

mean possible I may call Mr. Gore briefly. He's already--

THE COURT: Yeah, he's already.

(Jury in at 3:22 p.m.)

THE COURT: Ladies and Gentlemen, I think I can say with some assurance that you'll be leaving early this afternoon but there is a rebuttal case of the Government. But before we get to the rebuttal case, I'm advised by both Mr. Godwin and Mr. Fitzwater that they have a joint motion and it relates to the document to which reference was made during the testimony of Mr. Gore. So I'll hear first from Mr. Godwin and then from Mr. Fitzwater.

MR. GODWIN: Your Honor, I move, along with the defendant to admit the public statement 34-20.09. It's been referred to in the testimony so that it will be available for the jury if they're concerned with what its content is. The document that has been provided is a public document that was retrieved from the public website.

THE COURT: All right, Mr. Fitzwater.

MR. FITZWATER: Your Honor, I jointly move with the Government and believe that the--this document is going to help the jury.

THE COURT: All right. The Court grants the motion and admits what I'm going to call Joint Exhibit Number 1 and that's going to be a public document, what is it 32--

MR. GODWIN: 34-20, Your Honor.

THE COURT: 34-20.09 which is the program statement of the BOP, correct?

MR. GODWIN: Yes.

THE COURT: Okay. Thank you.

(Joint Exhibit Number 1 admitted.)

THE COURT: Now does the Government have a rebuttal case?

MR. GODWIN: I call Christopher McCoy.

THE COURT: All right, Officer McCoy. Good afternoon, sir, would you please approach the Clerk who will administer the oath to you before you take the witness stand?

CHRISTOPHER MCCOY, GOVERNMENT'S WITNESS, SWORN

THE CLERK: Thank you, you may take the witness stand. The witness is Christopher McCoy, M-c-C-o-y.

DIRECT EXAMINATION

BY MR. GODWIN:

Q. Mr. McCoy, where do you live?

A. I live in Parkersburg, West Virginia.

THE COURT: All right, Mr. McCoy, you need to speak in a loud, clear voice into the microphone, sir.

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

BY MR. GODWIN:

Q. And how are you employed?

A. I work for the--for the prison in Gilmer County.
Q. An employee of the Bureau of Prisons?
A. Yes, ma'am. Yes, sir.
Q. And did you work there in July of this year?
A. Yes, sir, I did.
Q. And what is your position there?
A. I'm a recreation specialist.
Q. All right, just briefly, what are the duties of a recreation specialist?
A. I oversee inmates during sports tournaments, when they're out on the rec yard with their activities there.
Q. Okay, I want to show a scene from a prison camera that's been admitted as part of the Government's Exhibit Number 1. Do you recognize that scene?
A. Yes, I do.
Q. What is that?
A. That is--at the bottom of the screen is the recreation yard. The structure in the middle of the screen is the rec shack where the inmates enter and leave the recreation area.
Q. Okay, I'm going to begin playing it. Do you recall these events of last July?
A. Yes. Yes, I do.
Q. And is this you running across--
A. That is me, yes.
Q. And you may recall there were some events there at the

shack concerning the defendant, Mr. Gore?
A. Yes.
Q. Now were you one of the officers that assisted in escorting him out?
A. Yes. Yes, I was.
Q. I'm going to advance this several minutes. Do you recognize here that--what's happening?
A. Yes, that's when we were escorting him to the special housing unit.
Q. Where is the special housing unit?
A. It's further to the left.
Q. Right here off the screen?
A. Yes, that's about right.
Q. Now what--is this part of the recreation yard?
A. Yeah, that's part of the recreation area there.
Q. And who are these people?
A. Those are inmates.
Q. Okay. Now if you'll bear with me, I want to switch to the other video for just a second. Do you recognize that scene?
A. Yes. Yes, I do.
Q. And what is that?
A. That is us where we were escorting Mr. Gore to SHU, special housing unit. We had to stop and wait for them to remove the lunch carts out of the--the area in front of the

door to go into the special housing unit. We stopped right there briefly.
Q. Where is the door to the special housing unit? Is it under this canopy?
A. Yes, that's--that's exactly where it's at there.
Q. Okay. Now is this pretty much the same position that we just saw the group of you officers and Mr. Gore a minute ago from the other perspective?
A. Yes, that's correct.
Q. Now as I recall you were the man that was in the shorts?
A. That was--yeah, that's correct.
Q. So that rec tent is right here off the screen?
A. Yes, sir.
Q. Okay. Now when you got to this point, do you recall Mr. Gore saying anything to--
A. Yes.
Q. --the inmates?
A. Yes, I do. He stated or actually he yelled that, that's how you get things done around here, something to that effect.

MR. GODWIN: I have no other questions, Your Honor.

THE COURT: Cross-examination.

MR. FITZWATER: Yes, Your Honor.

CROSS EXAMINATION

BY MR. FITZWATER:

Q. Mr. McCoy, my name is Travis Fitzwater and I represent Mr. Gore in this case. Are you sure that you heard Mr. Gore make a statement when you were taking him to the special housing unit on July 8th?
A. Yes. Yes, I am.
Q. Do you recall giving a signed statement on July 8th after the event occurred?
A. Yes. Yes, I did.
Q. And that statement was addressed to the operations lieutenant, Jesse Bell?
A. Correct.
Q. And did you have an idea of what the purpose of giving that signed statement was?
A. Yes. It was to report the incidents that had occurred.
Q. Did you believe that it was important that you record accurately what you knew about the incident?
A. Yes, I do.
Q. And isn't it true that your statement made on July 8th, the same day that this incident occurred, makes no mention of any kind about any statement made by Mr. Gore?
A. That is correct.

MR. FITZWATER: No further questions, Your Honor.

THE COURT: All right, any redirect?

REDIRECT EXAMINATION

BY MR. GODWIN:

Q. Officer McCoy, were you later interviewed by the agent here, Mr. Fox?
A. Yes, I was.
Q. And in response to his questions did you tell him about this statement?
A. Yes, I did.
MR. GODWIN: I have no other questions.
THE COURT: Further cross?
MR. FITZWATER: Yes, Your Honor.

RECROSS EXAMINATION

BY MR. FITZWATER:
Q. Mr. McCoy, do you recall when you gave that statement to Mr. Fox?
A. The exact date, no, I'm not sure exactly when that was. I do remember the event.
Q. If I were to show you the statement prepared by Brian Fox as a result of that interview, would it refresh your recollection as to that date?
A. Sure.
MR. FITZWATER: Your Honor, may I approach the witness?
THE COURT: You may approach the witness.
BY MR. FITZWATER:
Q. You can review this and just let me know when you're done.

A. Okay.
Q. May I have that document? Mr. McCoy, after reviewing this statement, is your memory refreshed about the day on which you met and gave a statement to Mr. Fox?
A. I did not focus on that, sir. I'm not sure exactly the date.
Q. Would you like to see it?
A. Yes, please, sorry.
Q. No problem, take your time. After looking at the statement, does that refresh your memory about the date on which you met Mr. Fox and gave a statement?
A. Yes, sir.
Q. And what date would that have been, sir?
A. 7/24/2007.
Q. So on the 24th, does this statement contain--do you recall making a statement on the 24th about something that Mr. Gore may have said when you were taking him into the special housing unit?
A. Yes.
Q. But you did not make a statement on the 8th, on the same day that it happened. You did not make a reference in your statement on July 8th that Mr. Gore had made a statement, is that correct?
A. That is correct.
MR. FITZWATER: No further questions, Your Honor.

MR. GODWIN: Your Honor, just briefly to clear up a little, can I just ask--

REDIRECT EXAMINATION

BY MR. GODWIN:

Q. I'm going to hand you the same document that was--that you just reviewed. The date at the top is 7/24/07. What does it say beside it?

A. Date of transcription.

Q. Down here where it says--it says investigation on, what date is that?

A. 7/16.

Q. So this interview most likely was about a week after the assault, is that right?

A. Correct.

Q. Now when you wrote your statement, did anybody ask you about this statement that you heard? When you wrote your statement for the SIS, was there any--the issue of his statement later on never came up, did it?

A. No.

Q. But the officer asked you about it, didn't he?

A. Correct. Yes.

MR. FITZWATER: I'm finished, Your Honor.

THE COURT: All right. Mr. Fitzwater.

RECROSS EXAMINATION

BY MR. FITZWATER:

Q. Mr. McCoy, in between July 8th and July 16th, the dates of the two statements, did you discuss this incident which occurred with Mr. Gore with other persons?
A. Yes.
MR. FITZWATER: No further questions, Your Honor.
MR. GODWIN: I have no other questions.
THE COURT: All right. Thank you, Mr. McCoy. You may step down.
(Witness excused)
MR. GODWIN: Your Honor, I rest in rebuttal.
THE COURT: Thank you. Is there any sur-rebuttal?
MR. FITZWATER: No, Your Honor.
THE COURT: All right, Ladies and Gentlemen, that concludes the evidence in the case.
(Testimony was concluded at 3:37 p.m., 11-29-2007)

CERTIFICATE

I, Linda L. Bachman, Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct partial transcript of the proceedings had in the above-styled action on November 29, 2007 as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 20th day of August, 2008.

_____/s/ Linda L. Bachman _______
Linda L. Bachman, CCR, CVR
Official Reporter, United States
District Court for the Northern
District of West Virginia